UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
..................................................................................................x
UNITED STATES OF AMERICA,


  – against –                                                    No. 82 CR 312

MUTULU SHAKUR                                          Judge Charles S. Haight Jr.
                      Defendant.
..................................................................................................x



**<u>EMERGENCY MOTION FOR REDUCTION IN SENTENCE</u>**

**<u>EXPEDITED BRIEFING AND DISPOSITION REQUESTED</u>**

     Mutulu Shakur, by and through undersigned counsel, hereby files this Reduction in

Sentence pursuant to 18 U.S.C. 3582(c)(1)(A).

**TABLE OF CONTENTS**

I.     INTRODUCTION……………………………………………………....1

II.    PROCEDURAL HISTORY……………………………….…………1

III.   APPLICABLE LAW…………………………………………..…..…3

IV.    ARGUMENT……………………………………………………...4

    **a.  Mr. Shakur Faces Extraordinary and Compelling Circumstances Justifying Compassionate Release**………………….……………..…………………5

        i.   Mr. Shakur's medical condition, and his advanced age, and BOP's multi-year delay in diagnosing and treating his cancer establish an "extraordinary and compelling" circumstance…….…………………5

        ii.  COVID-19 is an extraordinary circumstance, especially when combined with the risk of death Mr. Shakur faces due to his age and medical condition………………........................................................7

            1.  Mr. Shakur's continued incarceration places him at increased risk of contracting COVID-19………………………………….7

            2.  Mr. Shakur's age and underlying health conditions place him at extraordinary risk, should he contract COVID-19……………...11

            3.  BOP shackled Mr. Shakur to a bed for nearly two months and cut him off from contact with his family, friends and his lawyers…14

    **b.  Mr. Shakur Should Be Granted Compassionate Release Because He Poses No Danger** …………………………………………………………...15

        i.   Nature and Circumstances of the Offense……………………...15

        ii.  Mr. Shakur's History and Characteristics…………………….. 16
            1.  Mr. Shakur's Character……………………………....16
            2.  Mr. Shakur's Physical and Mental Condition…………………17
            3.  Family Ties…………………………………………18
            4.  Employment and Financial Resources………………………19
            5.  Past Conduct and Criminal History……………………………19
            6.  Drug and Alcohol Abuse……………………………………22

    **c.  The Factors Identified in 18 U.S.C. § 3553(a) Support Release**……………22

V.     CONCLUSION……………………………………………………..25

i

DECLARATIONS ..................................................................................................... 26

   Declaration of Brie Williams, M.D. ..................................................................... 26

   Declaration of Jennifer Malin, M.D. ................................................................... 32

   Declaration of Joel Morrisey, M.D. ..................................................................... 37

   Declaration of Benjamin Howell, M.D. . ............................................................. 41

   Declaration of Maurice Shelton Harding Shakur .............................................. 45

   Declaration of Mark Allen Kleiman ................................................................... 50

         Exhibit A - Letter from Congressman Rush ............................................. 56

         Exhibit B - Clinical Encounter Note 9/10/14 ........................................... 59

         Exhibit C - Clinical Laboratory Blood Test 12/12/14 ............................. 61

         Exhibit D - Bone Marrow Biopsy 10/21/19 .............................................. 63

         Exhibit E - BOP Policy for Screening  Contractors ................................ 69

         Exhibit F -  BOP Policy for Screening Staff ............................................. 72

         Exhibit G - BOP Coronavirus Action Plan .............................................. 74

         Exhibit H - JAMA Article 2/21/20 ........................................................... 77

         Exhibit I  - NEJM article 3/5/20 ............................................................... 80

         Exhibit J - AG Barr's Memo to Director of BOP ................................... 83

         Exhibit K - Letter from Judiciary Committee .......................................... 87

         Exhibit L -  Letter from Bipartisan Group ............................................... 91

         Exhibit M - Letter from Warden of USP Victorville ............................... 95

         Exhibit N - Letter from Carlyle Holder .................................................... 97

         Exhibit O - Dr. Fabian's Neuropsyche Exam ........................................ 100

         Exhibit P - Letter from Deondre Williams ............................................ 120

         Exhibit Q - Summary Reentry Report .................................................... 123

Exhibit R - Inmate Skills Development Record ................................................... 128

Exhibit S - Letter from Assistant Supervisor of Education at USP Victorville.. 131

Exhibit T - Letter re: Completion of Suicide Watch Training........................... 133

Exhibit U - Letter from Edgar Gamboa ............................................................. 135

## I.        INTRODUCTION

Mutulu Shakur is 69 years old and has been diagnosed with an incurable cancer. Through his 34 years of incarceration, he has exhibited remarkable conduct, with few disciplinary reports and no incidents of violence. More than completing prison programs, he has led them, and has had such a positive impact on younger prisoners that he has been commended by Bureau of Prisons staff members who support his release. He now suffers from advanced stage multiple myeloma that attacks his immune system and requires treatment by powerful drugs that deplete it even more. In light of COVID-19, in which over 700 Federal Bureau of Prison (BOP) prisoners and staff have already tested positive, and with infections in half of the BOP's federal medical centers and forty of its other prisons, Mr. Shakur faces extraordinary and compelling circumstances that support his release. Mr. Shakur's cancer, the mortal danger he will face when he is exposed to the virus, and his rehabilitation all justify a reduction in sentence on the grounds of compassionate release.

## II.        PROCEDURAL HISTORY

As this Court stated in a recent order, Mr. Shakur "is serving a 60-year sentence of imprisonment imposed by this Court in 1988 following Shakur's conviction by a jury on several criminal charges." [Dkt. No. 190.] He was convicted of conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), participation in a racketeering enterprise, bank robbery, armed bank robbery, and bank robbery murder, in violation of 18 U.S.C. §§ 1961, 1962(d), 1962(c), 2113(a), 2113(d), 2113(e), and 2. *United States v. Shakur*, 888 F.2d 234 (2nd Cir. 1989).

On June 27, 2019, Mr. Shakur petitioned the Warden of USP Victorville for compassionate release on the grounds that he had suffered a debilitating stroke combined with

other serious health problems. Although BOP physicians suspected that he had cancer, he had

not been informed of this suspected diagnosis and he did not include this as a basis for his

request. It was not until October 2019 that a private Victorville oncologist said that he had

advanced stage cancer and had about two years to live. He was advised that the Victorville

prison staff had resubmitted his request for compassionate release on November 5, 2019, adding

the information that he had a terminal disease -- multiple myeloma. (Multiple myeloma is a

cancer of the plasma cells. It is considered incurable, although it can be treated. *Copenhaver v.*

*Comm'r of Soc. Sec.*, 2015 U.S. Dist. LEXIS 12516 *5, fn.6). Supplemental information was

submitted by one of his counsel in November of 2019, explaining the gravity of his condition

and stressing that Mr. Shakur would be welcomed home to live with his son and daughter in-law

in Los Angeles, and that Harbor-UCLA Medical Center had promised to provide him with

comprehensive medical care.

The petition was denied by BOP's Assistant Director and General Counsel and Mr.

Shakur was notified of the denial on December 7, 2019. This constitutes a final administrative

decision thus authorizing Mr. Shakur to directly move this Court for a Reduction in Sentence to

be adjudicated pursuant to 18 U.S.C. §3582(c)(1)(A). *United States v. Davis* 2020 U.S. Dist.

LEXS 40652  at *5, (D. Md.)

Mr. Shakur's counsel in California, Mr. Kleiman, sought a legal meeting with Mr. Shakur

at Victorville to prepare the motion, but BOP refused to permit the meeting. In late December,

2019 Mr. Shakur was moved to the Federal Medical Center in Lexington Kentucky for

temporary incarceration while he receives cancer treatment. On February 7, 2020, Mr. Shakur

moved this Courtfor an order that BOP produce all his medical records so that a motion for

reduction in sentence could be prepared. [Dkt. No. 189]. On February 11, 2020 The Department

of Justice was ordered to file and serve either its consent or opposition to this motion. [Dkt. No. 190]. On February 14, 2020 the Department of Justice stated that it did not oppose this motion. [Dkt. No. 193]. Accordingly, on February 19, the Bureau of Prisons was ordered to produce all of the records within ten days. [Dkt. No. 194]. After Mr. Shakur's counsel contacted the United States Attorney's Office and the Bureau of Prisons to secure compliance with this Court's order, the records were produced piecemeal. Mr. Shakur and his counsel finally received a complete set of current records on April 2, 2020, which have been reviewed by medical experts. Mr. Shakur now moves this Court for a reduction of sentence, based on those expert findings, and in light of the COVID-19 pandemic.

## III.    APPLICABLE LAW

Defendant Mutulu Shakur respectfully requests that this Court grant him a reduction of sentence, also referred to as "compassionate release," pursuant to 18 USC § 3582(c)(1)(A). A district court may reduce a defendant's sentence, "if the defendant shows that (1) extraordinary and compelling circumstances warrant a reduction and (2) a reduction would be consistent with applicable Sentencing Commission policy." *United States v. Rivernider*, 2019 U.S. Dist. LEXIS 137134, at *2-3 (D. Conn. Aug. 14, 2019.) Previously, "only the Director of the Bureau of Prisons ("BOP") could move for a sentence modification under this provision. But the First Step Act enables a defendant to file a motion for compassionate release directly with the sentencing court provided he first exhausts administrative remedies." *Id.*

The court's role in granting compassionate release is to assess whether "new mitigating 'extraordinary and compelling' circumstances exist to reduce that sentence; [it] is not an opportunity to second guess or to reconsider whether the original sentence was just." *United States v. Ebbers*, 2020 U.S. Dist. LEXIS 3746 at *17 (S.D.N.Y. Jan. 8, 2020.) "In passing the

statute, Congress empowered district courts, not the U.S. Parole Commission, as previously, to decide in individual cases if 'there is a justification for reducing a term of imprisonment.'" *United States v. Millan*, 2020 U.S. Dist. LEXIS 59955, at \*16  (S.D.N.Y. Apr. 6, 2020). The court elaborated that "Lawmakers further noted that the foregoing approach would keep 'the sentencing power in the judiciary where it belongs,' rather than with the U.S. Parole Commission, and that 18 U.S.C. § 3582(c)(1)(A) would allow for the 'later review of sentences in particularly compelling situations.'[1] *Id.*  [2]

The First Step Act directs the courts to consider whether the proposed reduction is consistent with the policy statements of the United States Sentencing Commission. (18 U.S.C. §3582(c)((1)(A). The Commission's Sentencing Guidelines explain that such circumstances exist when "the defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required." U.S.S.G. § 1B1.13 app. note 1(A)(i).

## IV.    ARGUMENT

Mr. Shakur's advanced age and incurable cancer present "extraordinary and compelling" reasons for release, reasons which are only exacerbated by the lethal threat he faces due to

---

[1] Mr. Shakur had a parole hearing scheduled for April 2020, which has been delayed at least 90 days due to COVID-19. Mr. Shakur has, in separate litigation, filed a habeas petition challenging the Parole Commission's procedures and conduct, *Shakur v. Milusnic*, et. a., 5:19-cv-00727, C.D. Cal.

[2] BOP frequently argues that its own internal policies limit compassionate release to prisoners with a life expectancy of eighteen months or less. However, an agency's interpretive rules, such as those in BOP Program Statement 5050.49, lack the force of law and "do not warrant Chevron-style deference." *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000). Instead, interpretive rules are  "'entitled to respect' . . . only to the extent that those interpretations have the "power to persuade.'" Id. (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). The Supreme Court has repeatedly confirmed that BOP program statements are internal agency guidelines that warrant little judicial deference under the Skidmore framework. *Reno v. Koray*, 515 U.S. 50, 60-61 (1995) (affirming policy defining "official detention"); *Cunningham v. Scibana*, 259 F.3d 303, 309 (4th Cir. 2001) (affirming policy defining "crime of violence"); *Hogge v. Wilson*, 648 F. App'x 327, 332 (4th Cir. 2016) (rejecting good conduct time credit.)

COVID-19. His release would pose no risk of danger to any person or the community at large and would be consistent with the policy purposes of the Sentencing Guidelines. As Congressman Bobby Rush has stated, "Mr. Shakur, a 69-year-old man who has been diagnosed with a terminal illness, is an excellent candidate for compassionate release, especially during this public health crisis resulting from the COVID-19 pandemic." (Exhibit A.)

> a. **Mr. Shakur Faces Extraordinary and Compelling Circumstances Justifying Compassionate Release**
>
> > i. **Mr. Shakur's medical condition, and his advanced age, and BOP's multi-year delay in diagnosing and treating his cancer establish an "extraordinary and compelling" circumstance**

Mr. Shakur was first diagnosed with anemia in 2013, more than six years before BOP finally ordered tests to diagnose him with the multiple myeloma which will kill him. (Malin Decla., ¶7, Williams Decla., ¶ 5) On September 10, 2014, a BOP physician considered myelophthisic disease (cancer of the blood cells) and recommended additional blood tests followed with an ultrasound study, and that if the ultrasound was normal, Mr. Shakur "may need hematology consultation, and a bone marrow biopsy." (Exhibit B.) On December 12, 2014, the repeat CBC showed that Mr. Shakur's red blood count, hemoglobin, and hematrocrit were still abnormally low. (Exhibit C). Although he was still anemic, the BOP never ordered the ultrasound. Mr. Shakur waited nearly five years for the definitive bone marrow biopsy. (Exhibit D).

In early 2017 Mr. Shakur began complaining of severe pain in his hip and his ribs (Malin Decla., ¶8, Williams Decla., ¶ 5)  Mr. Shakur's pain, his anemia, and the non-traumatic bone fractures seen on x-rays were "highly suspicious for multiple myeloma and should have led to a bone marrow biopsy and serum and urine electrophoresis to confirm the diagnosis and start

treatment." (Malin, *id.,* Morissey Decla., ¶8)  Yet BOP turned a blind eye to all of this and Mr.

Shakur suffered with intractable pain for nearly three years before he was diagnosed and

treatment was begun. In *United States v. Almontes* 2020 U.S. Dist. LEXIS 62524 (D-Ct. April 9,

2020), the court was troubled by the BOP's similar year delay in starting treatment for the

defendant. The court cited this delay among the "combination of factors" which supported a

finding of "extraordinary and compelling" reasons to reduce Almontes' sentence. *Id.* at 25.

Mr. Shakur now faces bone marrow cancer that is much more advanced and requires

aggressive treatment. He has endured three years of pain when he could and should have been

getting treatment. Now, both his cancer and his cancer treatment place him in mortal jeopardy

for major, and even fatal complications should he contract Covid-19. (Malin Decla., ¶¶9-10,

Williams Decla., ¶¶ 6-9). Because this type of cancer attacks the very cells which form the

foundation of the human immune system, patients with multiple myeloma have badly

compromised immune systems by the very nature of their disease. Because multiple myeloma is

incurable, Mr. Shakur will require constant monitoring and ongoing treatment to address

potentially aggressive relapses. The medical experts agree that this problem is only compounded

by the immunosuppressive effects of the chemotherapy Mr. Shakur must take.

The effects of this delay will last throughout whatever remains of Mr. Shakur's lifetime.

The cancer spread to his skull six months ago, which was doubtless a factor in the local

oncologist's warning that he had just two years to live. (Morrissey, ¶¶ 8, 11). He has multiple

lesions -- holes essentially where the bones in his pelvis and thoracic spine (among others) have

weakened. One doctor warns, "Given the lesions that have made for a fragile backbone, hips,

ribs, arms, and shoulders, the consequence of a fall could be extremely serious." (Williams

Decla, ¶ 11.) And because his cancer cannot be cured, the drugs he must take to slow the

cancer's growth will suppress his immune system for the rest of his life. So long as he remains in prison he will face all the dangers of being jostled in a crowd or exposed to illness in some crowded common area. (Morrissey, ¶¶ 9-10)

> ### ii. COVID-19 is an extraordinary circumstance, especially when combined with the risk of death Mr. Shakur faces due to his age and medical condition.

The current COVID-19 pandemic is a national emergency. See *United States v. Roman*, 2020 U.S. Dist. LEXIS 53956, at *5 (S.D.N.Y. Mar. 27, 2020) ("COVID-19 presents an unprecedented public health crisis."); *United States v. Rodriguez*, 2020 U.S. Dist. LEXIS 58718, at *1 (E.D. Pa. Apr. 1, 2020) ("We are in the midst of an unprecedented pandemic. COVID-19 has paralyzed the entire world. The disease has spread exponentially, shutting down schools, jobs, professional sports seasons, and life as we know it. It may kill 200,000 Americans and infect millions more. At this point, there is no approved cure, treatment, or vaccine to prevent it.") This public health crisis, especially in the prisons, is an "extraordinary and compelling" situation, with a profound impact on Mr. Shakur, warranting compassionate release.

> ### 1. Mr. Shakur's continued incarceration places him at increased risk of contracting COVID-19.

Incarcerated individuals are at a higher risk of infection of the highly contagious and potentially dangerous coronavirus. (Howell Declaration, ¶ 4). See *Basank v. Decker*, 2020 U.S. Dist. LEXIS 53191, at *10 (S.D.N.Y. Mar. 26, 2020) ("A number of courts in this district and elsewhere have recognized the threat that COVID-19 poses to individuals held in jails and other detention facilities."); *United States v. Rodriguez*, 2020 U.S. Dist. LEXIS 58718, at *2-3 (E.D. Pa. Apr. 1, 2020) ("Prisons are tinderboxes for infectious disease. The question whether the

government can protect inmates from COVID-19 is being answered every day, as outbreaks appear in new facilities.")

Correctional facilities are congregate living situations and they are poorly designed to prevent the spread of the virus. (Howell declaration, ¶¶. 7, 8). Prevention of transmission is achieved through physical distancing, frequent handwashing, continuous disinfection of shared objects and spaces, and avoidance of congregate living situations. (Howell declaration, ¶¶ 6, 8). These steps to prevent transmission are nearly impossible for incarcerated individuals.

This crisis has already struck the Bureau of Prisons. See *United States v Garlock*, 2020 U.S. Dist. LEXIS 53747, at *1-2 (N.D. Cal. Mar. 25, 2020) (citing "chaos" inside federal prisons in *sua sponte* extending time to self-surrender.); *United States v. Karl Oreste*, 14-20349-cr-Scola, DE 200 (S.D. Fl. April 6, 2020) ("COVID-19 poses a greater threat to Federal Bureau of Prison inmates than to the general population...");The number of confirmed cases is rapidly increasing daily and as of April 15, 2020, there were 451 BOP prisoners and 280 BOP staff members who tested positive.[3] These infections have occurred in half of the Federal Medical Centers and 43 BOP prisons in over 25 states. (*Id.*) Tragically, as of this filing, sixteen of those individuals have died from COVID-19. (*Id.*) As the following chart shows, the numbers have been steadily rising.

---

[3] https://www.bop.gov/coronavirus/, last visited April 15, 2020



https://www.levittandkaizer.com/#, last visited April 15, 2020.

These numbers will continue to rise daily, likely growing exponentially at alarming rates. There has not yet been an identified case of COVID-19 at FMC Lexington, the spread of infection in the Lexington, Kentucky area resembles the spread across the country. (Williams Decla, ¶10). As Dr. Benjamin Howell states, "Given the attributes of COVID-19…it is unavoidable that some people in correctional facilities located in jurisdictions with community spread will eventually be infected." (Howell Decla., ¶. 7). Given the spread in the Lexington community and within the BOP system, it is nearly inevitable that the virus will be transmitted inside the walls of FMC Lexington.

Mr. Shakur faces this increased risk of exposure due to his incarceration, even though he is currently at a Federal Medical Center (FMC). Prisoners at FMC Butner, FMC Carswell, and FMC Fort Worth have already tested positive, along with staff at FMC Butner, proving that BOP is unable to prevent exposure within their medical facilities.[4] FMC Lexington is still a congregate living facility, housing 1278 prisoners,[5] in which staff and medical professionals are moving between the prison and the community. (Howell, ¶ 8). Mr. Shakur still faces multiple threats of exposure within the facility. (Williams, ¶¶ 9-10, Morrissey, ¶ 10). When he leaves FMC Lexington to receive medical treatment at University of Kentucky Medical Center, he is transported by four or five prison guards. (*Id.*). This makes "social distancing," as advised by the CDC, impossible for Mr. Shakur, or for the guards who shackle him and remain in close contact with him throughout the transportation. (*Id.*)

At present, BOP admits that prisoners are infected at half of BOP's six Federal Medical Centers, which will inevitably increase due to insufficient screening measures.[6] "The BOP's containment measures have already proven insufficient to prevent the spread of COVID-19." *United States v. Rodriguez*, at *23 (E.D. Pa. Apr. 1, 2020). Attorney General Barr has even conceded that the BOP's precautions "have not been perfectly successful at all institutions." (April 3, 2020 Barr Letter). The screening measures for BOP employees and contractors will not detect coronavirus carriers who are still in the incubation period or are asymptomatic. Contractors with a fever of less than 110.4°F are admitted to the FMCs, per BOP's published screening tool. (Exhibit s E and F). Staff members with a fever of less than 110.4°F and who

---

[4] https://www.bop.gov/coronavirus/, last accessed April 6, 2020

[5] https://www.bop.gov/locations/institutions/lex/, last accessed April 13, 2020. It should also be noted that there is a Federal Prison Camp at the same facility, housing an additional 217 prisoners

[6] https://www.bop.gov/coronavirus/, last visited April 11, 2020.

deny new coughs, new shortness of breath, or new nasal congestion are also admitted to work at

the FMCs per BOP's published guidelines. (Exhibit G). Science magazine and the New England

Journal of Medicine both reported in February that coronavirus could be transmitted by

asymptomatic carriers. (Exhibits H and I). Dr. Anthony Fauci, Director of the National Institute

of Allergy and Infectious Diseases, has estimated that between 25 and 50% of persons with

coronavirus are asymptomatic.[7] BOP's screening tools will fail at FMC Lexington, as they have

failed at FMC Butner, FMC Carswell, and FMC Fort Worth, and at dozens of other federal

prisons. Mr. Shakur's continued incarceration places him at increased risk of contracting

COVID-19 and also increases the risk faced by other prisoners and BOP staff, creating an

"extraordinary and compelling" circumstance justifying his release. (Morrissey, ¶13)

### 2.  Mr. Shakur's age and underlying health conditions place him at extraordinary risk, should he contract COVID-19

Mr. Shakur's age, advanced cancer, other diseases, and even his treatment all place him

in peril. *Basank v. Decker*, 2020 U.S. Dist. LEXIS 53191, at *9 (S.D.N.Y. Mar. 26, 2020) ("The

Court takes judicial notice that, for people of advanced age, with underlying health problems, or

both, COVID-19 causes severe medical conditions and has increased lethality.") These dangers

combine to make the risk he faces an extraordinary one which renders him extremely vulnerable

should he contract the virus. (Williams, ¶7, Morrissey, ¶11) According to the CDC, adults over

the age of 65 are at higher risk, with higher rates of hospitalization, admission to intensive care

units, and death.[8] The CDC reports that among adults with confirmed COVID-19 reported in the

U.S., 80% of the deaths have been individuals 65-years-old and older. (*Id.*)

---

[7]  https://www.nytimes.com/2020/04/06/world/coronavirus-news.html, last visited April 6, 2020.

[8] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html

The threat Mr. Shakur faces due to his age is exacerbated by his current medical condition, as infections of COVID-19 are more likely to lead to serious complications or death in patients with underlying health conditions. (Howell declaration ¶. 11) Mr. Shakur's cancer diagnosis of advanced stage multiple myeloma creates an increased risk, as the evidence has shown that individuals with cancer face increased rates of death from COVID-19. (*Id.*) To treat the cancer, Mr. Shakur has been undergoing chemotherapy for six months and the CDC have concluded that chemotherapy itself is a risk factor which renders patients highly vulnerable to COVID-19. (Williams declaration, ¶ 7) Mr. Shakur also suffers from diabetes and hypertension, which are additional risk factors. (*Id.*) Courts in this district and across the country have found that COVID-19 is an "extraordinary and compelling" reason to grant compassionate release, especially for older individuals with underlying health issues.[9]

---

[9] *United States v. Zukerman*, 16-cr-194-AT, Dkt. 116 (S.D.N.Y. Apr. 3, 2020) (Granting immediate compassionate release to a 75-year-old defendant with underlying health conditions, in light of COVID-19); *United States v. Campagna*, WL 1489829 (S.D.N.Y. March 27, 2020) ("Defendant's compromised immune system in concert with the COVID-19 public health crisis constitutes an extraordinary and compelling reason to modify Defendant's sentence"); *United States v. Hernandez*, U.S. Dist. LEXIS 58739 (S.D.N.Y April 2, 2020) ("In light of the heightened medical risk presented to Mr. Hernandez by the COVID-19 pandemic, there are extraordinary and compelling reasons to reduce Mr. Hernandez's sentence"); *United States v. Perez*, 17-cr-513, Dkt. No. 98 (S.D.N.Y April 1, 2020) (Defendant's "heightened risk of serious illness or death from COVID-19 due to his pre-existing medical issues" constitutes an "extraordinary and compelling" reason for compassionate release); *United States v. Plunk*, No. 3:94-cr-36-TMB (D Alaska Apr. 9, 2020) ("In this case, Defendant qualifies for compassionate release due to his medical conditions and age, particularly in light of the ongoing coronavirus (COVID-19) pandemic, and time spent in custody, as well as his remarkable history of rehabilitation while in custody and several prior recommendations by his wardens, the U.S. Probation office, and Judge Sedwick to reduce or commute his sentence."); *United States v. Huneeus,* 1:19-cr-10117, Order, dkt. 642 (D. Mass. March 17, 2020) (Finding "extraordinary and compelling reasons" and granting motion for reduction of sentence "in light of the national state of emergency due to the global COVID-19 pandemic and Hunneus' unique health circumstances"); *United States v. Wishner*, 2:14-cr-712, Order, Dkt. 155 (C.D. Cal. March 27, 2020) (Granting compassionate release under 18 U.S.C. 3582(c)(1) based on COVID-19 and underlying medical conditions); *United States v. Copeland,* No. 2:05-cr-135-DCN, Dkt. 662 (D.S.C. Mar. 24, 2020) (granting compassionate release to defendant in part due to "Congress's desire for courts to release individuals the age defendant is, with the ailments that defendant has during this current pandemic"); *United States v. Powell*, No. 1:94-cr-316-ESH (Mar. 28, 2020) (granting unopposed motion for compassionate release in light of COVID-19); *United States v. Rodriguez*, 2020 U.S. Dist. LEXIS 58718 (E.D. Pa. Apr. 1, 2020) (Defendant's circumstances-particularly the outbreak of COIVD-19 and his underlying medical conditions present "extraordinary and compelling reasons" to reduce sentence); *United States v. Colvin*, 2020 U.S. Dist. LEXIS 57962 (D. Conn. Apr. 2, 2020) (Defendant demonstrated "extraordinary and compelling reasons justifying her immediate release under Section 3582(c)(1)(A) and U.S.S.G. 1B1.13" because her diabetes

Attorney General William Barr has called on the BOP to release individuals to home confinement, stating that "Given the speed with which this disease has spread through the general public, it is clear that time is of the essence." (Exhibit J, April 3, 2020 Barr Memo). Members of the U.S. House Judiciary Committee have called for releasing "as many people as possible who are currently behind bars and at risk of getting sick." (Exhibit K, March 19, 2020 House Judiciary Letter). Fourteen U.S. Senators, with members of both parties, have expressed their "serious concern for the health and wellbeing of federal prison staff and inmates in federal

---

substantially increases risk of illness should she contract COVID-19); *United States v. Resnick*, 2020 U.S. Dist. LEXIS 59091 (Granting compassionate release where defendant is particularly vulnerable to COVID-19 because he is 65 years old with diabetes and end-stage liver disease); *United States v. Jepsen*, 2020 U.S. Dist. LEXIS 57007 ("The court finds that the totality of the circumstances specific to Mr. Jepsen constitute 'extraordinary and compelling' reasons to grant compassionate release," including that he suffers chronic conditions considered to be risk factors for COVID-19); *United States v. Edwards* 2020 U.S. Dist. LEXIS 60095 *8, (W.D. Va April 2, 2020) (Granting compassionate release, in considerations of COVID-19 pandemic and defendant's compromised immune system."); *United States v. Karl Oreste*, 14-20349-cr-Scola, Dkt. 200 (S.D. Fl. April 6, 2020) (Granting compassionate release, concluding that there were extraordinary and compelling circumstances presented by COVID-19 pandemic and defendant's advanced age and poor health); *United State v. Bartolo Hernandez*, 16-20091-CR-Williams, Dkt. 561 (S.D. Fl April 3, 2020) (finding extraordinary and compelling reasons and granting compassionate release motion, over the government's opposition, where—because of the coronavirus pandemic— the defendant was the only potential caregiver for his elderly mother); *United States v. Foster*, No. 1:14-cr-324-02, Dkt. 191 (M.D. Pa. Apr. 3, 2020) (Granting compassionate release to a defendant who—due to an underlying lung condition—was at greater risk of serious illness or death from COVID-19); *United States v. Brannan*, No. 4:15-CR-80-01, Dkt. 286 (S.D. Tx. Apr. 2, 2020) (Granting compassionate release where defendant was 66-years-old with diagnoses of high blood pressure and high cholesterol); *United States v. Williams*, No. 3:04-cr-95-MCR-CJK, DE 91 (N.D. Fla. Apr. 1, 2020) (Granting compassionate release in light of severe risk posed to defendant by COVID-19); *United States v. Marin*, 15-cr-252, DE 1326 (E.D.N.Y Mar. 30, 2020) (Granting release due to age, deteriorating health and elevated risk of dire health consequences due to COVID-19 outbreak); *United States v. Bolston*, 18-cr-382-MLB, DE 20 (N.D. Ga. Mar. 30, 2020) (Releasing defendant in part because of danger inherent to continued incarceration during COVID-19); *United States v. McCarthy*, 2020 WL 1698732 (D. Conn. Apr. 8, 2020) ("The defendant's age and medical condition, taken in concert taken in concert with the COVID-19 public health crisis, constitute an extraordinary and compelling reason to reduce McCarthy's sentence."); *United States v. Hansen*, No. 07-CR-00520 (KAM), 2020 WL 1703672 (EDNY Apr. 8, 2020) ("Mr. Hansen's medical risk from the COVID-19 pandemic, taken alone, arguably constitutes 'extraordinary and compelling' circumstances justifying his release."); *United States v. Trent*, 2020 WL 1812242 (ND Cal. Apr. 9, 2020) ("Trent suffers from a number of serious physical or medical conditions…which render Trent uniquely vulnerable to serious illness if he contracts COVID-19, substantially diminish his ability "to provide self-care within the environment of a correctional facility.");

custody" and have demanded that "the most vulnerable inmates are released." (Exhibit L, March 23, 2020 U.S. Senate Letter).

These members of Congress have made it clear that the release of individuals like Mr. Shakur is consistent with the legislative intent of the First Step Act. In urging the release of federal prisoners who are vulnerable to COVID-19, members of the House Judiciary Committee cited 18 U.S.C. 3582(c)(1)(A) as the legal basis for release. (Exhibit K, *supra*). The fourteen Senators stated explicitly that "extraordinary and compelling" circumstances should "include vulnerability to COVID-19." (Exhibit L, *supra*). Similarly, Congressman Rush has specifically identified Mr. Shakur as a candidate for compassionate release, stating that "given his age and medical condition, he is particularly vulnerable to COVID-19 and his risk of infection increases the longer he remains in prison." (Exhibit A). Congressman Rush has respectfully addressed this court in writing, "I hope that Mr. Shakur will be granted a reduction in sentence that will permit him to peacefully live out his remaining days with his family who loves him." (*Id.*)

### iii. BOP shackled Mr. Shakur to a bed for nearly two months and cut him off from contact with his family, friends and his lawyers.

Despite BOP's statutory requirement to "notify the defendant's attorney, partner, and family members of the defendant's condition" within 72 hours of a diagnosis, BOP did almost exactly the opposite, telling no one, isolating Mr. Shakur, keeping *him* from seeking help. BOP was required to "provide the defendant's partner and family members (including extended family) with an opportunity to visit the defendant in person". Instead, Mr. Shakur was swept out of the prison and chained to a bed for two months in a location the prison kept secret from his lawyers and family. Mr. Shakur was not permitted to make telephone calls or to receive calls from his lawyers. 18 U.S.C. §3582(d)(2)(A)(1) and (A)(ii)

A legal visit was permitted only after one of Mr. Shakur's lawyers complained to BOP's Office of Legal Counsel. His lawyer entered the nursing home's room to find Mr. Shakur shackled to the rails of his hospital bed, barely able to move his hand a few inches. Mr. Shakur was shackled that way from late October 2019 until late December, when he was abruptly taken from his room in chains and transferred to Lexington. During the first two months of his chemotherapy, while he spent chained to his bed, Mr. Shakur, a 69-year-old man, could not even use the bathroom without beseeching a guard to briefly release him.

### b. Mr. Shakur Should be Granted Compassionate Release Because He Poses No Danger.

Mr. Shakur, as a 69-year-old man with an incurable cancer, is not a danger to the community and should therefore be granted compassionate release. When considering a reduction of sentence under 18 U.S.C. 3582(c)(1)(A), a court must apply USSG 1B1.13(2) and find that the defendant "is not a danger to the safety of any other person or to the community, as provided in 18 USC 3142(g)." 18 USC 3142(g) contains three relevant factors for the court to consider: "the nature of the offense, the characteristics of defendant; and the nature of the danger." *United States v. Ebbers*, 2020 U.S. Dist. LEXIS 3746, at *16 (S.D.N.Y. Jan. 8, 2020). Looking at the totality of circumstances, it is clear that releasing Mr. Shakur would not pose a threat to any other person or to the community at large.

### i. Nature and Circumstances of the Offense

This Court considered the 3142(g) factors in its 1987 decision to grant bail to Mr. Shakur. *United States v. Shakur*, 656 F. Supp. 241 (S.D.N.Y. 1987). In analyzing the first factor, this Court noted that the nature and circumstances of the underlying offense were very serious. *Id.*, at

243. As this is a static factor, the facts of the underlying offense have not changed and the crimes Mr. Shakur was convicted of remain as serious today as they ever were.

### ii.  Mr. Shakur's History and Characteristics

Mr. Shakur's history and characteristics demonstrate that he is not a danger. 18 U.S.C. 3142(g)(2) enumerates several aspects to consider in assessing an individual's "history and characteristics," including character, physical and mental condition, family ties, employment, financial resources, past conduct, criminal history and drug and alcohol abuse. In analyzing each of these applicable aspects of Mr. Shakur's history and characteristics, it is clear that his release does not pose a danger to any individual person or the community at large.

### 1.  Mr. Shakur's Character

Mr. Shakur has demonstrated his character so powerfully that he has earned the respect of BOP staff who interact with him. Courts have found that support from BOP staff and the staff's "opinions that if released ... [the defendant] would be a productive member of society to be a compelling factor in favor of release." *United States v. Millan*, *supra*, at *47 (S.D.N.Y. Apr. 6, 2020). The Associate Warden at USP Victorville, stated, "My years of experience with the Bureau has made me quite astute to the judgment of men and their character. I sincerely believe if given the opportunity, Mr. Shakur will not re-offend and will abide by the law and be an asset to the overall environment and community." (Exhibit M, Keilman letter). In describing Mr. Shakur's character, he states that Mr. Shakur "has consistently dedicated himself to maintain character that is consistent with our goals of the safe and orderly operation of our facility." *id*.

Carlyle Holder, the retired warden of FCI Coleman describes how Mr. Shakur "was well respected by both staff and inmates alike because of the way he conducted himself." (Exhibit N, Holder Letter). He describes how Mr. Shakur facilitated prosocial programs and helped minimize

violence at the prison. (*Id.*) These individuals have been in leadership positions within BOP and have been tasked with supervising Mr. Shakur's daily routine and prison conduct for over 34 years. Their professional experience in the field of corrections, and their direct contact with Mr. Shakur, make them uniquely positioned to speak to Mr. Shakur's character and to conclude that he is not a danger to anyone.

### 2.  Mr. Shakur's Physical and Mental Condition

As described above, Mr. Shakur's current physical condition, as a 69-year-old cancer patient is evidence that he is not dangerous. See *United States v. Karl Oreste*, 14-20349-cr-Scola, Dkt. 200 (S.D. Fl. April 6, 2020) ("Crucially, his severe medical conditions render him extremely unlikely to commit violent crimes.") Mr. Shakur is undergoing chemotherapy treatment, as he has been for several months, and he anticipates receiving a stem cell transplant. The cancer weakens Mr. Shakur's physical condition, as does the treatment, which causes serious side-effects and compromises his immune system. Additionally, Mr. Shakur suffers from the lasting effects of a severe stroke, hypertension and diabetes, which combined with his cancer diagnosis place him at extreme risk, should he contract COVID-19.

Mr. Shakur turns 70 this year, an age group with an essentially non-existent risk of recidivism. There is a well-established criminological consensus that the risk of re-offending drops dramatically as people age.[10] The U.S. Sentencing Commission found "older offenders are substantially less likely to recidivate following release compared to younger cohorts" and that "as age increases recidivism by any measure declined."[11] Similarly, the Center for Justice at

---

[10] See Vera Institute of Justice Report, "It's About Time, Aging Prisoners, Increasing Costs, and Geriatric Release" p. 5 https://www.vera.org/publications/its-about-time-aging-prisoners-increasing-costs-and-geriatric-release.

[11] United States Sentencing Commission, "The Effects of Aging on Recidivism Among Federal Offenders" p. 30 https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf

Columbia University reported that re-arrest rates for people over 65 are almost 0%.[12] This is especially true of individuals over the age of 70, as Mr. Shakur will be in just a few short months. The Office of the Inspector General of the Department of Justice analyzed FBI data and found the recidivism rate for former prisoners over 70 was 0%.[13]

In 2016, a forensic psychological expert  assessed Mr. Shakur's mental condition and concluded that, "Mr. Shakur poses as a low risk of future general and violent criminality once released to the community." (Exhibit O, Fabian Report, p. 19). After administering numerous tests and conducting a clinical interview of Mr. Shakur, Dr. Fabian determined that Mr. Shakur had "no significant antisocial and psychopathic personality traits." (*id*.,  pp. 14-15). In reviewing BOP records, Dr. Fabian found that Mr. Shakur was "involved with individual therapy with goals of assessing healthy mechanisms for dealing with the processing of aging," and developing positive communication skills." (*id.* p. 8).

### 3.   Family Ties

Mr. Shakur has very strong family ties. He maintains close relationships with his children, including his son Maurice Shelton Harding Shakur, who Mr. Shakur will live with in Los Angeles, should he be released. (Exhibit X, Maurice Shelton Harding Shakur Letter). Maurice writes that he and his father have a "very close and loving relationship," speaking on the phone weekly andvisiting regularly. (*Id.*) In addition to his relationship with Maurice, Mr. Shakur is also close to his other children Sekyiwa who also lives in California, and Tyrone who lives in Jamaica, New York, who are both eager to support him upon release. Dr. Fabian listed

---

[12] Aging in Prison: Reducing Elder Incarceration and Promoting Public Safety, p. IX
http://centerforjustice.columbia.edu/files/2015/10/AgingInPrison_FINAL_web.pdf

[13] DOJ's Office of the Inspector General Report "The Impact of an Aging Inmate Population on the Federal Bureau of Prisons" p. 38-40 https://oig.justice.gov/reports/2015/e1505.pdf

"definite social and family supports" as one of twenty-two identified factors indicating lower risk, stating in his report that "prior to his arrest and currently, he has good social support and a lack of family problems." (*Id.*, at pp. 16, 18). Mr. Shakur's strong family and personal relationships will support him in adjusting to life after prison and show that he is unlikely to reoffend.

### 4.   Employment and Financial Resources

In light of Mr. Shakur's age, his medical condition, and his need to self-quarantine due to COVID-19, he does not plan on working immediately upon his release. His son, Maurice, who has a successful career in the music business and entertainment industry, is happy to financially support his father. (Maurice Shelton Shakur Letter). Mr. Shakur will be able to live with his son and daughter-in-law in their three-bedroom home in Los Angeles, where he will have his own bedroom and bathroom. (*Id.*) In addition to offering Mr. Shakur rent-free housing, Maurice and his wife are prepared to  cover his other living expenses. Prior to his incarceration, Mr. Shakur was a well-respected acupuncturist. Previously, he was offered part-time employment teaching acupuncture upon release and should circumstances change that would allow him to work, those opportunities remain available to him.

### 5.   Past Conduct and Criminal History

Mr. Shakur's criminal history and past conduct strongly show that he would not be a danger to any individual or the community. Mr. Shakur was 35 years old when he was arrested in this matter and as this Court noted, he had "no prior criminal record" at the time. *United States v. Shakur*, at 245 (S.D.N.Y. 1987). This case remains his sole criminal conviction, as he has not faced any new charges during his incarceration.

Throughout his 34 years in prison, Mr. Shakur has maintained a strong institutional adjustment, with remarkably few disciplinary violations. A person's "success in prison is commendable and…certainly counts heavily in his favor" in considering compassionate release. *Almontes*, at 21-22. According to his most recent "Summary Reentry Plan" issued by the BOP, Mr. Shakur has received disciplinary reports on only five occasions throughout his time in custody and he has "maintained clear conduct" for over seven years. (Summary Reentry Plan). These reports were largely for minor infractions and none involved any allegations of violence, exemplifying Mr. Shakur's peaceful conduct for 34 years and demonstrating that he would not be dangerous upon release.

Beyond Mr. Shakur's lack of disciplinary incidents, his positive conduct in prison paints the picture of a man who is committed to self-improvement, is not a danger to anyone, and has actually improved the prison environment for others. Mr. Shakur has expressed empathy for all the direct and indirect victims of his crimes and this empathy been one of the forces that have led him to embody nonviolent solutions to conflict and teach those lessons to others. The Associate Warden at USP Victorville describes how Mr. Shakur's "lack of violence (or other disciplinary issues) indicate a desire toward rehabilitation." (Keilman letter) Carlyle Holder, the retired warden of FCI Coleman describes how Mr. Shakur "took responsibility for his actions and was remorseful with the mindset to demonstrate his commitment to change and be rehabilitated." (Holder letter)

Warden Holder writes of Mr. Shakur's willingness to be a "role model and mentor to other men incarcerated at the facility." (Holder letter) One of those young men, Deondre Williams, has now been released from prison, is employed full time and is caring for his family. He credits Mr. Shakur with contributing to his success and writes "I am proud to be a positive

member of my community today. If it wasn't for Mr. Shakur, I wouldn't be the man I am for myself or my family." (Deondre Williams letter). In describing Mr. Shakur's demeanor, he writes that he "carried himself [] like an old man who wanted nothing more but just to go home and live in peace." (*Id.*)

Mr. Shakur's conduct throughout 34 years of his incarceration exhibit a man who has taken great strides to improve himself and create a positive environment around him. He has completed extensive educational courses and programming in history, arts, crafts, typing, wellness, screenwriting, and the sciences. Prior to 2014, he had completed over 1,600 hours of programming and has continued to take classes, most recently completing a health course earlier this year and last year, completing courses on human rights, Mother's Day history, creative writing and world cultures. (2015 Inmate Skills Development Plan, 2020 Summary Reentry Plan) Beyond participating in the courses, he has shared his knowledge and skills with other prisoners, actually leading programs, including teaching courses, including classes on political science and human rights and working as an adult continuing education tutor. (Shuldt letter)

His efforts to assist other prisoners has included the life-saving work of participating in an "Suicide Watch Inmate Companion" program where he received specialized training in suicide prevention and worked closely with prison staff in monitoring at-risk prisoners. (Dr. Peprah letter) One example of Mr. Shakur selflessly assisting another prisoner is described by Edgar Mosquera Gamboa, who suffered a massive heart attack and Mr. Shakur ran through the yard to his side, rendering assistance until medical staff arrived. (Gamboa letter). Mr. Gamboa explains how impressed he was that a man who he had never met rushed to help him and writes, "My respect and admiration is based on what I believe is the humane character of his gesture and actions." (*Id.*) These efforts at improving himself and others are just a few examples of the

remarkable activities Mr. Shakur has engaged in throughout his time in prison, demonstrating his rehabilitation and lack of dangerousness.

### 6.  Drug and Alcohol Abuse

Mr. Shakur has no history of drug or alcohol abuse. Dr. Fabian's clinical evaluation found that "[t]here was no evidence of alcohol or drug problems." (*id.*, p. 16). In fact, Dr. Fabian cited "no significant alcohol and drug issues" as one of twenty-two enumerated factors indicating that Mr. Shakur is at a low risk. (*id.*, at 19).[14]

### c.  The Factors Identified in 18 U.S.C. § 3553(a) Support Release

After finding "extraordinary and compelling reasons," a court must then "consider[] the factors set forth in section 3553(a)." 18 U.S.C. § 3582(c)(1)(A). The applicable factors are:

> "(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed--
>
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> >
> > (B) to afford adequate deterrence to criminal conduct;
> >
> > (C) to protect the public from further crimes of the defendant; and
> >
> > (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> . . . [and]
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]"

---

[14] Mr. Shakur has one disciplinary incident from 1991 where he tested positive for morphine. (Summary Reentry Plan). Mr. Shakur believes that this test was in error and he denies ever taking morphine or any other illicit drug while in BOP custody. Regardless, this single positive drug test from nearly thirty years ago does not constitute drug or alcohol abuse, and does not indicate that he would be a danger to anyone upon release.

*United States v. Rodriguez*, 2020 U.S. Dist. LEXIS 58718, at *30-31 (E.D. Pa. Apr. 1, 2020)

The first factor, "the nature and circumstances of the offense and the history and characteristics of the defendant" is described more fully *supra* at pp. 16-22. As articulated above, although the nature and circumstances of the offense were serious, the history and characteristics of the defendant demonstrate that Mr. Shakur is not a risk and support his release.

In addressing the second factor, it is important to recognize that Mr. Shakur has now served 34 years in prison, which is nearly half of his life. Granting him compassionate release at this point "will not prevent him from being adequately punished nor will it discount the seriousness of his offense or diminish the message that his crimes were unacceptable." *United States v. Ebbers*, 2020 U.S. Dist. LEXIS 3746, at *25 (S.D.N.Y. Jan. 8, 2020). See *United States v. Wong Chi Fai*, 2019 U.S. Dist. LEXIS 126774, at *13 (E.D.N.Y. July 30, 2019) (Court found that the defendant having served 26 years of a life sentence "appropriately 'reflect[s] the seriousness of the offense,'" and that "to require Mr. Wong to serve out the rest of his life sentence would be 'greater than necessary to serve the purposes' 18 U.S.C. § 3553(a)(2)."); *United States v. Owens*, 2020 U.S. Dist. LEXIS 61460, at *11 (S.D. Cal. Mar. 20, 2020) (Granting compassionate release to defendant, finding that 22 years in prison is "by any measure is a substantial punishment.") Mr. Shakur's "continued confinement in prison for the last few years of his life does not serve the purposes of punishment under § 3553(a)(2)." *United States v. Karl Oreste*, 14-20349-cr-Scola, DE 200 (S.D. Fl. April 6, 2020). In *United States v. Almontes*, at *27, the court found just such a reduction appropriate even where the defendant was a career criminal with three prior felonies. *Id.*, at *9. A similar reduction is even more appropriate here where Mr. Shakur had no prior criminal history at all.

Granting compassionate release would be consistent with the third applicable factor, 3553(a)(6): "'[t]he need to avoid unwarranted sentence disparities' among similarly situated defendants." *United States v. Millan*, 2020 U.S. Dist. LEXIS 59955, at *47 (S.D.N.Y. Apr. 6, 2020). Granting compassionate release would not create any unfair sentence disparity, Mr. Shakur remains the last of his co-conspirators to remain in prison.

| Name | Time Sentenced | Time Served[15] |
|---|---|---|
| Sylvia Baraldini | 40 years | 24 years |
| Alan Berkman | 12 years | 7 years |
| Timothy Blunk | 58 years | 16 years |
| Marilyn Buck | 80 years | 25 years (dying just ten days after her release) |
| Linda Evans | 40 years | 16 years |
| Cecil Ferguson | 12½ years | 7½ years |
| Jamal Joseph | 12½ years | 5½ years |
| Sekou Odinga | 40 years | 33 years |
| Susan Rosenberg | 58 years | 16 years, 2 months |

---

[15] Sylvia Baraldini:  *The Guardian*, https://www.theguardian.com/world/2001/apr/23/rorycarroll; http://www.agi.it/english/news.pl?doc=200609262053-1275-RT1-CRO-0-NF11&page=0&id=agionline-eng.oggitalia

 Alan Berkman:  *United States v. Whitehorn*, 710 F. Supp. 803, 842 (D.D.C. 1989); *New York Times*, Jan. 10, 1994 "Healing on Parole; Doctor and Ex-Prisoner, He Treats Others on Probation"

Timothy Blunk:  *United States v. Rosenberg* 806 F.2d 1169, 1175 (3rd Cir. 1986);

Marilyn Buck:  *New York Times*, August 5, 2010, "Marilyn Buck, Imprisoned for Brinks Holdup, Dies at 62"

Linda Evans:  *United States v. Evans* 848 F.2d 1352, 1356 (5th Cir. 1988); *Associated Press* January 20, 2001 "President Clinton's Commutations, January 2001" https://www.justice.gov/opa/president-clintons-commutations-january-2001

Cecil Ferguson:  *United States v. Ferguson*, 758 F.2d 843, 848 (2nd Cir. 1985); *New York Times*, March 27, 1982 "Two Brink's Suspects Seized in Dawn Raids in Manhattan"; Federal Bureau of Prison Inmate Locator for Cecil Ferguson, Reg. No. 04372-

Jamal Joseph:  *United States v. Ferguson*, 758 F.2d 843, 848 (2nd Cir. 1985); *Columbia News* Feb. 22, 2012 "Jamal Joseph's Path From Black Panther to Professor.

Susan Rosenberg: *United States v. Rosenberg* 806 F.2d 1169, 1175 (3rd Cir. 1986); Department of Justice, "President Clinton's Commutations, January 2001" https://www.justice.gov/opa/president-clintons-commutations-january-2001

A reduction of Mr. Shakur's sentence would avoid unwarranted sentencing disparities among his co-conspirators and in the totality of circumstances, establishes that "extraordinary and compelling" reasons exist to support compassionate release.

**V.      Conclusion**

After serving 34 years of his sentence, Mr. Shakur has a BOP release date in just another 4½ years. He is dying from a cancer which can be slowed but not cured, and the very treatment that may prolong his life puts it in danger every day he remains exposed to the coronavirus.  This danger, the needless delay in his treatment, and the shocking conditions he endured in Victorville all make him an ideal candidate for compassionate release. Nothing in his conduct in those 34 years suggests that he is a danger to anyone or that there is any need for his continued confinement.  He should be granted compassionate release.

Dated: April 16, 2020                                   Respectfully Submitted,

/s/  Mark Kleiman
KLEIMAN/RAJARAM
2525 Main Street Ste. 204
Santa Monica, CA 90405
(310) 392-5455
mkleiman@quitam.com
*Pro hac vice* motion filed Feb. 14, 2020

/s/ Brad Thomson
Brad Thomson
PEOPLE'S LAW OFFICE
1180 N. Milwaukee
Chicago, IL 60642
(773) 235-0070
Brad@peopleslawoffice.com
*Pro hac vice* motion pending

# DECLARATION OF BRIE WILLIAMS, M.D.

I, Brie Williams, hereby declare as follows:

1.   I am a physician licensed to practice medicine by the State of California and am a full Professor of Medicine at the University of California San Francisco.  If called upon to do so, I could and would testify competently to the following:

2.   The University of California San Francisco School of Medicine is widely recognized as among the top ten medical schools in the United States.  I direct the Medical School's Criminal Justice and Health Program and teach and conduct research in the Division of Geriatrics.  My special areas of expertise include the health and mental health needs of the geriatric prison population, palliative medicine.  I have been and continue to be a Principal Investigator in studies sponsored by the National Institute of Health in health outcomes of geriatric prisoners in the prison population.

3.   I have worked as a consultant to the California Department of Corrections and Rehabilitation, which currently has approximately 115,000 inmates, and have extensive direct experience with the prison environment.

4.   I have been able to review the medical records for Mutulu Shakur from January 2013 through March 23, 2020.  These records show that Mr. Shakur is at grave risk for suffering serious and potentially fatal complications should he be exposed to the novel coronavirus.  It is by now conclusively established that certain diseases, drug treatments, and risk factors all heighten the dangers of coronavirus for some patients.  Mr. Shakur is absolutely at the extreme end of those risks.  He is a 69 year-old male who suffers from advanced stage multiple myeloma with extensive lesions in his hip, his rib cage, and his thoracic spine.  Recent imaging studies show the cancer has spread to his upper arm, his shoulder, his clavicle, and his jaw.  He has been receiving chemotherapy since November and is scheduled to continue this therapy through April

27

and most likely through May.  In addition to this Mr. Shakur suffers from diabetes, high blood pressure, and high cholesterol.  He has also had a major stroke.

5.    The records strongly suggest that Mr. Shakur had been suffering from this cancer for at least 18 – 20 months before it was diagnosed, and possibly was suffering from it for years. Every blood study taken since 2013 has shown that Mr. Shakur has suffered from an unexplained anemia.  Anemia goes hand in hand with multiple myeloma, which is a form of cancer which attacks the cells in a patient's blood plasma.  By late 2017 he was reporting to the prison medical staff that he had great pain in his hip and his ribs, so much so that he could barely sleep.  He continued making these complaints and continued seeking medical help throughout 2018 and early 2019.  Yet despite consistent findings of unexplained anemia and unexplained osteopenia (low bone mass density), it was not until April 2019 that that a prison doctor recommended a CT scan.  Despite the doctor's recommendation, Mr. Shakur was not taken for a CT scan for four more months.  Even then, chemotherapy was delayed for another three months.  Thus, although it is reasonably probable that Mr. Shakur could have been diagnosed with multiple myeloma in February or March of 2018, with therapy soon to follow, treatment for this advanced stage cancer was not even begun until twenty months later.

6.    Every single one of these factors increases the danger Mr. Shakur will face if he is exposed to novel coronavirus.  Cumulatively they create a profoundly grave risk.  To begin with, Mr. Shakur is undergoing active cancer treatment which has by its nature compromised his immune system.  The next round of treatment is a stem cell transplant, which will require that Mr. Shakur's immune system be completely suppressed, rendering him completely defenseless against the coronavirus.

7.   The Centers for Disease Control and Prevention have concluded that chemotherapy is a risk factor which renders patients highly vulnerable to Covid-19.   The CDC has also stated that diabetes, heart disease, and age are each significant risk factors.   And each of them endangers Mr. Shakur.   Centers for Disease Control and Prevention.   (2020 March) *Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019 – United States, February 12 – March 28, 2020.*  (Early Release/ Vo. 69, Atlanta, Georgia, CC Covid-19 Response Team.

8.   I have direct experience observing and evaluating prison medical treatment units. The most important point is that a prison medical center is not a hospital and does not maintain the same level of sanitation or prophylactic isolation that is practiced in a hospital setting.

9.   My understanding is that although Mr. Shakur is in an isolated unit called the "Chronic Care Unit", he has multiple points of contact with an exposed population almost every day.   First, food for prisoners in the Chronic Care Unit is prepared and distributed the same way it is throughout the prison.   On March 20, 2020 a team of scientists from the CDC, the National Institute of Allergy and Infectious Diseases, and UCLA reported in the New England Journal of Medicine that coronavirus can remain viable on cardboard for 24 hours, plastic and stainless steel for up to 72 hours, and will survive in the air for at least three hours.   (Doremalen, N., et. al., "Aerosol and Surface Stability of SARS-CoV-2 as Compared With SARS-CoV-1". *New England J. Med.*, March 17, 2020.)

10.   The rapid spread of infection in Lexington is the same we observe elsewhere.   The first case of coronavirus infection was reported on March 9, 2020. (https://www.lexingtonky.gov/news/03-09-2020/covid-19-update-mayor-linda-gorton)  In three weeks Lexington has gone from one case to 110.

https://www.wkyt.com/content/news/Lexington-COVID-19-cases-up-to-110-another-death-reported-569257141.html).   This places Mr. Shakur in danger every day.  Food for prisoners in the Chronic Care Unit is brought by the same outside delivery vendors and prepared by the same prisoners as the food given to the general prison population.  Finally, the very conditions of Mr. Shakur's transport place him in danger. Between treatment, follow-up examinations, and diagnostic testing, he is moved from the prison to the University of Kentucky Medical Center two, and often three times a week.  Each time he is moved, this 69 year-old man is shackled at his waist, feet, and hands, and a high voltage stun belt is placed around his waist.  He is then surrounded by four or five correctional officers who take him to a vehicle, enter it with him, for a 15-20 minute drive, and surround him again while they take him into the hospital.  Under such conditions "social distance" is not an option.  Given all of these conditions it is not so much a question of whether Mr. Shakur contracts Covid-19, but when.  And when he does, his weakened condition and his compromised immune system render him singularly vulnerable to its predations.

11. Mr. Shakur is at a significant risk for falling.  He had fall precautions issued on December 17, 2019.  He is sometimes so frail that he must be transported in a wheelchair and has cramps in his feet and toes so severe that he has difficulty walking.  He has had balance problems and weakness on his left side since his 2013 stroke.  Combined with his age, the pain medication, and his joint difficulties the risk may well be greater than prison personnel appreciate.  Given the lesions that have made for a fragile backbone, hips, ribs, arm, and shoulders, the consequence of a fall could be extremely serious.

12.   This aging man faces painful, risky treatments in an already weakened state.  A physically present and loving support system is an essential factor in this treatment.

13. It is my understanding that Mr. Shakur has a son and daughter-in law in Los Angeles, California, who have a home with an extra bedroom and are eager to care for him.  This family was already screened and approved by Pre-release Services when the Bureau of Prisons was considering Mr. Shakur's petition that they support his bid for compassionate release.  Finally, Mr. Shakur will have the full medical support of Harbor-UCLA Medical Center, whose Chair of the Department of Family Medicine has committed to ensuring that he receives thorough, comprehensive treatment.

14. Finally, although I have not interviewed Mr. Shakur, I have some general observations.  First, the rate of recidivism is absolutely the lowest amongst prisoner of his advanced age.  Geriatric prisoners have been described by criminologists as the safest group to release, especially when they have a strong release plan as he does, with a loving adult son and daughter-in law who are happy to make a home for him.

I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct.

Executed this 3 day of April, 2020, at San Francisco, California.

_____

Brie Williams, M.D.
Professor of Medicine
University of California San Francisco
School of Medicine

# DECLARATION OF JENNIFER MALIN, M.D.

I, Jennifer Malin, hereby declare as follows:

1.   I am a physician licensed to practice medicine by the State of California. If called upon to do so, I could and would testify competently to the following:

2.   I earned my Bachelor's degree in Biology from Harvard University.  My medical education was completed entirely at the UCLA School of Medicine, which is regarded as one of the top medical schools in the country.  I completed a residency in Internal Medicine at UCLA, as well as a Fellowship in Oncology and Hematology.   In addition to being board certified in Internal Medicine and Oncology, I hold a doctorate from the UCLA School of Public Health.

3.   I am a Clinical Professor of Medicine at UCLA and an attending physician at the Veterans' Affairs Medical Center in Los Angeles, where I continue to see patients with cancer as a volunteer physician.  I served as the Medical Director of Clinical Oncology for Anthem Blue Cross and then it's Vice President for Clinical Strategy.

4.   Since 2016 I have been Senior Medical Director for Oncology and Genetics for United Health Group, which insures or directly provides care to over forty-five million people. In this position I am responsible for leading the clinical programs for all United Healthcare members with cancer, including developing clinical pathways for cancer therapy.

5.    In addition to my teaching and clinical activities, I remain deeply involved in cancer research, and have been the senior author or co-author on over one hundred scientific papers which have been published in Cancer, Journal of the American Medical Association, Archives of Internal Medicine, the Journal of the National Cancer Institute, Annals of Internal Medicine, Supportive Care in Cancer, the American Journal of Clinical Oncology,  Journal of the American College of Surgeons, Journal of Clinical Oncology, Health Services Research, Breast Cancer Research and Treatment, and Medical Care, among others.

33

6.   I have reviewed the medical records for Mutulu Shakur from 2013 through March 2020.  From these records I was able to form an opinion as to both Mr. Shakur's cancer prognosis, as well as determine that he is at extremely high risk of contracting the novel coronavirus (COVID19) and if infected, suffering serious and potentially fatal consequences from the virus.

7.   Mr. Shakur is a 69 year-old African-American man with advanced stage multiple myeloma and painful lesions that have spread to his thoracic spine, pelvis, ribs, and mandible. He has multiple comorbidities (diseases in addition to his primary diagnosis of cancer which can complicate his treatment and put him at even greater risk) including Type II diabetes, history of stroke, and hyperlipidemia (high cholesterol.).  He is undergoing first line chemotherapy for multiple myeloma and as a consequence of this treatment he is extremely immunocompromised. His age, comorbidities, cancer diagnosis, chemotherapy and resultant immunosuppression all put him at high risk for developing severe complications should he contract COVID-19.

8.   In reviewing past records, Mr. Shakur's anemia dates back to 2013.  This anemia was likely due to the multiple myeloma as the blood work up shows no iron deficiency (it would have been considered "smoldering myeloma" at that time).  Mr. Shakur also complained of severe hip and rib pain in 2017.  A chest x-ray obtained in March 2017 showed a non-displaced fracture of the posterior right seventh rib and an old fracture of the left ninth rib.  In the absence of trauma, in the setting of an ongoing unexplained anemia, these findings are highly suspicious for multiple myeloma and should have led to a bone marrow biopsy and serum and urine electrophoresis to confirm the diagnosis and start treatment.  Although the films ordered in April 2019 were interpreted as suggesting a possible myeloma, the recommended CT scan was delayed more than four months.  This delay in proper diagnosis, and therefore proper treatment,  has

caused Mr. Shakur to suffer and has resulting in a substantial delay in effective treatment for his cancer.

9.   The most recent work up prior to his anticipated bone marrow transplant was done in early March 2020.  Results from this work up show that Mr. Shakur has responded to the initial chemotherapy although he does have some minimal residual disease that will require ongoing chemotherapy, harvesting of his blood stem cells and an autologous stem cell transplant, followed by maintenance chemotherapy.  With this ongoing treatment, Mr. Shakur is at high risk for COVID19, as discussed above, due to the both the chemotherapy he has gone through so far and the multiple myeloma causing him to be immunosuppressed.

10.     In addition, the facility in which he is currently being held is a Federal Medical Center (FMC).  I have been informed that the FMC is not a hospital.  I have been told that Mr. Shakur is housed in something called the Chronic Care Unit.  This is not like an acute care or intensive care unit in a hospital, where the environment is strictly controlled.  He is not isolated from potential sources of infection in this unit.  Mr. Shakur must use an elevator that is used by other prisoners in order to see the nurse practitioners and physician assistants who are responsible for his daily treatment.  He is also potentially exposed to the novel coronavirus every time he has to make his daily phone calls as he must travel through the section of the prison where the rest of the prisoners are living in even tighter conditions which are ripe for the spread of the virus.   He is transported to and from the prison multiple times per week.to receive care (including chemotherapy) at the affiliated hospital.  Each time he travels back and forth, he is potentially getting exposed to the novel coronavirus and also risks exposing/putting at risk the rest of the inmates and staff in the medical center.

11.   Mr. Shakur can receive safe and effective treatment outside the prison system.

Especially in light of the COVID19 pandemic, it is safer for both Mr. Shakur and the prison population if he is granted compassionate release and allowed to seek treatment through the UCLA system while living with his son and daughter-in-law, who are prepared to take over and manage his care and provide him with the support he needs.

I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct.

Executed this 6th day of April , 2020, at Los Angeles, California.

Jennifer Malin, M.D., Ph.D.
Clinical Professor of Medicine
UCLA School of Medicine

36

# DECLARATION OF JOEL MORRISEY, M.D.

I Joel Morrissey declare as follows:

1.   I am a physician licensed to practice medicine by the State of Virginia.  If called upon to do so, I could and would testify competently to the following:

2.   I am board certified in both Emergency Medicine and Internal Medicine with privileges in both departments at the Virginia Commonwealth University Health Sciences hospital (VCUHS) and provide care in both the emergency room and inpatient settings.

3.   In addition to my clinical duties and teaching duties at the school of medicine, I have served on the Quality Improvement committee since 2013, and at the University of Washington before that.

4.   VCUHS is the provider of both emergency and inpatient health care for the Virginia Department of Corrections as well as Richmond City Jail.

5.   Since 2005, I have testified as an expert medical witness in both Federal and local courts in Louisiana as well as performed forensic medical records analysis for Federal and county courts in New Orleans as well as local courts in Richmond, Virginia.

6.   In addition to my clinical duties involving caring for incarcerated individuals, I volunteer as a health advocate and health educator within the Virginia Department of Corrections.

7.   I have been able to review the portion of Dr. Shakur's medical records relevant to the issues of chronic medical conditions and their impact on his risk for premature death while incarcerated.

8.   In this review I have found evidence that Dr. Shakur's anemia was not investigated according to the standard of care, resulting in a delayed diagnosis with consequences including metastasis of disease. These metastases include lesions to the skeleton and skull as recently as September 2019.

9.   Dr. Shakur's medical records document multiple fractures of varying ages. Whether due to falls, assault, or metastatic cancer, it is clear that he is at ongoing risk from trauma despite the efforts of the Bureau of Prisons to mitigate.

10. Dr. Shakur's current clinical condition requires complex coordinated daily medical care, disease-specific dietary restrictions as well as outpatient evaluations by multiple medical specialties, which increases his risk to COVID exposure compared to non-incarcerated individuals.

11. Based on the evidence of inadequate care provided for Dr. Shakur's multiple medical conditions, all of which are known individually and synergistically to reduce life expectancy, it is clear that continued incarceration would shorten his already markedly reduced life expectancy.

12. As of 4/14, information provided by the Bureau of Prisons (BOP), almost 1/3 of BOP facilities have a either staff or inmates test positive for COVID-19.

13. Based on the Attorney General's memos to the BOP dated March 26, 2020 and April 3, 2020, 4/3/2019, the CARES act, and the BOP reference of CDC guidelines for high risk individuals, Dr. Shakur meets all the medical criteria for release.

14. Based on the Attorney General's memos to the BOP dated March 26, 2020 and April 3, 2020, 4/3/2019, the CARES act, my analysis of publicly available records shows that Dr. Shakur meets all the non-medical discretionary criteria for release.

I declare under penalty of perjury of the laws of the State of Virginia that the foregoing is true and correct.

Executed this 15th day of April, 2020 at Richmond Virginia.

Joel Morrissey, M.D.
Assistant Professor of Medicine
VCU School of Medicine.

40

# DECLARATION OF BENJAMIN HOWELL, M.D.

# Yale SCHOOL OF MEDICINE

**National Clinician Scholars Program**
PO Box 208088
New Haven, CT 06520-8088
T: 203-785-4148
F: 203-785-3461

Courier:
Sterling Hall of Medicine (SHM)
Room IE-61
333 Cedar Street

April 5, 2020

Judge Charles S. Haight
United States District Court

Dear Judge Haight:

I, Benjamin A. Howell, MD, MPH, MHS, affirm as follows:

1.   I am a doctor licensed to practice medicine in the State of Connecticut.

2.   I am currently a post-doctoral fellow in the National Clinician Scholars Program at the Yale School of Medicine, a member of the Yale Health Justice Lab, and a primary care physician in the VA Connecticut Healthcare System. My clinical research focuses on the health impact of incarceration in particular focusing on health outcomes following release from prison or jail. Clinically, in my practice I provide primary care for veterans who are experiencing homelessness. This population frequently has exposure to the criminal justice system. I received my medical degree (MD) from the University of California, San Francisco (UCSF) School of Medicine, a Masters in Public Health (MPH) from the University of California, Berkeley School of Public Health, and a Masters in Health Sciences (MHS) from the Yale University School of Medicine. This letter reflects my opinions based on by clinical and professional expertise in my role as a private citizen. They do not reflect the position or opinions of either the Yale School of Medicine or the VA Connecticut Healthcare System.

3.   I have not personally examined Mr. Shakur nor reviewed his medical records. These comments reflect my general opinions around the risk posed by the current COVID-19 pandemic to prison populations and how it could endanger the lives of older adults currently incarcerated.

4.   It is my opinion, informed by my clinical and professional expertise, that people currently incarcerated in correctional facilities are at higher risk of getting infected with COVID-19 and at higher risk of developing serious complications or dying from that infection. It is also my opinion that older adults and those with serious medical comorbidities, such as multiple myeloma, are at much higher risk of developing serious complications or dying from COVID-19.

**Risk of infection with COVID-19**

5.   COVID-19, a respiratory illness caused by a novel coronavirus, is a viral pandemic with documented infections in all states of the United States. It is highly contagious and it has the potential to cause severe illness and death. Deaths from COVID-19 have occurred in people in all age groups and among people with no previous medical conditions. In addition, not all people who are infected present with symptoms. People who are infected, and therefore have the potential to infect other people, can range from asymptomatic (no symptoms) to mild symptoms (fever and cough) to severe

42

symptoms (requiring hospitalization and ICU-level care). In addition, even people who eventually develop symptoms, will have several days when they are infectious prior to symptom onset.[1]

6.   The virus that causes COVID-19 is spread through person-to-person transmission of viral particles in respiratory droplets.[2] Respiratory droplets are produced during coughing and sneezing, but also during normal breathing and talking. Under normal conditions, these respiratory droplets remain airborne within a radius of less than 6 feet. Respiratory droplets can also remain on skin and surfaces for an extended period of time. Prevention of transmission is achieved via physical distancing (not getting within 6 feet), frequent hand washing, and cleaning of shared objects and spaces.[3] Following from this is the avoidance of non-congregate living situations is also recommended.[4]

**Risk of COVID-19 in correctional facilities**

7.   Correctional facilities are not immune from contagious spread of infectious diseases like COVID-19. Although people currently incarcerated are removed from the community, they are not isolated from the community. Correctional staff, medical professionals, and visitors move between the community and correctional facilities, allowing infectious diseases from the community to enter correctional facilities. Given the attributes of COVID-19, as described above, it is unavoidable that some people within correctional facilities located in jurisdictions with community spread of the infection will eventually be infected. [5]

8.   Correctional facilities are poorly designed to prevent the spread of COVID-19. Reliance on congregate living settings (shared cells, dorms), shared facilities (bathrooms, dining halls), controlled access to personal cleaning materials, and frequent contact with other people (including between inmates and correctional staff) make spread implementation of measures meant to prevent the spread of infection difficult to impossible. There are also constraints on the ability to isolate and quarantine infected or at-risk people in custody. In addition, limited medical services (including limited access to ICU level care) and delays in care, make those infections that do occur potentially more dangerous.

9.   At this moment, there are documented COVID-19 infections in correctional facilities in over 24 states[6] including nearly 200 infections in Federal Bureau of Prisons (BOP) facilities.[7] There have also

---

[1] Kimball A. *Asymptomatic and Presymptomatic SARS-CoV-2 Infections in Residents of a Long-Term Care Skilled Nursing Facility—King County, Washington, March 2020.* MMWR. http://dx.doi.org/10.15585/mmwr.mm6913e1; Wei WE et al. *Presymptomatic Transmission of SARS-CoV-2 — Singapore, January 23–March 16, 2020.* MMWR. http://dx.doi.org/10.15585/mmwr.mm6914e1

[2] *How COVID-19 Spreads.* CDC. https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html

[3] *How to Protect Yourself & Others.* CDC. https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html

[4] *Coronavirus (COVID-19) Pandemic: Non-Congregate Sheltering.* CDC. https://www.fema.gov/news-release/2020/03/31/coronavirus-covid-19-pandemic-non-congregate-sheltering

[5] Keegan Hamilton, *Sick Staff, Inmate Transfers, and No Tests: How the U.S. Is Failing Federal Inmates as Coronavirus Hits*, Vice (Mar. 24, 2020), https://www.vice.com/en_ca/article/jge4vg/sick-staff-inmate-transfers-andno-tests-how-the-us-is-failing-federal-inmates-as-coronavirus-hits. ; Sadie, Gurman, *Bureau of Prisons Imposes 14-Day Quarantine to Contain Coronavirus*, WSJ (Mar. 24, 2020), https://www.wsj.com/articles/bureau-of-prisonsimposes-14-day-quarantine-to-contain-coronavirus-11585093075

[6] *Study of COVID-19 in Correctional Facilities,* National Commission on Correctional Health Care. https://www.ncchc.org/filebin/COVID/NCCHC-HU_SurveillanceTracker_20200402_No5_April_1.pdf

[7] https://www.bop.gov/coronavirus/

been several inmate deaths due to COVID-19 in BOP facilities.[8] Fayetteville County, Kentucky, where FMC Lexington is located, as the third highest rate of infection in the state.  Given rates of infections in the community, we can expect these numbers to only increase.

**Increased risk of COVID-19 in older and chronically ill adults**

10. Infections with COVID-19 are more likely to lead to serious complications or death in older adults. In particular older adults are much more likely to die if infected. Reported case fatality rates for adults >85 range from 10%-27% and for adults 65-84 fatality rates are from 3%-11%.[9]

11. Infections with COVID-1 are also more likely to lead serious complications or death in patients with underlying health conditions.[10] In particular, patients with diabetes mellitus, chronic lung disease, and cardiovascular disease are more likely to have serious complications or death. Early reports from China also noted an increased risk of serious complications or death among patients with cancer, such as multiple myeloma.[11] People in an immunosuppressed state, that is a decreased ability for the body to fight infections, are at higher risk of serious infections which likely holds true for COVID-19 as well.


12. For these reasons, to avoid serious and life-threatening outbreaks of COVID-19, decreasing prison populations is of the outmost importance. In particular, it is important to focus on the release of inmates at risk of serious complications and death. Ultimately, reducing the overall correctional population will also help medical professionals provide sufficient clinical care for the remaining population. In my opinion, the current viral pandemic offers extraordinary and compelling circumstances to expedite the release to the community of medically frail individuals in our Federal Bureau of Prisons who do not pose a public safety risk.

Sincerely,

Benjamin A. Howell, MD, MPH, MHS
Yale School of Medicine

---

[8] Westwood R, *Third Federal Inmate Dies From COVID-19*. WWNO (April 1, 2020) https://www.npr.org/sections/coronavirus-live-updates/2020/04/01/825448006/second-federal-inmate-dies-from-covid-19

[9] *Severe Outcomes Among Patients with Coronavirus Disease 2019 (COVID-19) — United States, February 12–March 16, 2020.* MMWR. http://dx.doi.org/10.15585/mmwr.mm6912e2

[10] *Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019 — United States, February 12–March 28, 2020.* MMWR. http://dx.doi.org/10.15585/mmwr.mm6913e2

[11] Liang W et al. *Cancer patients in SARS-CoV-2 infection: a nationwide analysis in China*. The Lancet Oncology. 2020 Mar 1;21(3):335-7.

# DECLARATION OF MAURICE SHELTON HARDING SHAKUR

# DECLARATION OF MAURICE SHELTON HARDING SHAKUR

I, Maurice Shelton Harding Shakur, depose and say:

1.    I am the eldest son of Dr. Mutulu Shakur (BOP Reg. No. 83205-012) and provide this declaration in support of his application for compassionate release.

2.    I reside with my wife, Talia del Carmen Rodriguez, at 3448 La Clede Avenue, Los Angeles, CA 90039.

3.    My wife and I have been married for over fifteen years. My wife knows my father well and has always had a positive relationship with him despite his incarceration and the limited ability this has on their communication.

4.    I am a veteran of the United States Army, with honorable discharge.

5.    I am fifty-two years old and work as an entertainer with over 30 years of experience in the music industry.

6.    My wife and I would welcome having my father live with us upon his release.

7.    My wife and I are very aware of the COVID-19 pandemic and have been following the guidelines being issued by the CDC and the California and local governments to avoid being infected by the virus.

8.    Steps we have taken include frequent washing of our hands with soap and water, cleaning and disinfecting frequently touched surfaces throughout the day, avoiding touching our eyes, nose or mouth with unwashed hands, covering our mouths and noses when we cough or sneeze with a tissue or elbow, working from home, remaining in our home as much as possible without visitors and wearing a mask and gloves on the rare instances where we leave the home for essential tasks.

9.    Neither my wife nor I are at high risk of getting sick from the virus due to age, or compromised immune systems, or serious chronic medical conditions like heart disease, diabetes, or lung disease.

10.   Neither my wife nor I have shown any symptoms of being infected with the virus.

11.   In the event my father is granted compassionate release, we will travel to Kentucky where he is now detained and transport him back to Los Angeles. We will engage in social distancing and wear protective gear, masks and gloves, throughout our travel back home to minimize our exposure to the virus.

12.   At our house we will fully orient my father to the measures we are taking to avoid exposure to the virus discussed above in Paragraph 8.

13.   We have a three-bedroom home so my father would have his own bedroom and bathroom.  My wife and I will assist in all tasks necessary to keep our home and his bedroom sanitized and clean. We will not have guests visit the home as long as the virus continues to infect people. To the maximum extent possible we will order food on-line for delivery and will provide my father with all of the basic necessities of life including food, clothing, toiletries, medicines, etc.

14.   Should my father need to see a doctor, we will drive him to and from his appointments and ensure that at all times when he leaves the home for medical appointments we are wearing masks and gloves.

15.   My father I and have a very close and loving relationship. We speak on the phone almost every week and I have often visited him. He has also established a close relationship with my wife Talia, and they get along very well. My wife fully supports my father and would welcome him into our home to live with us.

47

16.     While my father has at least two offers of employment in Los Angeles, he obviously will not work during the COVID-19 crisis. My wife and I are fully able to support him both during the COVID-19 crisis and beyond that if he chooses not to be employed when the COVID-19 pandemic has ended and instead to spend time with his family.

17.     Once the COVID-19 pandemic is over, my wife and I would be happy to assist my father with transportation, visits to medical appointments, and creating a new life in Los Angeles. If my father decides to accept one of the two job offers he has in Los Angeles, we are willing to transport him to and from work or to pay for transportation. We are very willing to assist my father in any way he needs our help in the process of acclimation and re-entry.

18.     Going back at least twenty years, my father has encouraged me and his other children, and indeed the many people around the country who follow his statements, unequivocally and consistently, to reject criminality and violence in all their forms, and to lead our lives with kindness, modesty, and high moral standards. My father instilled these same values in my step-brother Tupac Shakur, with the result that the message of peace, social justice, and reconciliation in our music reached millions of young people at a time when other famous rappers were glorifying gang violence.

19.     My father has never glorified the crimes he engaged in over 30 years ago. He has consistently expressed remorse for those crimes. As the person on earth who is perhaps closest to him, I am absolutely, one hundred percent, certain he will never reoffend if released from custody. He has served his time in prison with dignity, and has consistently and repeatedly denounced gang and political violence in any form whatsoever. He is fully rehabilitated, now of old age, and very sick with cancer. I hope and pray every day that he may be released to spend his last years with me, my brothers and sisters, our spouses, his grandchildren, his elderly, blind mother, his own siblings and our whole family,

48

3

who all love and miss him very much, and will care for him dearly for his remaining years.

I declare under penalty of perjury that the foregoing facts are true and correct. Executed this 15th day of April, 2020, in the City and County of Los Angeles, State of California.

_____
Maurice Shelton Harding Shakur

# DECLARATION OF MARK ALLEN KLEIMAN

## DECLARATION OF MARK ALLEN KLEIMAN

I, Mark Kleiman, hereby declare as follows:

1.   I am an attorney licensed to practice law before all courts in the State of California, and am cocounsel for Mutulu Shakur.  I applied for admission to this Court *pro hac vice* on February 14, 2020, and my application remains pending.  If called upon to do so, I could and would testify competently to the following based upon firsthand knowledge:

2.   Attached hereto as Exhibit "A" is a true and correct copy of a letter from Congressman Bobby Rush.

3.   Attached hereto as Exhibit "B" is a true and correct copy of a "Clinical Encounter Note" of September 10, 2014, furnished us by the Bureau of Prisons pursuant to this Court's order, suggesting further tests including a bone marrow biopsy should Mr. Shakur's next laboratory test continue to show that he has anemia.

4.   Attached hereto as Exhibit "C" is a true and correct copy of a clinical laboratory blood test of December 12, 2014, furnished us by the Bureau of Prisons pursuant to this Court's order.  It shows that Mr. Shakur continued to have anemia.

5.   Attached hereto as Exhibit "D" is a true and correct copy of the report of Mr. Shakur's first bone marrow biopsy, performed on October 8, 2019 and read and reported on October 21, 2019, furnished us by the Bureau of Prisons pursuant to this Court's order.

6.   Attached hereto as Exhibit "E" is a true and correct copy of the BOP's policy for screening contractors before they are allowed to enter prisons.  It was obtained from https://www.bop.gov/coronavirus/docs/covid19_screening_tool.pdf, last visited April 15, 2020.  The screening policy flags only people who report that they have symptoms of novel coronavirus.

51

7.   Attached hereto as Exhibit "F" is a true and correct copy of what had been BOP's policy for screening staff before they are allowed to enter prisons. The screening policy flags only people who report that they have symptoms of novel coronavirus. It was obtained from BOP's website on April 8, 2020 but has since been taken down without explanation and has not been replaced.

8.   Attached hereto as Exhibit "G" is a true and correct copy of BOP's Coronavirus Action Plan.  I obtained the main page from https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp, last visited on April 15, 2020. From the naming convention in the web page (20200331) I believe the plan was first posted on or about March 31, 2020.  The second page, entitled "Updates to COVID-19 Action Plan" bear the date of March 19, 2020, and were obtained from https://www.bop.gov/resources/news/20200319_covid19_update.jsp.  This page was last visited on April 15, 2020.

9.   Attached hereto as Exhibit "H" is a true and correct copy is a report published in the Journal of the American Medical Association on February 21, 2020, reporting that novel coronavirus can be transmitted by people who are asymptomatic.

10. Attached hereto as Exhibit "I" is a true and correct copy is a report published in the New England Journal of Medicine on March 5, 2020, reporting that novel coronavirus can be transmitted by people who are asymptomatic.

11. Attached hereto as Exhibit "J" is a true and correct copy of Attorney General Barr's April 3, 2020 memorandum to the Director of the Bureau of Prisons directing increased home confinement of prisoners.

12. Attached hereto as Exhibit "K" is a true and correct copy of a March 19, 2020 letter from the Chairman of the House Judiciary Committee (Jerold Nadler) and the Chairwoman of the House Subcommittee on Crime, Terrorism, and Homeland Security (Karen Bass).  These criminal justice leaders exhort DOJ and BOP, saying they "must do all they can to release as many people as possible who are vulnerable."

13. Attached hereto as Exhibit "L" is a true and correct copy of a March 23, 2020 letter from a bipartisan group of fourteen United States Senators, including three former state attorneys general (Harris, Blumenthal, and Whitehouse) and two former United States Attorneys (Blumenthal and Whitehouse) urging that the "most vulnerable inmates [be] released or transferred to home confinement, if possible.

14. Attached hereto as Exhibit "M" is a true and correct copy of an April 9, 2018 letter from the Assistant Warden of U.S.P. Victorville attesting to Mr. Shakur's nonviolent behavior and his commitment to "maintaining a degree of respect across the various prisoner groups and my staff", and that he has directly intervened to quell racial conflicts.

15. Attached hereto as Exhibit "N" is a true and correct copy of a letter from Carlyle Holder, who was the Warden of the Federal Correctional Complex in Coleman, Florida from 2000 to 2008, when Mr. Shakur was incarcerated there, attesting to Mr. Shakur's remorsefulness, his commitment to change himself, and his work to make Coleman "one of if not the safest penitentiary in the system at the time."

16. Attached hereto as Exhibit "O" is a true and correct copy of Dr. John Fabian's forensic neuropsychologic examination of Mr. Shakur, concluding that Mr. Shakur poses a low risk of violence and criminality.

53

17.   Attached hereto as Exhibit "P" is a true and correct of an April 12, 2020 letter written by Deondre Williams, a former fellow inmate of Mr. Shakur's who attests how Mr. Shakur's mentoring "changed my entire way of thinking" after Mr. Williams has spent most of a decade fully immersed in criminal activities.

18.   Attached hereto as Exhibit "Q" is a true and correct of the November 16, 2019 Summary Reentry Report on Mr. Shakur, page two of which shows that there were only four incidents giving rise to discipline reports over the thirty-four years of his incarceration.

19.   Attached hereto as Exhibit "R" is a true and correct of Mr. Shakur's Inmate Skills Development record showing that he had completed fifty-four instructional courses by 2014.

20.   Attached hereto as Exhibit "S" is a true and correct of a March 20, 2018 letter written by the Assistant Supervisor of Education at U.S.P. Victorville indicating that Mr. Shakur teaches a class, tutors students, and motivates his fellow inmates to participate in the education programs.

21.   Attached hereto as Exhibit "T" is a true and correct of a December 28, 2017 letter attesting that Mr. Shakur had completed training to do the life-saving work of a "Suicide Watch Inmate Companion" to work closely with prison staff to monitor at-risk behavior of other inmates.

22.   Attached hereto as Exhibit "U" is a true and correct of aJanuary 12, 2012 letter from fellow inmate Edgar Gamboa, relating how, when Gamboa had a heart attack, Mr. Shakur raced across the entire yard, indifferent to the danger of personal harm as he crossed through areas reserved by various gangs, races, or ethnic groups.  Mr. Shakur did this to apply acupressure techniques to try to calm Gamboa and save his life.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed this 16th day of April, in Los Angeles, California.

_____

Mark Kleiman

# EXHIBIT A



**BOBBY L. RUSH**
1ST DISTRICT, ILLINOIS

**COMMITTEE ON ENERGY AND COMMERCE**

SUBCOMMITTEES:
CHAIRMAN: ENERGY
CONSUMER PROTECTION AND COMMERCE
HEALTH

WASHINGTON:
2188 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515-1301

CHICAGO:
11750 SOUTH WESTERN AVENUE
CHICAGO, IL 60643-4732

RUSH.HOUSE.GOV

## CONGRESS OF THE UNITED STATES
### HOUSE OF REPRESENTATIVES
WASHINGTON, D.C. 20515

March 26, 2020

The Honorable Charles S. Haight
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007-1502

Re: *United States v. Shakur*; Cause No. 82 CR 312-CSH

Dear Judge Haight:

I am writing to express my support for Mr. Mutulu Shakur's motion for a reduction in sentence based upon the compassionate release provisions of the First Step Act (PL 115-391). As you know, the First Step Act was passed in 2018 by bipartisan majorities in both houses of Congress and formally supported by the Administration.

Mr. Shakur is 69 years old and has recently been diagnosed with bone marrow cancer caused by multiple myeloma. Given his age and medical condition, he is particularly vulnerable to COVID-19 and his risk of infection increases the longer he remains in prison. Considering these factors, the fact that he has served the majority of his sentence, and the fact that he does not pose a risk to the community, Mr. Shakur should receive a reduction of sentence under the First Step Act.

The First Step Act reformed the process for granting compassionate release, allowing for individuals facing "extraordinary and compelling" circumstances to be released. The current state of emergency caused by COVID-19 is certainly an "extraordinary and compelling" situation, particularly for those in prison. The close quarters present in our nation's jails and prisons present a clear and ongoing risk of infection.[1] This, coupled with the fact that prisoners across the country — including in my home state of Illinois[2] and in the Bureau of Prisons' custody[3] — have

---

[1] Lopez. "A Coronavirus Outbreak in Jails or Prisons Could Turn into a Nightmare." Vox. Vox, March 17, 2020. https://www.vox.com/policy-and-politics/2020/3/17/21181515/coronavirus-covid-19-jails-prisons-massincarceration

[2] Ballesteros, Carlos, and Jake Wittich. "2 Illinois Prisons under Lockdown after Confirmed Cases of the Coronavirus." Chicago Sun-Times, March 26, 2020. https://chicago.suntimes.com/coronavirus/2020/3/26/21194633/illinois-prisons-lockdown-coronavirus-inmate-release.

[3] Barr, Luke. "Despite Coronavirus Warnings, Federal Bureau of Prisons Still Transporting Inmates: Sources." ABC News. ABC News Network, March 23, 2020. https://abcnews.go.com/Health/warnings-bureau-prisons-transporting-inmates-sources/story?id=69747416.

tested positive for this virus, underscores the need for action; particularly since the number of infected cases in prisons will likely increase exponentially, as has happened across the U.S.

The elderly population, at large, is especially vulnerable to this disease and this is even more true when faced with the close confines of a prison environment.  Releasing Mr. Shakur would not only protect him, it would also protect hundreds of thousands of other people in Bureau of Prisons custody, along with the employees of the Bureau who come in contact with those prisoners.  His continued incarceration places him, and others, at increased risk.

While I recognize that Mr. Shakur was convicted of serious crimes, those actions occurred within a unique historical context many decades ago.  Given this history, combined with Mr. Shakur's age and medical condition, I believe it is highly unlikely that he would reoffend, should he be released.  Additionally, I understand that in Mr. Shakur's 34 years in prison, he has had very few disciplinary infractions, none of which involved violence.  I also understand that he has gained the respect and confidence of prison officials, including the wardens of facilities where he was housed.  He has also served as a mentor and teacher for many young prisoners, counseling them against violence and gang activity, while promoting positive and rehabilitative programs.  Based on this information, I do not believe he will be a danger to the safety of the community upon release.

In summary, Mr. Shakur, a 69-year-old man who has been diagnosed with a terminal illness, is an excellent candidate for compassionate release, especially during this public health crisis resulting from the COVID-19 pandemic.  I hope that Mr. Shakur will be granted a reduction in sentence that will permit him to peacefully live out his remaining days with his family who loves him.

Sincerely,

Bobby L. Rush
Member of Congress

# EXHIBIT B

# Bureau of Prisons
# Health Services
# Clinical Encounter - Administrative Note

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | SHAKUR, MUTULU | | | Reg #: | 83205-012 |
| Date of Birth: | 08/08/1950 | Sex: | M    Race:BLACK | Facility: | VIP |
| Note Date: | 09/10/2014 18:43 | Provider: | Quinn, Ross MD | Unit: | C32 |

Review Note encounter performed at Health Services.
**Administrative Notes:**

**ADMINISTRATIVE NOTE  1**          **Provider:** Quinn, Ross MD

Reviewed inmate's labs. He remains anemic, wth H&H 10.8/35.5, normocytic, but with high RDW of 18.3. Platelets are normal at 250,000, as are WBCs, 3,800 with normal differential percentage. Iron studies are normal, as are B-12 and Folate levels. ANA and Ra were both negative, and sed rate was only 10. Hemoccults X 3 were negative, and recent colonoscopy found only a single 4 mm hyperplastic polyp, with diverticulosis and internal hemorrhoids, but no sign of bleeding anywhere. Unfortunately, a reticulocyte count was not done. All this is essentially unchanged since May, 2014.

At this point we still have an unexplained anemia, most likely from an unidentified source of bleeding, which has not yet exhausted the iron stores, vs a hemoglobinopathy trait. Anemia of chronic disease seems less likely, as does a myelophystic disease or an autoimmune disorder. I now recommend simply a repeat CBC with a reticulocyte count, and a hemoglobin electrophoresis. An Ultrasound of the abdomen to exclude splenomegaly would also be helpful. If all this turns out normal, he may need hematology consultation, and a bone marrow biopsy. This needs to be squared away before any orthopedic surgery.

**Copay Required:** No                 **Cosign Required:** Yes
**Telephone/Verbal Order:** No

Completed by Quinn, Ross MD on 09/10/2014 19:12
Requested to be cosigned by  Gulani, Saroj MD.
Cosign documentation will be displayed on the following page.
Requested to be reviewed by  Wolverton, Brigitte PA-C.
Review documentation will be displayed on the following page.

BOP FOIA  # 2020-01992 210 of 1636

60

**MS-00226**

# EXHIBIT C

| spectra laboratories | 525 Sycamore Drive<br>Milpitas, CA 95035<br>1-888-726-9105 | USP-Victorville (D) 69406<br>13777 Air Expressway Blv<br><br>VICTORVILLE,CA  92394 |
|---|---|---|
| **Patient Name**<br>**SHAKUR, MUTULU**<br>ID: 83205-012<br>DOB: 08/08/50  Gender: M<br>lab ID: 8001544283 | Physician: GULANI, SAROJ<br>Physician Code:<br>Account #: A113496<br>Requisition #: 8290Z4W | Collect Date:   12/11/14<br>Collect Time:   07:20<br>Received Date: 12/12/14<br>Reported Date: 12/12/14 |

FREQUENCY:   OTHER

| TEST NAME | RESULTS | | REFERENCE RANGE | |
|---|---|---|---|---|
| | OUT OF RANGE | IN RANGE | | |
| **Hematology** | | | | |
| White Blood Cell Count[1] | | 5.67 | 4.80-10.80 | 1000/mcL |
| Red Blood Cell Count | 3.97    L | | 4.70-6.10 | mill/mcL |
| Hemoglobin | 10.9    L | | 14.0-18.0 | g/dL |
| Hematocrit | 35.4    L | | 42.0-52.0 | % |
| MCV | | 89 | 80-100 | fl |
| MCH | | 27.5 | 27.0-31.0 | pg |
| MCHC | | 30.8 | 30.0-36.0 | g/dL |
| RDW | 16.5    H | | 11.5-14.5 | % |
| Neutrophils | | 50.1 | 40.0-75.0 | % |
| Lymphocytes | | 34.6 | 19.0-48.0 | % |
| Monocytes | | 9.4 | 3.0-10.0 | % |
| Eosinophils | | 1.5 | 0.0-7.0 | % |
| Basophils | | 1.1 | 0.0-1.5 | % |
| LUC | | 3.3 | 0.0-4.0 | % |
| Platelet Count | | 247 | 130-400 | 1000/mcL |
| Reticulocytes | | 1.62 | 0.80-2.10 | % |

[1]FASTING

| **Chemistry** | | | | |
|---|---|---|---|---|
| BUN[2] | | 15 | 6-19 | mg/dL |
| Creatinine | | 1.2 | 0.6-1.3 | mg/dL |
| Sodium | | 141 | 136-145 | mEq/L |
| Potassium | 3.3    L | | 3.5-5.1 | mEq/L |
| Chloride | | 100 | 96-108 | mEq/L |
| Bicarbonate | 32    H | | 22-29 | mEq/L |
| Calcium | | 10.0 | 8.4-10.2 | mg/dL |
| Alkaline Phosphatase | | 94 | 40-129 | U/L |
| AST (SGOT) | | 37 | 13-39 | U/L |
| ALT (SGPT) | | 39 | 7-52 | U/L |
| Bilirubin, Total | | 0.4 | 0.1-1.2 | mg/dL |
| Protein, Total | | 6.9 | 6.0-8.5 | g/dL |
| Albumin (BCG) | | 4.6 | 3.5-5.2 | g/dL |
| Glucose | 114    H | | 70-100 | mg/dL |
| Ferritin | | 82 | 22-322 | ng/mL |
| Iron | | 91 | 45-160 | mcg/dL |
| UIBC | | 245 | 155-355 | mcg/dL |
| TIBC (Calc) | | 336 | 185-515 | mcg/dL |
| Transferrin Sat (Calc) | | 27 | 20-55 | % |

[2]FASTING

**Final Report**

L: LOW, H: HIGH, EL: EXCEPTION LOW, EH: EXCEPTION HIGH, AL: ALERT LOW, AH: ALERT HIGH, !: ABNORMAL
Print Date/Time:12/12/14 12:30 PST                    Medical Director: C. Burdick, MD
Page:1 of 3

MS-00312

# EXHIBIT D

OCT/21/2019/MON 05:09 PM   Desert Valley OB Dep      FAX No.                    P. 006

**DESERT VALLEY MEDICAL GROUP**
16850 Bear Valley Road, Victorville, CA - 92395
Ph: (760) 241 - 8000

Patient Name: SHAKUR,MUTULU                     DOB: 08/08/1950 / Sex: M
Account #: V00001704821                          MR #: M000061371
Admission Dt:                                    Discharge Dt:
Room: / Bed:                                     Attending Phy: NANDA,VIR K MD

---

BONE MARROW ASPIRATION AND BIOPSY

PROCEDURE TIME:  1:00 p.m.

REASON FOR BONE MARROW BIOPSY:  Multiple myeloma.

POSTPROCEDURE DIAGNOSIS:  Multiple myeloma.

DESCRIPTION OF PROCEDURE: The patient was placed on his left side.  Right
posterior superior iliac spine was prepared in sterile fashion and infiltrated
with 1% lidocaine.  Skin, subcutaneous tissues and periosteum were adequately
locally anesthetized.  Bone marrow aspirate core samples were obtained.  Slides
were prepared.  A sample was sent for cytogenetic and flow cytometry.  Blood
loss was minimum, less than 3 mL.  The area was cleaned and sterile dressing was
done.  The patient was instructed to put pressure on his back or lie down for
the next 4 hours.  We will review the results in 2-3 weeks.  Procedure was
uneventful.  Informed consent was obtained prior to the procedure.  Risks and
benefits were explained.

_____
Soe Maunglay M.D.

DD: 10/08/2019 13:26
DT: 10/09/2019 02:18
JOB# 143016  3585789

---

OPERATIVE PROCEDURE REPORT

Patient Name: SHAKUR,MUTULU                           DOB: 08/08/1950
MR#: M000061371                                       Account#: V00001704821

64

MS 00363   2018-2019

OCT/21/2019/MON 05:09 PM   Desert Valley OB Dep      FAX No.                    P. 005

**DESERT VALLEY HOSPITAL**
Yvonne Noronha, M.D.
Laboratory Medical Director
16850 Bear Valley Road
Victorville, CA 92392
(760) 241-8000
(760) 843-5059 (Fax)

| | |
|---|---|
| Pathology #: | **BM19-000018** |
| Patient Name: | **Shakur, Mutulu** |
| Date of Birth: | 8/8/1950 |
| Sex: | Male |
| Medical Record #: | M000061371 |
| Referring Physician(s): | Maunglay, Soe M.D. |

**Bone Marrow Report**

The following TargetGene FISH analysis was performed on this patient's specimen:

| Probe | Detection Parameters | Result | ISCN |
|---|---|---|---|
| Centromere 7 | Detects a gain of chromosome 7 | Detected | nuc ish(D7Z1x3)[14/100] |
| Centromere 9 | Detects a gain of chromosome 9 | Detected | nuc ish(D9Z4x3)[12/100] |
| Centromere 15 | Detects a gain of chromosome 15 | Detected | nuc ish(D15Z4x3)[15/100] |
| 13q14(DLEU1) | Detects a monosomy for chromosome 13 | Detected | nuc ish(DLEU1,TFDP1)x1[16/100] |
| TP53/17p | Detects a deletion of TP53 gene | Not Detected | nuc ish(TP53x2)[100] |
| CKS1B/1q21 | Detects a gain of 1q21 | See Interpretation | nuc ish(SRD,CKS1B)x3[20/100] |
| CCND1/IGH - t(11;14) | Detects a CCND1/IGH translocation | See Interpretation | nuc ish(CCND1x3,IGHx2)[25/100] |
| FGFR3/IGH - t(4;14) | Detects a FGFR3/IGH translocation | See Interpretation | nuc ish(FGFR3x3,IGHx2)[14/100] |
| IGH/MAF - t(14;16) | Detects an IGH/MAF translocation | Not Detected | nuc ish(IGH,MAF)x2[100] |

*Noronha*
Yvonne Noronha, M.D.   10/21/2019

RECEIVED
OCT 2 1 2019
By____

**PATHOLOGY REPORT**
Page 4 of 4

Collected: 10/08/2019
Received: 10/08/2019

Maunglay, Soe M.D.
DVMC - MOB
16850 Bear Valley Road, Suite 202
Victorville, CA 92395

PATIENT NAME:   Shakur, Mutulu
PATHOLOGY NO:   BM19-000018
MED REC NO:     M000061371
PATHOLOGIST:    Yvonne Noronha, M.D.

MS 00364   2018 - 2019

OCT/21/2019/MON 05:08 PM   Desert Valley OB Dep      FAX No.                          P. 004

---

**DESERT VALLEY HOSPITAL**
Yvonne Noronha, M.D.
**Laboratory Medical Director**
16850 Bear Valley Road
Victorville, CA  92392
(760) 241-8000
(760) 843-5059 (Fax)

Pathology #:  **BM19-000018**
Patient Name:  **Shakur, Mutulu**
Date of Birth:  8/8/1950
Sex:  Male
Medical Record #:  M000061371
Referring Physician(s):  Maunglay, Soe M.D.

**Bone Marrow Report**

---

CYTOGENETIC STUDIES (performed and interpreted at Integrated Oncology); report dated 10/18/2019 states as follows:

**RESULTS:**   **46,XY[20]**
                **Male Karyotype**

**INTERPRETATION:**
Normal male chromosome complement observed in all cells examined. There was no evidence of a chromosome abnormality within the limits of the technology utilized.

**FLUORESCENCE IN SITU HYBRIDIZATION (FISH) MULTIPLE MYELOMA PANEL** (performed and interpreted at Integrated Oncology); report dated 10/19/2019 states as follows:

**RESULT:**   **Assay specific abnormalities detected by Multiple Myeloma FISH panel:**
              **Gain of chromosomes 7, 9, and 15, and a monosomy for chromosome 13**

              **Note: Other abnormalities were also detected. See interpretation.**

**INTERPRETATION:**
Fluorescence in situ hybridization (FISH) analysis was performed on this patient's specimen using DNA probes for multiple myeloma panel. One hundred interphase nuclei were examined for each probe and the signal patterns revealed the following:

Positive for 3 copies of both 1q21 and 1p36 (20.0% of nuclei), most likely indicating a gain (trisomy) of chromosome 1.
Positive for trisomy of chromosome 7 (14.0% of nuclei).
Positive for trisomy of chromosome 9 (12.0% of nuclei).
Positive for trisomy of chromosome 15 (15.0% of nuclei).
Positive for monosomy of chromosome 13 (loss of both 13q14/DLEU1 and 13q34/TFDP1) (16.0% of nuclei).

Negative for FGFR3/IGH translocation. However, an extra copy of FGFR3 was observed in 14.0% of nuclei indicating the presence of a chromosome 4 abnormality.

Negative for a CCND1/IGH translocation. However, an extra copy of CCND1 was observed in 25.0% of nuclei indicating the presence of a chromosome 11 abnormality, most likely trisomy 11.

The signal pattern obtained with the remaining probes did not differ significantly from the normal controls.

Aneuploidy is the most common genetic alteration in plasma cell myeloma (multiple myeloma), as it is detected by FISH analysis in ~60 to 90% of patients. Trisomies of chromosomes 7, 9, 11, and 15 are among the most commonly observed numerical changes. Aneuploidy, and particularly trisomy can also be found in monoclonal gammopathy of unknown significance (MGUS), smoldering myeloma and amyloidosis. Hyperdiploidy in plasma cell myeloma (multiple myeloma) without IGH gene rearrangements and other poor prognostic markers is associated with a more favorable outcome.

Genetic changes other than those assayed in this study cannot be ruled out on the basis of this testing. Correlation with cytogenetic, clinical and pathological findings is suggested for a complete interpretation of the results. Follow-up FISH analysis may be considered as a means to monitor the clinical course of the disease.

**PATHOLOGY REPORT**

| | | |
|---|---|---|
| Maunglay, Soe M.D. | Page 3 of 4 | PATIENT NAME:  Shakur, Mutulu |
| DVMC - MOB | | PATHOLOGY NO:  BM19-000018 |
| 16850 Bear Valley Road, Suite 202 | Collected: 10/08/2019 | MED REC NO:  M000061371 |
| Victorville, CA 92395 | Received: 10/08/2019 | PATHOLOGIST:  Yvonne Noronha, M.D. |

66

MS 00365   2018 - 2019

OCT/21/2019/MON 05:08 PM   Desert Valley OB Dep     FAX No.                    P. 003

**DESERT VALLEY HOSPITAL**
Yvonne Noronha, M.D.
Laboratory Medical Director
16850 Bear Valley Road
Victorville, CA 92392
(760) 241-8000
(760) 843-5059 (Fax)

| | |
|---|---|
| Pathology #: | BM19-000018 |
| Patient Name: | Shakur, Mutulu |
| Date of Birth: | 8/8/1950 |
| Sex: | Male |
| Medical Record #: | M000061371 |
| Referring Physician(s): | Maunglay, Soe M.D. |

**Bone Marrow Report**

## MARROW CLOT/BIOPSY

Material evaluated includes clot and core biopsy sections. The clot section shows blood and scattered hematopoietic cells. The core biopsy is adequate for evaluation and shows an overall normocellular marrow for age with increased plasma cells with interstitial pattern of distribution as well as focal small nodules. Foci of trilineage hematopoiesis are seen. Megakaryocytes are relatively normal in number with some hypolobate forms.

The iron stained core biopsy section shows absent marrow iron stores.
The reticulin stained core biopsy section does not show any increase in reticulin fibrosis

To further evaluate the different cell populations, immunohistochemical and ISH stains are performed on the core biopsy section with the following results:

| | |
|---|---|
| CD138 | ~40% plasma cells positive |
| Kappa ISH | majority of plasma cells positive |
| Lambda ISH | rare plasma cells positive |
| CD38 | plasma cells positive |
| CD56 | plasma cells positive |
| CD117 | plasma cells positive |
| CD34 | ~1% blasts positive |
| CD3 | ~2-3% T-cells positive |
| CD5 | ~2% T-cells positive |
| CD20 | ~1-2% B-cells positive |

Interpretation: The presence of increased numbers of monoclonal (kappa-restricted) plasma cells is consistent with a plasma cell neoplasm.

The immunohistochemical and ISH stains reported above were developed and their performance characteristics determined by LabCorp Laboratories. They have not been cleared or approved by the U.S. Food and Drug Administration, although the FDA has determined such approval is not required for analyte-specific reagents of this type. Appropriate positive and negative controls are included for each immunohistochemical/ ISH stain.

**SPECIAL STUDIES**
FLOW CYTOMETRY (performed and interpreted at Integrated Oncology); report dated 10/09/2019 states as follows:

Interpretation
Bone Marrow Aspirate:
**Abnormal monotypic (kappa) plasma cell population (8.0% of sample), consistent with a plasma cell neoplastic process**

Comments
The plasma cells detected in this analysis comprise 8.0% of the total leukocytes. The plasma cells are CD45 negative, express CD38, CD138, CD56 and CD117. Analysis for cytoplasmic B-cell light chains demonstrates a Kappa light chain restriction (cK/cL= 262:1). Plasma cells are typically underrepresented by flow cytometry. Correlation with all available clinical, laboratory, and morphologic data is recommended.

| | | |
|---|---|---|
| Maunglay, Soe M.D. | **PATHOLOGY REPORT** | |
| DVMC - MOB | Page 2 of 4 | PATIENT NAME: Shakur, Mutulu |
| 16850 Bear Valley Road, Suite 202 | | PATHOLOGY NO: BM19-000018 |
| Victorville, CA 92395 | Collected: 10/08/2019 | MED REC NO: M000061371 |
| | Received: 10/08/2019 | PATHOLOGIST: Yvonne Noronha, M.D. |

MS 00366   2018 - 2019

OCT/21/2019/MON 05:08 PM   Desert Valley OB Dep      FAX No.                    P. 002

---

**DESERT VALLEY HOSPITAL**
Yvonne Noronha, M.D.
Laboratory Medical Director
16850 Bear Valley Road
Victorville, CA 92392
(760) 241-8000
(760) 843-5059 (Fax)

| | |
|---|---|
| Pathology #: | **BM19-000018** |
| Patient Name: | **Shakur, Mutulu** |
| Date of Birth: | 8/8/1950 |
| Sex: | Male |
| Medical Record #: | M000061371 |
| Referring Physician(s): | Maunglay, Soe M.D. |

**Bone Marrow Report**

---

## DIAGNOSIS

BONE MARROW, RIGHT POSTERIOR SUPERIOR ILIAC SPINE, ASPIRATION AND CORE BIOPSY:
- PLASMA CELL NEOPLASM (SEE COMMENT)
- OVERALL NORMOCELLULAR MARROW FOR AGE WITH ~40% KAPPA-RESTRICTED PLASMA CELLS

**COMMENT:**
The aspirate smears are suboptimal for evaluation and therefore, a differential count could not be performed. However, the core biopsy shows ~40% CD138 positive, kappa-restricted plasma cells. Flow cytometric analysis revealed 8% kappa-restricted plasma cells. (Plasma cells are typically underrepresented by flow cytometry.) Urine protein electrophoresis revealed an M-spike. Serum free kappa light chains were increased with a kappa/lambda ratio of 167.63.

The findings are consistent with a plasma cell neoplasm and the histopathologic differential includes plasma cell myeloma versus smoldering (asymptomatic) plasma cell myeloma. Correlation with clinical and radiologic findings is recommended.

The myeloma FISH panel revealed multiple abnormalities including gain of chromosomes 7, 9, and 15, and a monosomy for chromosome 13 (see details below). Karyotyping did not reveal any abnormalities.

---

**Material Identification**
Right posterior superior iliac spine, aspiration and biopsy

**Operative Procedure**
Bone marrow aspiration and biopsy

**Clinical History**
Clinical myeloma, active disease

**PERIPHERAL BLOOD**
HEMOGRAM (Dated: 10/08/19):
WBC 5.2 x10$^9$/µL; RBC 3.45 x10$^6$/µL; HGB 9.4 g/dL; HCT 29.1%; MCV 84.3 fL; MCH 27.1 pg; MCHC 32.2 g/dL; RDW 21.1%; platelets 229 x10$^9$/µL; neutrophils 56.0%, lymphocytes 28.9%, monocytes 13.4%, eosinophils 1.6%, basophils 0.1%.
The peripheral smear has been reviewed and the findings are consistent with the CBC data. The red blood cells are mildly decreased in number, overall normochromic and normocytic. The white blood cells are normal in number with overall normal morphology. Platelets are normal in number with overall normal morphology.

**MARROW SMEAR**
The bone marrow aspirate smears are markedly limited for evaluation due to hemodilution and paucity of spicules. A differential count is therefore not possible. Scattered neutrophils, lymphocytes and a rare erythroid precursor are noted. Megakaryocytes are not seen.

---

**PATHOLOGY REPORT**

Maunglay, Soe M.D.
DVMC - MOB
16850 Bear Valley Road, Suite 202
Victorville, CA 92395

Page 1 of 4

Collected: 10/08/2019
Received: 10/08/2019

| | |
|---|---|
| PATIENT NAME: | Shakur, Mutulu |
| PATHOLOGY NO: | BM19-000018 |
| MED REC NO: | M000061371 |
| PATHOLOGIST: | Yvonne Noronha, M.D. |

68

**MS 00367   2018 - 2019**

# EXHIBIT E

# VISITOR/VOLUNTEER/CONTRACTOR COVID-19 SCREENING TOOL

| 1.  Have you……. | |
|---|---|
| ☐ Yes ☐ No | a.  Traveled from or through, any of the following locations identified by the CDC as increasing epidemiologic risk for COVID-19 within the last 14 days?<br>China, Iran, South Korea, Italy, Japan |
| ☐ Yes ☐ No | b.  Had close contact with anyone diagnosed with the COVID-19 illness within the last 14 days? |
| | |
| **2.   Do you currently have a …………** | |
| ☐ Yes ☐ No | a.  Fever or Chills |
| ☐ Yes ☐ No | b.  Cough |
| ☐ Yes ☐ No | c.  Shortness of Breath |
| **3.  Perform a temperature check _____°F Method: oral / forehead (temporal) / tympanic** | |
| ***Staff see instruction sheet for screening form.*** | |

**Purpose of Visit (Circle one):**
Attorney-legal / Contractor / Volunteer
Social (visiting an inmate) – Inmate name/reg. number _____
Other - _____

**Visitor Name (Last, First):** _____

**Date:** _____

**Institution**: _____

# Visitor/Volunteer/Contractor COVID-19 Screening Tool

**Instructions for staff:**

The BOP staff member will provide the COVID-19 Screening Tool to all persons entering the lobby (visitors, volunteers, contractors, legal visits, etc.), ask each person to complete questions 1. a-b and 2. a-c.   A qualified health care staff member will complete the temperature check.

If answers to all the questions are No, and there are no obvious signs of respiratory infection, e.g. frequent coughing, and temperature is < 100.4°F, follow usual procedures.

Social visitors: If answers to any of the questions are YES, *or* if the person has a temperature ≥ 100.4°F (oral), *or* if the person has obvious signs of a respiratory illness, ask social visitors to wait in a separate area (6 feet from others or outside), and contact the Operations Lieutenant and/or Institution Duty Officer (IDO), for further direction to the visitor(s).  The IDO or Operations Lieutenant should deny visitation and not allow entry into the institution.

Attorney/Contractor/Volunteer: If answers to any of the questions are YES, *or* if the person has a temperature ≥ 100.4°F (oral), *or* if the person has obvious signs of a respiratory illness, they should not be allowed entry to the institution.

In the case of an attorney / legal visitor who answers yes to any of the questions, decisions may be made on a case-by-case basis with approval at the local level and confidential legal calls will be allowed.

# EXHIBIT F

# CORONAVIRUS DISEASE 2019 (COVID-19) STAFF SCREENING TOOL

## DATE:_____

| | |
|---|---|
| **1. Temperature:** _____ °F    Method:  Mouth          Ear          Forehead | |

□ If Temperature (Mouth) ≥ 100.4°F,  or  Temperature (Ear) ≥101°F,    or  Temperature (Forehead) ≥ 100°F

    Then Deny Access , Place on Leave (Not Safety & Weather Leave) for 3 days + STOP HERE & Proceed to Section 3

**2.  Signs** (Employee Complete)

| | |
|---|---|
| □ Yes  □ No | **New On-Set Cough**          # of Days_____ |
| □ Yes  □ No | **New Onset Trouble Speaking because of Needing to take a Breath** |
| □ Yes  □ No | **Stuffy/Runny Nose** |

➤   Contact the Medical Officer on Call for the Institution to provide Disposition

    ✓  Disposition by Medical Officer Assessment:
                  □ Leave
                  □ Work

**3.  Notification of Local Human Resources Department**

□ If Individual is placed on leave for Section 1 *or* 2, Then share document with HR Office for T&A purpose

➤ **<u>HR</u>**

□ Please have HSD place this document in the Employee's Medical Folder (Blue Folder) if leave is indicated

**Staff Name (Last, First):** _____  **Year of Birth (Year):** _____

**Institution:** _____  **State:** _____

# EXHIBIT G

## COVID-19 Action Plan: Phase Five

Additional Agency-wide Actions Effective April 1



Updated 6:30 PM ET, March 31, 2020

**(BOP) -** Today, the Director of the Bureau of Prisons (BOP) ordered the implementation of Phase 5 of its COVID-19 Action Plan, effective tomorrow, April 1, 2020. In response to a growing number of quarantine and isolation cases in our facilities, the BOP will take the following actions immediately to further mitigate the exposure and spread of COVID-19.

- For a 14-day period, inmates in every institution will be secured in their assigned cells/quarters to decrease the spread of the virus. This modification to our action plan is based on health concerns, not disruptive inmate behavior.
- During this time, to the extent practicable, inmates should still have access to programs and services that are offered under normal operating procedures, such as mental health treatment and education.
- In addition, the Bureau is coordinating with the United States Marshals Service (USMS) to significantly decrease incoming movement during this time.
- After 14 days, this decision will be reevaluated and a decision made as to whether or not to return to modified operations.
- Limited group gathering will be afforded to the extent practical to facilitate commissary, laundry, showers, telephone, and Trust Fund Limited Inmate Computer System (TRULINCS) access.

Starting in January 2020, the BOP implemented its Pandemic Influenza contingency plan, modified as an Action Plan for COVID-19. The BOP continues to revise and update its action plan in response to the fluid nature of the COVID-19 pandemic, and in response to the latest guidance from experts at the World Health Organization (WHO), the Centers for Disease Control and Prevention (CDC) and the Office of Personnel Management (OPM).

Background on Phases 1 - 4:

Phase 4: On March 26, 2020, the BOP implemented revised preventative measures for all institutions. The agency updated its quarantine and isolation procedures to require all newly admitted inmates to BOP, whether in a sustained community transition area or not, be assessed using a screening tool and temperature check. This includes all new intakes, detainees, commitments, writ returns from judicial proceedings, and parole violators, regardless of their method of arrival. Asymptomatic inmates are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation.

These are the latest measures that follow the first three phases of the Bureau's action plan, which may be found here: www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf

The Bureau will continue to provide daily updates and information on actions related to COVID-19 at www.bop.gov/coronavirus/

75

# Updates to BOP COVID-19 Action Plan

Inmate Movement



Updated 5:00 PM ET, March 19, 2020

**(BOP) -** As a result of continued admission of new inmates to federal custody and to assure the safe ongoing management of the inmate population in the entire federal prison system, the BOP is updating its action plans as follows:

## INMATE MOVEMENT: As we previously described generally, inmate internal movement is suspended with limited exceptions. This suspension, however, does not mean the BOP has ceased all inmate movements because the federal judicial system as well as state courts continue to process criminal cases.

These movement exceptions may include, but are not limited to, transfers related to forensic studies, writs, Interstate Agreements on Detainers (IAD), medical or mental health reasons (including local medical trips), and RRC placements. **To be clear, the BOP may need to move inmates to better manage the detention bedspace as well as assure that administrative facilities do not become overcrowded beyond available resources.**

All inmates are being authorized for movements from **all facilities** under the following conditions:

- Inmates must have been in BOP custody for greater than 14 days;
- Perform an exit screening for COVID-19 symptoms (fever, cough, shortness of breath and temperature).
  - If the inmate has no symptoms and a temperature less than 100.4 degrees F, the inmate will be transferred;
  - If the inmate has COVID-19 symptoms, or temperature greater than 100.4 degrees F, they will not be transferred and will instead be immediately placed in isolation.
- Regional Directors will notify the BOP Emergency Operations Center prior to movement in order to track and monitor movement.

**The BOP emphasizes that all inmates regardless of where they are being housed are screened for COVID-19 prior to movement. Both the BOP and USMS are using screening protocols for both inmates and staff.**

An additional update to the BOP's COVID-19 Action Plan is as follows: To assist inmates who are releasing from custody and facing difficulty obtaining medications, the BOP is providing such inmates with a sixty-day supply of medication.

The Federal Bureau of Prisons (Bureau) is our nation's largest correctional agency, housing over 175,000 inmates across the United States. Our mission serves our country nationwide - maintaining safety and security of our institutions is our highest priority.

Our over 36,000 staff nationwide play a critical role in the federal criminal justice system; arresting authorities, prosecutors, judges, and our communities count on us to keep our communities safe and our institutions secure. The work of our staff goes largely unseen and often unrecognized by the general public. Yet this inherently dangerous work helps keep communities safe every day.

76

# EXHIBIT H

# Letters

RESEARCH LETTER

## Presumed Asymptomatic Carrier Transmission of COVID-19

A novel coronavirus has resulted in an ongoing outbreak of viral pneumonia in China.[1-3] Person-to-person transmission has been demonstrated,[1] but, to our knowledge, transmission of the novel coronavirus that causes coronavirus disease 2019 (COVID-19) from an asymptomatic carrier with normal chest computed tomography (CT) findings has not been reported.

Methods | In January 2020, we enrolled a familial cluster of 5 patients with fever and respiratory symptoms who were admitted to the Fifth People's Hospital of Anyang, Anyang, China, and 1 asymptomatic family member. This study was approved by the local institutional review board, and written informed consent was obtained from all patients. A detailed analysis of patient records was performed.

All patients underwent chest CT imaging. Real-time reverse transcriptase polymerase chain reaction (RT-PCR) tests for COVID-19 nucleic acid were performed using nasopharyngeal swabs (Novel Coronavirus PCR Fluorescence Diagnostic Kit, BioGerm Medical Biotechnology).

Results | Patient 1 (presumed asymptomatic carrier), a 20-year-old woman, lives in Wuhan and traveled to Anyang on January 10, 2020. She initially met with patients 2 and 3 on January 10. On January 13, she accompanied 5 relatives (patients 2 through 6) to visit another hospitalized relative in Anyang District Hospital (Figure). There was no report of COVID-19 at this hospital. After development of disease in her relatives, patient 1 was isolated and observed. As of February 11, she had no elevated temperature measured or self-reported fever and no gastrointestinal or respiratory symptoms, including cough and sore throat, reported or observed by the physicians. Chest CT images on January 27 and 31



**Figure. Timeline of Exposure to the Asymptomatic Carrier of the Novel Coronavirus That Causes COVID-19 in a Familial Cluster**

PCR indicates polymerase chain reaction test for the coronavirus disease 2019 (COVID-19) nucleic acid.

**Table. Summary of Laboratory Examination Results of the Familial Cluster Infected With the Novel Coronavirus That Causes Coronavirus Disease 2019**

| | Reference range | Patient 1[a] | Patient 2 | Patient 3 | Patient 4 | Patient 5 | Patient 6 |
|---|---|---|---|---|---|---|---|
| C-reactive protein, mg/L | 0.0-4.0 | 0.69 | 217.17 | 10.14 | 66.07 | 14.9 | 202.03 |
| Eosinophils, ×10⁹/L | 0.02-0.52 | 0.02 | 0 | 0.01 | 0 | 0 | 0 |
| Eosinophil ratios, % | 0.4-8 | 0.40 | 0 | 0.30 | 0 | 0.10 | 0 |
| Lymphocytes, ×10⁹/L | 1.1-3.2 | 1.55 | 0.53 | 1.65 | 0.91 | 0.46 | 0.69 |
| Lymphocyte ratios, % | 20-50 | 27.50 | 6.70 | 35.90 | 27.70 | 13.30 | 7.40 |
| Neutrophils, ×10⁹/L | 1.8-6.3 | 3.62 | 6.89 | 2.64 | 2.10 | 2.89 | 8.21 |
| Neutrophil ratios, % | 40-75 | 63.90 | 86.40 | 57.40 | 64.00 | 84.10 | 87.00 |
| White blood cell count, ×10⁹/L | 3.9-9.9 | 5.65 | 7.97 | 4.59 | 3.29 | 3.44 | 9.43 |

[a] Asymptomatic.

© 2020 American Medical Association. All rights reserved.

Downloaded From: https://jamanetwork.com/ by Mark Kleiman on 04/14/2020

78

Letters

showed no significant abnormalities. Her C-reactive protein level and lymphocyte count were normal (Table). Results of RT-PCR testing were negative on January 26, positive on January 28, and negative on February 5 and 8.

Patients 2 through 6 developed COVID-19. Four were women, and ages ranged from 42 to 57 years. None of the patients had visited Wuhan or been in contact with any other people who had traveled to Wuhan (except patient 1).

Patients 2 through 5 developed fever and respiratory symptoms between January 23 and January 26 and were admitted to the hospital on the same day. All patients had RT-PCR test results positive for COVID-19 within 1 day. Patient 6 developed fever and sore throat on January 17 and went to the local clinic for treatment. There was no report of COVID-19 at the clinic. Her symptoms improved over the next few days but worsened on January 24, when she was admitted to the hospital and confirmed to have COVID-19 on January 26. Two patients developed severe pneumonia; the other infections were moderate.

All symptomatic patients had multifocal ground-glass opacities on chest CT, and 1 also had subsegmental areas of consolidation and fibrosis. All the symptomatic patients had increased C-reactive protein levels and reduced lymphocyte counts (Table).

Discussion | A familial cluster of 5 patients with COVID-19 pneumonia in Anyang, China, had contact before their symptom onset with an asymptomatic family member who had traveled from the epidemic center of Wuhan. The sequence of events suggests that the coronavirus may have been transmitted by the asymptomatic carrier. The incubation period for patient 1 was 19 days, which is long but within the reported range of 0 to 24 days.[4] Her first RT-PCR result was negative; false-negative results have been observed related to the quality of the kit, the collected sample, or performance of the test. RT-PCR has been widely deployed in diagnostic virology and has yielded few false-positive outcomes.[5] Thus, her second RT-PCR result was unlikely to have been a false-positive and was used to define infection with the coronavirus that causes COVID-19.

One previous study reported an asymptomatic 10-year-old boy with COVID-19 infection, but he had abnormalities on chest CT.[6] If the findings in this report of presumed transmission by an asymptomatic carrier are replicated, the prevention of COVID-19 infection would prove challenging. The mechanism by which asymptomatic carriers could acquire and transmit the coronavirus that causes COVID-19 requires further study.

**Yan Bai, MD**
**Lingsheng Yao, MD**
**Tao Wei, MD**
**Fei Tian, MD**
**Dong-Yan Jin, PhD**
**Lijuan Chen, PhD**
**Meiyun Wang, MD, PhD**

**Author Affiliations:** Department of Medical Imaging, Henan Provincial People's Hospital, Zhengzhou, Henan, China (Bai, Chen, Wang); Department of Radiology, Anyang Hospital of Traditional Chinese Medicine, Anyang, Henan, China (Yao); Department of Radiology and Interventional, the Fifth People's Hospital of Anyang, Anyang, Henan, China (Wei); Tianjin Medical University Cancer Institute and Hospital, Tianjin, China (Tian); Li Ka Shing Faculty of Medicine, the University of Hong Kong, Pokfulam, Hong Kong, China (Jin).

**Corresponding Author:** Meiyun Wang, MD, PhD, Department of Medical Imaging, Henan Provincial People's Hospital and the People's Hospital of Zhengzhou University, No. 7, WeiWu Road, Zhengzhou 450003, Henan, China (mywang@ha.edu.cn).

**Published Online:** February 21, 2020. doi:10.1001/jama.2020.2565

**Author Contributions:** Drs Yao and Wang had full access to all of the data in the study and take responsibility for the integrity of the data and the accuracy of the data analysis. Drs Bai, Yao, and Wei contributed equally to the work.
*Concept and design:* Bai, Yao, Tian, Jin, Wang.
*Acquisition, analysis, or interpretation of data:* Bai, Yao, Wei, Tian, Chen, Wang.
*Drafting of the manuscript:* Bai, Yao, Wei, Tian, Wang.
*Critical revision of the manuscript for important intellectual content:* Bai, Tian, Jin, Chen, Wang.
*Statistical analysis:* Bai, Chen, Wang.
*Administrative, technical, or material support:* Bai, Yao, Wei, Tian, Wang.
*Supervision:* Tian, Wang.

**Conflict of Interest Disclosures:** None reported.

**Additional Contributions:** We thank Taiyuan Liu, MD, Rushi Chen, MD, and Wei Wei, MD (Henan Provincial People's Hospital and the People's Hospital of Zhengzhou University), for data analysis and literature research. None of these persons received any compensation for their contributions.

**1.** Paules CI, Marston HD, Fauci AS. Coronavirus infections—more than just the common cold. *JAMA.* Published online January 23, 2020. doi:10.1001/jama.2020.0757

**2.** Li Q, Guan X, Wu P, et al. Early transmission dynamics in Wuhan, China, of novel coronavirus–infected pneumonia. *N Engl J Med.* Published online January 29, 2020. doi:10.1056/NEJMoa2001316

**3.** Wang D, Hu B, Hu C, et al. Clinical characteristics of 138 hospitalized patients with 2019 novel coronavirus–infected pneumonia in Wuhan, China. *JAMA.* Published online February 7, 2020. doi:10.1001/jama.2020.1585

**4.** Guan WJ, Ni ZY, Hu Y, et al. Clinical characteristics of 2019 novel coronavirus infection in China. medRxiv. Published February 9, 2020. Accessed February 18, 2010. https://www.medrxiv.org/content/10.1101/2020.02.06.20020974v1

**5.** Corman VM, Landt O, Kaiser M, et al. Detection of 2019 novel coronavirus (2019-nCoV) by real-time RT-PCR. *Euro Surveill.* Published online January 23, 2020. doi:10.2807/1560-7917.ES.2020.25.3.2000045

**6.** Chan JF, Yuan S, Kok KH, et al. A familial cluster of pneumonia associated with the 2019 novel coronavirus indicating person-to-person transmission: a study of a family cluster. *Lancet.* 2020;395(10223):514-523. doi:10.1016/S0140-6736(20)30154-9

© 2020 American Medical Association. All rights reserved.

79

Downloaded From: https://jamanetwork.com/ by Mark Kleiman on 04/14/2020

# EXHIBIT I



# CORRESPONDENCE

# Transmission of 2019-nCoV Infection from an Asymptomatic Contact in Germany

**TO THE EDITOR:** The novel coronavirus (2019-nCoV) from Wuhan is currently causing concern in the medical community as the virus is spreading around the world.[1] Since identification of the virus in late December 2019, the number of cases from China that have been imported into other countries is on the rise, and the epidemiologic picture is changing on a daily basis. We are reporting a case of 2019-nCoV infection acquired outside Asia in which transmission appears to have occurred during the incubation period in the index patient.

A 33-year-old otherwise healthy German businessman (Patient 1) became ill with a sore throat, chills, and myalgias on January 24, 2020. The following day, a fever of 39.1°C (102.4°F) developed, along with a productive cough. By the evening of the next day, he started feeling better and went back to work on January 27.

Before the onset of symptoms, he had attended meetings with a Chinese business partner at his company near Munich on January 20 and 21. The business partner, a Shanghai resident, had visited Germany between January 19 and 22. During her stay, she had been well with no signs or symptoms of infection but had become ill on her flight back to China, where she tested positive for 2019-nCoV on January 26 (index patient in Fig. 1) (see Supplementary Appendix, available at NEJM.org, for details on the timeline of symptom development leading to hospitalization).

On January 27, she informed the company about her illness. Contact tracing was started, and the above-mentioned colleague was sent to the Division of Infectious Diseases and Tropical Medicine in Munich for further assessment. At presentation, he was afebrile and well. He reported no previous or chronic illnesses and had no history of foreign travel within 14 days before the onset of symptoms. Two nasopharyngeal swabs and one sputum sample were obtained and were found to be positive for 2019-nCoV on quantitative reverse-transcriptase–polymerase-chain-reaction (qRT-PCR) assay.[2] Follow-up qRT-PCR assay revealed a high viral load of $10^8$ copies per milliliter in his sputum during the following days, with the last available result on January 29.

On January 28, three additional employees at the company tested positive for 2019-nCoV (Patients 2 through 4 in Fig. 1). Of these patients, only Patient 2 had contact with the index patient; the other two patients had contact only with Patient 1. In accordance with the health authorities, all the patients with confirmed 2019-nCoV infection were admitted to a Munich infectious diseases unit for clinical monitoring and isolation. So far, none of the four confirmed patients show signs of severe clinical illness.

This case of 2019-nCoV infection was diagnosed in Germany and transmitted outside Asia. However, it is notable that the infection appears to have been transmitted during the incubation period of the index patient, in whom the illness was brief and nonspecific.[3]

The fact that asymptomatic persons are potential sources of 2019-nCoV infection may war-

### THIS WEEK'S LETTERS

970    **Transmission of 2019-nCoV Infection from an Asymptomatic Contact in Germany**

972    **Dapagliflozin in Patients with Heart Failure and Reduced Ejection Fraction**

974    **A Smartwatch to Identify Atrial Fibrillation**

976    **Focused Cardiac Ultrasonography for Left Ventricular Systolic Function**

The New England Journal of Medicine
Downloaded from nejm.org on April 5, 2020. For personal use only. No other uses without permission.
Copyright © 2020 Massachusetts Medical Society. All rights reserved.

81

CORRESPONDENCE



**Figure 1.** Timeline of Exposure to Index Patient with Asymptomatic 2019-CoV Infection in Germany.

rant a reassessment of transmission dynamics of the current outbreak. In this context, the detection of 2019-nCoV and a high sputum viral load in a convalescent patient (Patient 1) arouse concern about prolonged shedding of 2019-nCoV after recovery. Yet, the viability of 2019-nCoV detected on qRT-PCR in this patient remains to be proved by means of viral culture.

Despite these concerns, all four patients who were seen in Munich have had mild cases and were hospitalized primarily for public health purposes. Since hospital capacities are limited — in particular, given the concurrent peak of the influenza season in the northern hemisphere — research is needed to determine whether such patients can be treated with appropriate guidance and oversight outside the hospital.

Camilla Rothe, M.D.
Mirjam Schunk, M.D.
Peter Sothmann, M.D.
Gisela Bretzel, M.D.
Guenter Froeschl, M.D.
Claudia Wallrauch, M.D.
Thorbjörn Zimmer, M.D.
Verena Thiel, M.D.
Christian Janke, M.D.
University Hospital LMU Munich
Munich, Germany
rothe@lrz.uni-muenchen.de

Wolfgang Guggemos, M.D.
Michael Seilmaier, M.D.
Klinikum München-Schwabing
Munich, Germany

Christian Drosten, M.D.
Charité Universitätsmedizin Berlin
Berlin, Germany

Patrick Vollmar, M.D.
Katrin Zwirglmaier, Ph.D.
Sabine Zange, M.D.
Roman Wölfel, M.D.
Bundeswehr Institute of Microbiology
Munich, Germany

Michael Hoelscher, M.D., Ph.D.
University Hospital LMU Munich
Munich, Germany

Disclosure forms provided by the authors are available with the full text of this letter at NEJM.org.

This letter was published on January 30, 2020, and updated on February 6, 2020, at NEJM.org.

**1.** Zhu N, Zhang D, Wang W, et al. A novel coronavirus from patients with pneumonia in China, 2019. N Engl J Med 2020;382: 727-33.
**2.** Corman V, Bleicker T, Brünink S, et al. Diagnostic detection of Wuhan coronavirus 2019 by real-time RT-PCR. Geneva: World Health Organization, January 13, 2020 (https://www .who.int/docs/default-source/coronaviruse/wuhan-virus-assay -v1991527e5122341d99287a1b17c111902.pdf).
**3.** Callaway E, Cyranoski D. China coronavirus: six questions scientists are asking. Nature 2020;577:605-7.

DOI: 10.1056/NEJMc2001468

The New England Journal of Medicine
Downloaded from nejm.org on April 5, 2020. For personal use only. No other uses without permission.
Copyright © 2020 Massachusetts Medical Society. All rights reserved.

# EXHIBIT J



**Office of the Attorney General**
**Washington, D. C. 20530**

April 3, 2020

MEMORANDUM FOR DIRECTOR OF BUREAU OF PRISONS

FROM:          THE ATTORNEY GENERAL

SUBJECT:     <u>Increasing Use of Home Confinement at Institutions Most Affected by COVID-19</u>

The mission of BOP is to administer the lawful punishments that our justice system imposes. Executing that mission imposes on us a profound obligation to protect the health and safety of all inmates.

Last week, I directed the Bureau of Prisons to prioritize the use of home confinement as a tool for combatting the dangers that COVID-19 poses to our vulnerable inmates, while ensuring we successfully discharge our duty to protect the public. I applaud the substantial steps you have already taken on that front with respect to the vulnerable inmates who qualified for home confinement under the pre-CARES Act standards.

As you know, we are experiencing significant levels of infection at several of our facilities, including FCI Oakdale, FCI Danbury, and FCI Elkton. We have to move with dispatch in using home confinement, where appropriate, to move vulnerable inmates out of these institutions. I would like you to give priority to these institutions, and others similarly affected, as you continue to process the remaining inmates who are eligible for home confinement under pre-CARES Act standards. In addition, the CARES Act now authorizes me to expand the cohort of inmates who can be considered for home release upon my finding that emergency conditions are materially affecting the functioning of the Bureau of Prisons. I hereby make that finding and direct that, as detailed below, you give priority in implementing these new standards to the most vulnerable inmates at the most affected facilities, consistent with the guidance below.

I.  **<u>IMMEDIATELY MAXIMIZE APPROPRIATE TRANSFERS TO HOME CONFINEMENT OF ALL APPROPRIATE INMATES HELD AT FCI OAKDALE, FCI DANBURY, FCI ELKTON, AND AT OTHER SIMILARLY SITUATED BOP FACILITIES WHERE COVID-19 IS MATERIALLY AFFECTING OPERATIONS</u>**

Memorandum from the Attorney General                                                     Page 2
Subject: Increasing Use of Home Confinement at Institutions Most Affected by COVID-19

While BOP has taken extensive precautions to prevent COVID-19 from entering its facilities and infecting our inmates, those precautions, like any precautions, have not been perfectly successful at all institutions. I am therefore directing you to immediately review all inmates who have COVID-19 risk factors, as established by the CDC, starting with the inmates incarcerated at FCI Oakdale, FCI Danbury, FCI Elkton, and similarly situated facilities where you determine that COVID-19 is materially affecting operations. You should begin implementing this directive immediately at the facilities I have specifically identified and any other facilities facing similarly serious problems. And now that I have exercised my authority under the CARES Act, your review should include all at-risk inmates—not only those who were previously eligible for transfer.

For all inmates whom you deem suitable candidates for home confinement, you are directed to immediately process them for transfer and then immediately transfer them following a 14-day quarantine at an appropriate BOP facility, or, in appropriate cases subject to your case-by-case discretion, in the residence to which the inmate is being transferred. It is vital that we not inadvertently contribute to the spread of COVID-19 by transferring inmates from our facilities. Your assessment of these inmates should thus be guided by the factors in my March 26 Memorandum, understanding, though, that inmates with a suitable confinement plan will generally be appropriate candidates for home confinement rather than continued detention at institutions in which COVID-19 is materially affecting their operations.

I also recognize that BOP has limited resources to monitor inmates on home confinement and that the U.S. Probation Office is unable to monitor large numbers of inmates in the community. I therefore authorize BOP to transfer inmates to home confinement even if electronic monitoring is not available, so long as BOP determines in every such instance that doing so is appropriate and consistent with our obligation to protect public safety.

Given the speed with which this disease has spread through the general public, it is clear that time is of the essence. Please implement this Memorandum as quickly as possible and keep me closely apprised of your progress.

## II.   **PROTECTING THE PUBLIC**

While we have a solemn obligation to protect the people in BOP custody, we also have an obligation to protect the public. That means we cannot simply release prison populations en masse onto the streets. Doing so would pose profound risks to the public from released prisoners engaging in additional criminal activity, potentially including violence or heinous sex offenses.

That risk is particularly acute as we combat the current pandemic. Police forces are facing the same daunting challenges in protecting the public that we face in protecting our inmates. It is impossible to engage in social distancing, hand washing, and other recommend steps in the middle of arresting a violent criminal. It is thus no surprise that many of our police officers have fallen ill with COVID-19, with some even dying in the line of duty from the disease. This pandemic has dramatically increased the already substantial risks facing the men and women who keep us safe, at the same time that it has winnowed their ranks while officers recover from getting sick, or self-quarantine to avoid possibly spreading the disease.

Memorandum from the Attorney General                                      Page 3
Subject: Increasing Use of Home Confinement at Institutions Most Affected by COVID-19

The last thing our massively over-burdened police forces need right now is the indiscriminate release of thousands of prisoners onto the streets without any verification that those prisoners will follow the laws when they are released, that they have a safe place to go where they will not be mingling with their old criminal associates, and that they will not return to their old ways as soon as they walk through the prison gates. Thus, while I am directing you to maximize the use of home confinement at affected institutions, it is essential that you continue making the careful, individualized determinations BOP makes in the typical case. Each inmate is unique and each requires the same individualized determinations we have always made in this context.

I believe strongly that we should do everything we can to protect the inmates in our care, but that we must do so in a careful and individualized way that remains faithful to our duty to protect the public and the law enforcement officers who protect us all.

# EXHIBIT K

# U.S. House of Representatives

## Committee on the Judiciary

### Washington, DC 20515–6216

#### One Hundred Sixteenth Congress

March 19, 2020

The Honorable William P. Barr
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

Dear Attorney General Barr:

We are writing to follow up on Chairman Nadler's letter of March 12, 2020 asking a series of questions about any measures taken by the Bureau of Prisons (BOP) and the U.S. Marshals Service (USMS) to respond to the COVID-19 pandemic. We write to reiterate the need to receive answers to these questions, as it is critical that we learn how BOP and the USMS are handling the COVID-19 crisis, both in protecting the employees of these agencies and the individuals held in their custody. We expect to hear from you on these matters, in short order.

We write now to underscore several points also made in that letter, as it has become even more evident, given the President's national emergency declaration, that these issues need to be addressed immediately. The BOP currently imprisons 175,000 people in about 100 facilities throughout the country. Data from 2019 indicates that the USMS is responsible for about an additional 75,000 people who are incarcerated pretrial, many in local jail or private contract facilities. Given these numbers, it is incontrovertible that, if the Department of Justice (DOJ) does not act aggressively to address the COVID-19 threat, federal jails and prisons could quickly become epicenters of the COVID-19 pandemic.

With large numbers of people living in close proximity to one another, many of them elderly or living with chronic diseases, DOJ must act now to save lives. Accordingly, we urge you to put in place measures to ensure that both the flow of prisoners into federal facilities is slowed significantly and that prisoners who can and should be released are released forthwith. We cannot wait any longer to take action.

We have learned that, in spite of the recent national emergency declaration and the fact that state and local prosecutorial agencies and courts across the country have made adjustments to their charging policies and are releasing prisoners who are at high risk of getting sick, it appears that it is "business as usual" in many U.S. Attorney's offices. If true, this is deeply distressing. We welcome any information showing that the Department of Justice is issuing guidance to U.S. Attorney's offices and to the BOP and USMS indicating that the Department

takes seriously the threat posed by COVID-19 to the health and welfare of inmates in the U.S. government's care, as well as to the health and welfare of federal correctional employees.

In this regard, we expect that BOP and the USMS are already implementing some baseline public health measures, such as carrying out comprehensive sanitation and cleaning of facilities (including visitation areas), and putting in place other safety measures, such as designating separate bathrooms for individuals with symptoms of COVID-19.  We also expect that BOP and the USMS will enact comprehensive testing procedures as soon as tests are made available.  We trust that BOP and the USMS are already making available to inmates and corrections officers Centers for Disease Control and Prevention (CDC)-recommended hand sanitizer, adequate soap, and personal protective equipment.  We expect that BOP and the USMS are following CDC guidelines for workplaces, including that staff and visitors stay home if they are sick, follow proper coughing, sneezing, and handwashing recommendations, and execute routine environmental cleaning.  We also expect that the BOP and facilities under contract with the USMS will follow proper isolation policies and not use extended solitary confinement as a substitute for providing proper medical care.  Indeed, BOP and the USMS should work to release all incarcerated people who test positive for COVID-19 to an external healthcare facility to receive care.

During this national emergency, DOJ should be doing all it can to increase social distancing and decrease movement to prevent further proliferation of COVID-19.  This means that the Department must limit the number of inmates being brought into the system.  Law enforcement agents and line attorneys should be given guidance to desist from making arrests, except where an arrest is the only way to stop a specific and substantial risk that the person will cause bodily injury or use violent force against the person of another.  The Department should issue guidance to U.S. Attorney's offices to refrain from pursuing probation, supervised release, and pretrial release revocations as much as possible, and only focus on those which are immediately essential to address.  Pending warrants should be recalled, in all but exceptional cases, in favor of summons; arrests on technical supervision violations should be barred.  Line lawyers should not be reflexively seeking detention in court, but should give serious consideration to whether the person they seek to detain poses a risk of serious injury to a reasonably identifiable person.  They should also take into consideration whether the person is pregnant, whether they are 50 years old or older, and whether they suffer from chronic illnesses such as asthma, cancer, heart disease, lung disease, diabetes, HIV, or other diseases that make them vulnerable to COVID-19 infection.

DOJ and BOP must also do all they can to release as many people as possible who are currently behind bars and at risk of getting sick.  Pursuant to 18 U.S.C. 3582(c)(1)(A), the Director of the Bureau of Prisons may move the court to reduce an inmate's term of imprisonment for "extraordinary and compelling reasons."  We urge you to use this existing authority and consider moving courts to release federal inmates who are vulnerable to COVID-19 (for instance, persons who are pregnant, who are 50 years old and older, and who suffer from chronic illnesses like asthma, cancer, heart disease, lung disease, diabetes, HIV, or other diseases that make them vulnerable to COVID-19 infection).  In addition, the BOP should immediately

2

reassess, under 18 U.S.C. 3621(b), every person with 36 months or less remaining on their sentence to determine if they can serve the last year of their sentence in community corrections and home confinement, rather than in a correctional institution.  DOJ should use all available powers and authorities, including executive clemency, commutation, furlough, compassionate release, and parole, to reduce the number of federal prisoners in jails, prisons, and other community-release-based programs housing large numbers of people.  Where possible, DOJ should create new emergency mechanisms to reduce imprisoned and incarcerated populations.

Finally, DOJ must make every effort to provide for transparency and communication.  We urge you to release information about the number of COVID-19 cases that exist in BOP and USMS contract facilities, that you provide prompt and accurate information about any fatalities from COVID-19, and that BOP and the USMS provide regular, timely, and up-to-date information to attorneys and families of those in custody who are ill with COVID-19.  Moreover, DOJ must ensure that inmates are able to communicate with their loved ones and with their attorneys during these difficult times.  One way to ensure this, in addition to maintaining family visitation wherever possible, would be to provide free telephone, video, and e-mail communication, as well as full access to postal services, particularly in places where in-person visits are curtailed or restricted because of COVID-19.  At all times, DOJ must also guarantee that the attorney-client privilege is preserved and respected and that attorneys are able to maintain in-person visits with their clients wherever possible, as well as confidential telephone calls and video teleconferencing where available.

Please confirm that each of the measures discussed above is being implemented and, if not, why not.  In addition, if there are other measures to address COVID-19 that the Department is considering and undertaking, besides those we have outlined here, please communicate them to us.  We look forward to working together to help alleviate this crisis.

Sincerely,

Jerrold Nadler
Chairman

Karen Bass
Chair, Subcommittee on Crime,
Terrorism, and Homeland Security

cc:   Jim Jordan, Ranking Member
      John Ratcliffe, Ranking Member
      Subcommittee on Crime, Terrorism,
      and Homeland Security

3

90

# EXHIBIT L

# United States Senate

WASHINGTON, DC 20510

March 23, 2020

The Honorable William P. Barr
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Director Michael Carvajal
Federal Bureau of Prisons
U.S. Department of Justice
320 First Street NW
Washington, D.C. 20534

Dear Attorney General Barr and Director Carvajal:

On March 13, 2020, President Trump declared a state of emergency concerning the novel
coronavirus disease (COVID-19) outbreak. We write to express our serious concern for the
health and wellbeing of federal prison staff and inmates in Federal custody, especially those who
are most vulnerable to infection, and to urge you to take necessary steps to protect them,
particularly by using existing authorities under the First Step Act (FSA).

We have reviewed the Federal Bureau of Prisons (BOP) COVID-19 Action Plan, which
covers health screening, limits on outside visits, staff travel, and inmate transfers, but notably
does not include any measures to protect the most vulnerable staff and inmates. The Centers for
Disease Control and Prevention (CDC) has issued guidance indicating that adults over 60 years
old and individuals with chronic medical conditions, such as lung disease, heart disease, and
diabetes, are at a higher risk of contracting COVID-19 and suffering more severe illness and
death. The CDC has advised these individuals to avoid crowds and stay at home as much as
possible. Conditions of confinement do not afford individuals the opportunity to take proactive
steps to protect themselves, and prisons often create the ideal environment for the transmission
of contagious disease. For these reasons, it is important that consistent with the law and taking
into account public safety and health concerns, that the most vulnerable inmates are released or
transferred to home confinement, if possible.

COVID-19 is an unprecedented crisis for our nation, including our inmate population.
However, Congress has equipped BOP and the Department of Justice (DOJ) with tools to use to
maximize their efforts to overcome these daunting times. For example, the FSA reauthorized and
expanded the Elderly Home Detention Pilot Program to place eligible elderly and terminally ill
inmates in home confinement. This pilot program permits the Bureau of Prisons (BOP) to
transfer nonviolent offenders to home detention if they are sixty years or older and have served
2/3 of their term of imprisonment, among other requirements. We call on BOP and DOJ to

92

review and expedite the current cases where the Elderly Home Detention Pilot Program would allow for an early transfer – where appropriate – of terminally ill and eligible elderly inmates to home confinement. Since elderly offenders are the most vulnerable to infection and the least likely to reoffend, we urge BOP's speedy review and processing of these cases for early release.

In addition, the FSA reformed the compassionate release program for people facing "extraordinary and compelling" circumstances. However, since enactment, BOP has opposed the vast majority of petitions. According to a report recently filed by BOP, in 2019, 1,735 requests for release were initiated by or on behalf of inmates, of which 1,501 were denied by wardens and 226 were forwarded to the BOP Director. Of these 226, BOP approved only 55 requests and denied 171 requests. We urge you to immediately issue guidance requiring that "extraordinary and compelling" circumstances be interpreted more broadly and clarify that such circumstances include vulnerability to COVID-19.

Finally, Section 602 of the FSA directed BOP, to the extent practicable, to transfer lower-risk inmates to home confinement for the maximum amount of time permitted under the law, which is the shorter of 10 percent of the term of imprisonment or six months. Given the current state of emergency, we urge you to consider the use of this authority to quickly transfer non-violent offenders who are at high risk for suffering complications from COVID-19 to home confinement.

Thank you for your time and consideration. We look forward to your prompt response.

Sincerely,


RICHARD J. DURBIN
United States Senator

CHARLES E. GRASSLEY
United States Senator


PATRICK LEAHY
United States Senator

MIKE LEE
United States Senator

93

AMY KLOBUCHAR
United States Senator

MIKE CRAPO
United States Senator

SHELDON WHITEHOUSE
United States Senator

THOM TILLIS
United States Senator

RICHARD BLUMENTHAL
United States Senator

KEVIN CRAMER
United States Senator

ELIZABETH WARREN
United States Senator

MAZIE K. HIRONO
United States Senator

CORY A. BOOKER
United States Senator

KAMALA D. HARRIS
United States Senator

# EXHIBIT M



**U.S. Department of Justice**
**Federal Bureau of Prisons**
**United States Penitentiary**

*USP VICTORVILLE, CALIFORNIA 92394*

April 9, 2018

United States Parole Commission
Washington D.C.
Re: Inmate Shakur, Mutulu
Reg. No. 83205-012

Dear Commissioners,

This letter is in reference to Mr. Shakur a Federal inmate who is
currently housed at the United States Penitentiary (USP) Victorville,
California.  I became familiar with Mr. Shakur while assigned as the
Associate Warden who oversees Correctional Services as well as the
daily operations at the United States Penitentiary (USP) Victorville.
My efforts regarding my occupation encompass an objective hands-on
approach to both the interaction with and management of the inmate
population.

From my observation and that of my colleagues, it is widely held that
excluding the nature of Shakur's convictions he has consistently
dedicated himself to maintain character that is consistent with our
goals of the safe and orderly operation of our facility, program
involvement and he's demonstrated a personal initiative to enhance the
overall environment to which he is engaged by maintaining a degree of
respect across the various prisoner groups and my staff.   Further, I
have been told this pattern has been consistent throughout the
duration of his placement here; as evidenced by his direct involvement
in intervention of racial conflicts as it has been specifically
reported to me.

In review of Shakur's institutional record it is apparent that his age
and lack of violence (or other disciplinary issues) indicate a desire
towards his rehabilitation.   I am aware of the controversy related to
a previous incident used as a basis for his 2016 parole denial and it
is my professional opinion conduct related to his 2013 Code 297 phone
incident report does not reflect a lack of rehabilitation or a
disrespect for institutional policies and authority.

In conclusion, I offer this letter as a recommendation for the parole
of Inmate Shakur based on my observations and interactions with him.
My years of experience with the Bureau has made me quite astute to the
judgment of men and their character.  I sincerely believe if given the
opportunity, Mr. Shakur will not re-offend and will abide by the law
and be an asset to the overall environment and community.

Respectfully submitted,

Associate Warden S. Keilman

96

# EXHIBIT N

Carlyle Holder Ministries

March 18, 2020

Re: Letter of Support - Dr. Mutulu Shakur

To Whom it May Concern:

As a retired warden and founder of C. I. Holder Ministries, a not for profit organization whose core mission is to provide support services and assistance to the formerly incarcerated, returning citizens and their families, I write this letter of support for Dr. Mutulu Shakur with the understanding that one may question my motive for such support. However, to set the record straight, I am doing so with the full understanding that prior to my retirement Dr. Shakur made a very dumb and stupid mistake by illegally recording a short video message to his supporters. He was deeply remorseful and took full responsibility for his actions and personally apologized to me. Although at the time I was very disappointed, I knew it was a knee jerk action on his part and not the model prisoner I had become to know. I am also a believer in forgiveness, redemption, restoration and second chances which was the motivation for me to write my first book, *"Can Anything Good Come Out of Prison, The Case for Prison Restructuring and Reintegration"*. As such, my conscience would not let this one incident negate or negatively impact all the positive things he did during my tenure as his warden to go unrecognized. He was a mentor and facilitator of the many programs we implemented to engage and empower the young men serving long sentences which created a safe environment for both staff and inmates through our Person First Model of Restructuring, Reunification and Reintegration. With this model we ensure and simultaneously train and retrain inmates through our many programs to reduce risk which provided a safe humane environment for rehabilitation and restoration. Dr. Shakur supported this model and was well respected by both staff and inmates alike the way he conducted himself. As a result, there was very little violence normally associated with a high security level facility such as ours and gave us the reputation as one of if not the safest penitentiary in the system at the time.

In closing, today we are at the center of an intense national debate about criminal justice and prison reform and the need to reduce our prison population through such method as parole and sentencing reform. I have been retired for over 12 years and I am assuming that Dr. Shakur has taken the necessary steps through his commitment to change to prepare himself by maintaining a positive prison record which supports his efforts for a second chance. The reality is that prison leaves an indelible impact on the lives of those who serve time, and the survivors of crime. Therefore, our resolve must be one of parallel commitment to all involved. I am a strong supporter and believer in restorative justice that restores the victims and survivors of crime, while also ensuring that offenders are rehabilitated so they too are restored and the risk of them reoffending is reduced. I trust he will be afforded the opportunity of a second chance.

If I maybe of further assistance, please feel free to contact me.

Respectfully submitted,

Carlyle I. Holder
Founder/President
ceo@thecmcg.com

C.I. Holder Ministries. 604 N. Highway 27, Minneola. Florida 34715

99

# EXHIBIT O

# JOHN MATTHEW FABIAN, PSY.D., J.D., ABPP
## BOARD CERTIFIED FORENSIC & CLINICAL PSYCHOLOGIST
## FORENSIC & CLINICAL NEUROPSYCHOLOGIST

---

▪5716 W US Hwy 290, Suite 110 Austin, TX 78735 ▪North Loop 1604 East, Suite 150 San Antonio, TX 78232 ▪Telephone: 512.487.7216 ▪Fax 512-840-1980▪Email john@johnmatthewfabian.com

**FORENSIC PSYCHOLOGICAL EVALUATION**
**FORENSIC NEUROPSYCHOLOGICAL EVALUATION**
**PRE-PAROLE RISK ASSESSMENT**

*United States of America v. Mutulu Shakur*

4/5/16

**DEFENDANT:**          Mutulu Shakur (Jeral Wayne Williams)
**DATE OF BIRTH:**      08/08/1950
**AGE:**                65 Years
**ORIGINAL CHARGES:**   Finding of Judgment RICO Conspiracy
                        RICO Substantive Bank Robbery
                        Armed Bank Robbery
                        Bank Robbery Killings
**SENTENCE:**           60 Years
**DATE OF EVALUATION:** 03/29/2016

**LEGAL REFERRAL:**

Mr. Peter Schey, attorney for the Center of Human Rights and Constitutional Law, contacted me to examine his client, Mr. Mutulu Shakur, for a forensic psychological evaluation, a formal violence risk assessment, and psychological evaluation pursuant to a parole hearing in April 2016.

**STATEMENT OF NON-CONFIDENTIALITY/INFORMED CONSENT:**

Mr. Shakur was informed about the nature and purpose of the evaluation and its limits of confidentiality in front of his attorney. He was able to understand these issues and agreed to proceed.

**SOURCES OF INFORMATION:**

1. Forensic and Clinical Interview
2. Discussion with his attorney, Mr. Schey
3. Level of Service Inventory, Revised (LSI-R)
4. Personality Assessment Inventory (PAI)
5. Inventory of Offender Risk, Needs, and Strengths (IORNS)
6. Beck Depression Inventory-II (BDI-II)
7. Static 99R
8. Hare Psychology Checklist-Revised (PCL-R)
9. U.S. Department of Justice records

10. Inmate Support Group Proposal
11. Talking Papers 03/27/2016
12. FOIA Document Excerpts
13. Appeal of Interim Parole Hearing Decision, 03/29/2005, U.S. Department of Justice
14. Various Appeal Records
15. Judgment and Probation Commitment Order, Docket Number 0031-01
16. United States District Court Pre-Sentence Report
17. Federal Initial Pre-Hearing Assessment
18. Family letters in support of parole of Mutulu Shakur

## BACKGROUND FAMILY HISTORY:

Mr. Shakur was born in Baltimore, Maryland.   His biological mother's name was Dolores Parker and his surrogate father's name was Salddine.   His parents were not married. He did not know who is biological father was.   He described Salddine as a merchant seaman.   He said his mother was blind.   He said at birth he lived with his mother until about 4 years of age.   His mother had deteriorated eyesight over time.   He said, "Me and my sister, Sharon, who was two years younger (half-sibling with the same mother), lived with my mom."   He described his mother as being in and out of the hospital and she was unable to "accompany us."   Mr. Shakur essentially said his mother was unable or incapable of raising the children- she had difficulty "accompanying us." He stated that her eyesight and blindness had severe consequences as to her ability to raise the children.   He said, "She really could not be with us most of the time.   She would have to leave us with cousins and friends up to about age 6.   I remember my uncle Johnny (grandmother's husband's brother-in-law) took us to New York and then I lived with my maternal grandmother named Ruth Lloyd.   I lived with Ruth and she was really the anchor of the family and had a lot of impact on me.   My mom would then come around and visit as well.   I always had a bed somewhere to stay."

Mr. Shakur reported that he was always loved and taken care of by family members, but he did lack a consistent upbringing by his mother because of her medical condition.   When I asked him about moving around a lot during childhood, he did acknowledge this, and then stated that this was the way it was and that he felt well taken care of.   He then stated that his father figure, Salddine, helped raise him, and there was another man, Herman, who was also a father figure in the home. He reported "some older guys like Herman would see me and connected with me."   He stated he had some father figure type of role models but never knew his biological father.   He did not share much information, thoughts, or feelings as to how his lack of biological father figure impacted his early development.

Mr. Shakur reported growing up in Queens and Jamaica area of New York.   He reported there was some poverty in different areas and he was exposed to this.   He also said he lived in the middle class areas where there were middle class black families.

I asked him again about his relationship with his mother, and he stated, "We were close.   She wanted me to grow up independently."   He stated that his mother struggled with being able to provide for her children because she was unable to work.   He said at times he would go months

without seeing his mother, but he usually saw her every few days and about twice per week.   He said he was close with her.   He reported, "It was really a day-to-day routine that I had to learn quick to be independent because my mother could not do everything for us a typical mother would do.   It was really my grandmother and my mother who raised us.   My mom, at times, lived in Baltimore and my grandmother lived in New York.   Other times, both of them lived in New York and my mother was nearby."   He described his grandmother as being "the reinforcement, really what you're doing day-to-day when you're young."

Mr. Shakur denied a history of any type of physical or sexual abuse.   He said, "I really was an independent guy and had to live much of my childhood on my own.   In much of my childhood, I lived with Ruth and then my grandfather, who was a step-grandfather named Churne.   I then had my own apartment in high school when I was about age 16.   I was really independent.   I remember living with my grandmother and she also raised some independence in me."

He described his mother as depressed and also blind.   She eventually received SSDI for different medical conditions.   He described her as a very strong woman.   He stated his mother was not involved with a number of men and he did not have step-father figures from relationships that she had.   Some of the men who touched his life, such as Herman, were guys in the community who knew the family and stepped in to help out.   He stated he did search for his biological father for years but never found him.   He felt at peace with this.

Due to his independence, he stated that he lived in an apartment by himself at 16 years of age and worked early in his life.   He said, "I had a job and got an apartment.   I was working at AAA in maintenance, and I was self-sufficient early on.   I also worked at A&P and learned how to take care of myself."

I asked Mr. Shakur about prior trauma.   He stated, "I've seen a lot.   Things were not as traumatic when you have a mother that's blind.   I remember I was her seeing eye dog.   People would look at my mom funny.   She would at times not be dressed up, she had difficulties with looking good, she would stumble and use a cane, she would trip and fall, and she had to stand in the welfare cheese line.   Things were different in that cheese line with a blind mother."   He stated that instead of feeling embarrassed or ashamed, he felt proud of his mother and realized her struggles early on.

Mr. Shakur reported again having a good connection with his biological grandparents.   He denied a history of domestic violence with them.   He again described Ruth as his anchor in life.   He reported no history of sexual abuse.   There was no evidence of natural disaster such as hurricanes, floods, tornadoes, or house fires.

Mr. Shakur also witnessing other traumatic experiences.   There was violence within the streets. He recalled one time seeing someone searched and hit in the head by the police.   The police shot this individual in the back.   Around age 16 or 17, there was a school strike for better schools in the Jamaica area.   Police were called in; they came in and beat some of the children.   He said, "I remember running.   It was really unnecessary, this police violence.   There were drugs in and on the streets.   I have seen men killed over drugs.   I've seen serious domestic violence that would

3

turn someone's stomach.   There was a lot of gang violence in the community.   I felt trapped as a person in school, and I wanted to get a good academic education.   Segregation just happened. There were also a lot of Vietnam guys coming back home addicted, and they would get involved with domestic violence, and I saw it all."

Essentially, Mr. Shakur stated that he grew up in a very political time of Vietnam and segregation. At times, he was living in more of an urban area of New York City where there was exposure to street violence and domestic violence as well as drug addiction and gang activity.   Other times he was residing in more of a black middle-class neighborhood with less exposure to these issues.

**Federal Presentence Report Background History**

The prior federal pre-sentence report indicated that Mr. Shakur had a sister named Dolores Porter who was born in Williamstown, North Carolina.   There were questions as to his biological father named Willie McCullough who was a native of North Carolina.   Shakur never knew his father as Mr. McCullough and neither resided nor maintained contact with the family.   Mr. Shakur's mother married James Porter and they produced a child, Sharon.   The mother reported this relationship was problematic due to her husband's alcoholism and they separated by 1953 when Mr. Shakur would have been about 3 years of age.   The mother suffered from glaucoma and lost her eyesight in 1954 when Mr. Shakur was about 4 years of age.   She relocated the family to Jamaica, New York, with her parents who were Reverend and Mrs. Churne Lloyd.   Ms. Porter received financial support from her parents and also worked for the Industrial Home for the Blind. She also worked as a nurse's aide in the Baltimore Hospital.

The mother described Mr. Shakur as having been an extremely sensitive and tender-hearted child in adolescence.   As he developed, he became sociable, outgoing, and made friends.   She related that he was a good student while attending Sharman Junior High School and that he graduated from Thomas Edison High School, which is a vocational school.   He was respectful to adults and attended church regularly where he was a member of the choir.   There were no significant problems in the family.   The subject and his sister were very close.   Later on, Mr. Shakur lived at home while working at the Lincoln Detoxification Center while he was in his early 20s, at which time he helped support his family.   Ms. Shakur then went to Canada to study acupuncture and subsequently established an independent residence in Manhattan, but he always maintained contact with his family.   Ms. Porter stated that she and several of her neighbors visited Mr. Shakur at the clinic for acupuncture treatments.   She found them painful, but several of her friends found relief from his treatments after conventional medical procedures had not been helpful.

She described herself as a devout Christian and that her son, Mr. Shakur, converted to Islamic faith and changed his name.   She described him as never being family and believed he had great feelings of humanity.   Therefore, she had difficulty believing that he was involved in any offenses in which he had been convicted.

Mr. Shakur's sister, Sharon Howell, was born in 1952 and is two years younger than Mr. Shakur. She reported that her father had remained with the family for about two years after she was born and the family moved to Queens and lived with her grandparents when she and the defendant were

children.   Her grandparents bought a house in Queens, and her mother settled the family in a quiet residential area in Queens when Mr. Shakur was about 11 years of age.   She described the family as being a close-knit family.

Afeni was also interviewed and stated she was a member of the Black Panther Party.   She and Mr. Shakur belongs to the Republic of New Africa.   She and the defendant became friends and lived together for about three years in the 1970s.   At that time, Mr. Shakur was employed at the Lincoln Detoxification Center.   They were highly compatible.   They shared a culturally rich life and informed blacks against abuse and drugs while performing similar political work.   She reported that he had been involved with grass roots advisory councils and understood political movement. He came from a real community which led to his involvement in the Republic of New Africa.   She stated that she had gravitated to the more violent Black Panther Party because she had less experience with community-based organizations as Mr. Shakur did.

While they remained good friends with basic capability, she and the defendant should never have become lovers.   They had a child names Sakyiwa Shakur, born on 10/03/1975, who had always lived with Afeni.   After their separation, Mr. Shakur was very close with his daughter and was then later a fugitive who provided financial support and was very generous to the point of over-indulging her. Their separation was caused by his relationship with Moto Ndoni who was Mr. Shakur's coworker at the Lincoln Detoxification Center.   Mr. Shakur and Ms. Ndoni produced a son, Aize, in 1974.   Although Mr. Shakur was under pressure from Ms. Ndoni to separate from Afeni, the defendant did not do so.   Mr. Shakur and Afeni lived together for a couple of years, but she was unable to accept his relationship with Ms. Ndoni, which resulted in their separation in 1976.

Churne Lloyd is Mr. Shakur's uncle.   He advised in the pre-sentencing report that he was raised in the same household as Mr. Shakur until he was about 12 years of age.   He stated the family gathered frequently.   Mr. Lloyd recalled that there were no serious conflicts and no problems in the family.   The step-grandfather named Reverend Churne Lloyd was described as having been accepting of Mr. Shakur's independent concepts.   Mr. Shakur was very close with the grandmother.   Mr. Lloyd noted that Mr. Shakur became involved in political activities as an adolescent at about age 15 or 16 with a black student group in the high school.   He volunteered to work with anti-poverty programs and joined progressive democratic clubs.   Eventually, while working with the NAACP, Mr. Shakur became frustrated with the pace of change and transitioned toward radicalism.   He recalled the defendant was always outgoing and very concerned about social issues.   Despite the nature of the severity of the criminal charges, Lloyd did not believe that Shakur was of a criminal nature.

**ACADEMIC HISTORY**:

Mr. Shakur reported attending public schools.   He attended elementary school, including three of them at PS45, PS160, and PS123.   He said he moved around a lot, depending on where his mother and grandmother lived.   He attended 142nd Junior High.   He described this as one of the worst schools in the system.   He commented, "We had 18 or 19 year olds and they were attending school with us.   There was teacher instability.   Some teachers were good and others did not really

want to be there.   We learned a lot, but it was like gang activity and pregnancy and the way of the world rather than book learning."

He stated that he ended up in the right school eventually at Thomas Edison in Queens.   He graduated from high school there.   He said this was a "good technical school."   He liked this school quite a bit more so than his junior high school.   He said he was getting more politically active by the time he left high school.   He realized the racial disparities and had seen a lot from a young age.   He had also seen his mother be on welfare, standing in a cheese line, and struggling with blindness.   They were very poor.   He also witnessed a lot of gang violence and criminal activity in the streets, often spearheaded by young black men.   He always questioned the disparities in crime, welfare, and opportunity.   He wanted to make a change in the community.

Mr. Shakur reported his high school grades were good.   He was truant for about one year.   He would attend school for about a half day and then leave school.   He did pursue technical and school work there.   He denied being suspended or expelled.   He reported being considered for class president, but then ran for the treasury.   He denied any history of grade failures.   He denied any type of special educations or behavioral placements.

Mr. Shakur was very interested in acupuncture and eventually pursued education in acupunctural training.   He learned massage and was interested in treating drug addiction with acupuncture.   He stated that he witnessed significant drug-related violence and addiction in the street, and he perceived that acupuncture could be a mind-body treatment for addiction.   He later on developed research relevant to drug addiction and acupuncture and then linked acupuncture to detox programming.   He eventually was offered opportunity to train in acupuncture in Canada and also developed a Lincoln Hospital and Detox Center between 1970 and 1979, where he ran and worked the facility.   He also worked at different hospitals in the acupuncture field.

**MILITARY HISTORY:**

Mr. Shakur has no military history.

**EMPLOYMENT HISTORY**:

Mr. Shakur reported working as a young male around 16 years of age.   He worked at AAA in maintenance.   He also reported living in his own apartment around that age.   He stated that he worked as a teacher's aide from 16 to 19 years of age.   He worked at different public schools.   He then ran a program for HUD and was an administrator.   He opened up a Job Corps in Queens.   He worked for the Commission for Racial Justice confronting racial issues.   As noted, he pursued acupuncture training in Canada and received his doctorate in acupuncture.   He eventually found the Lincoln Hospital and Detox Center.   He was actively involved in that program, blending acupuncture with detoxing and addiction.

When asked about his activism, he stated he again had a lot of social concerns.   He said, "I was really into the culture, and I wanted to do change.   I had a lot of friends, and I was a favorite around town.   I was very concerned about issues, such as racial disparity, racism, and equal

6

opportunity."

He added that he wanted to contribute to the struggle and establish an independent nation at one time.  He said, "At that time, there were desperate times.  I was really influenced by a lot of people at that time and became part of the Black Panthers.   I believed at that time I could make a better tomorrow and had the right to do, think, and speak."

The PSR indicated that Mr. Shakur was involved in establishing a drug certification program at Lincoln Hospital in the Bronx.   He adopted the concept of treating drug addicts with acupuncture, particularly to reduce withdrawal symptoms.   He was required to practice under a research protocol through a licensed physician.   The defendant's sponsor was Richard Taft of Lincoln Hospital.   He advised that when legislation was introduced in 1975 in New York and Massachusetts establishing safeguards and standards for non-doctors to be acupuncturists and Lincoln Detoxification Program was in the forefront.   He stated that the program was attacked for political reasons by the New York City government and was shut down.   He eventually bought a building in 1979 through fundraising events and contributions and opened the Black Acupuncture Advisory Association of North America (BAAANA).   He said the clinic was not supported by an unlawful underground operation, but it was funded through affordable fees paid by the clients, tuition received from acupuncture students, and donations.   He also received training at the Quebec Association of Acupuncture in 1971 and the International Association of Acupuncture of Montreal from 1972 to 1976.   He was licensed as an acupuncturist by the State of California in 1977. He stated that BAAANA and the clinic was used as a nonprofit agency and the primary function of the center was to help the community.

During the course of the current evaluation, Mr. Shakur has continued to state that he did not commit any prior violent acts and did not much take accountability for the prior offenses that were regarding his RICO offenses.   He stated that he was an activist rather than a criminal.   He stated he never had any agreements or conspiracies to commit violent acts against anyone.

**RELATIONSHIP HISTORY:**

Mr. Shakur has been legally married once to Mekini.   He reported having six children, but only three of them are his biological children and the other three are not.   He said he was also involved with Afeni and she currently lives with California.   He plans on living with Afeni Shakur.   He said he wanted to live with her and her daughter, Sekyiwa.   He said they visited him in the BOP occasionally.

Mr. Shalur had relationships with Afeni Shakur and they had a daughter, Sekyiwa, together.

**MENTAL HEALTH HISTORY:**

Mr. Shakur did not believe his mother used alcohol and drugs during her pregnancy with him.   He reported no evidence of birth complications.   Mr. Shakur reported no history of neurodevelopmental conditions, such as ADHD or learning disability.   He reported no significant childhood medical issues.   He denied a history of speech or language pathology.   He reported no

7

evidence of setting fires, burning property, destroying property, or hurting animals for example. He reported no significant history of fighting behaviors.  He reported as a youth he did not experience any hearing, language, vision, or speech problems.   He denied significant symptoms consistent with oppositional defiant disorder or conduct disorder.

During the current evaluation, Mr. Shakur reported no inpatient psychiatric treatment history.   He said he may have seen a mental health professional before his instant offense, but he could not recall why and with who.   He denied a history of psychiatric symptoms such as bipolar disorder and mania, depression, psychosis, delirium, PTSD, or anxiety.   He reported no evidence of suicidal or homicidal ideation, plan, or intent.   He has no history of self-mutilation, by report. He reported that after his son died (Tupac Shakur), "I was put in the hole and I was there for some emotional episodes.   I had some fleeting suicidal thoughts."   He reported his mood is usually stable.   He denied problems with anger or aggression.   He reported no evidence of psychosis, such as hallucinations or delusions.   He reported seeking out mental health treatment through the BOP consistently throughout his prison history.   I do not have any mental health records regarding this information, but he did state that he would seek out counseling and he denied every seeking out psychotropic medications.

BOP records indicate that Mr. Shakur was involved with therapy.   There was no Axis I or Axis II diagnosis.   He was involved in individual therapy with goals of assessing healthy mechanisms for dealing with the processing of aging, reduced feelings of environmental stress, develop a sense of wellbeing within the environment, clarify values and goals especially as they relate to family and friends, rehearse positive communication skills and improve time management skills.   He expressed interest in developing insight and increase sense of connecting with others and improve the level of wellbeing within his environment through peer group affiliation.

**MEDICAL HISTORY:**

Mr. Shakur is getting older now, and he has had some medical issues.   He said he had a stroke in the year 2013 or 2014.   He said that he had difficulties with his right leg and right eye.   He had dysarthria with evidence of speech difficulties.   He denied any neurocognitive deficits after the stroke, such as problems with attention or memory.   He said he had gangrene in one of his legs. He said he has esophageal stomach infection and high blood pressure, and he was recently tested at 130/76.   He has had high sugar levels and currently weighs 185 pounds and stands 5 feet 9 inches tall.   He has no evidence of concussions, traumatic brain injury, or seizures.   He reported his sleep is good.   He sleeps about 8 to 10 hours per 24-hour period.   He wakes up at about 5 a.m. He stated his iron is low and he needs to rest more.   He reported his appetite his good, and he denied weight gain or weight loss.

Desert Valley Hospital records in Victorville, California, indicated that Mr. Shakur had a stroke, cerebrovascular accident on 03/21/2013.

## SUBSTANCE USE HISTORY:

Mr. Shakur reported using marijuana and would smoke two or three puffs per day, "if it was good marijuana." He denied using marijuana all day long or smoking in large amounts or having problems controlling his use. He believed rather that he could control his uses. He said that he liked taking a couple of puffs here and there each day. He denied anyone ever telling him that the marijuana affected his life functioning.

In 1991, the Federal Bureau of Prison (BOP) noted a violation of morphine positive at Lompoc Bureau of Prisons, which he denied. He stated he never had taken any illegal drugs while serving time in the BOP. He denied ever using illegal hard drugs, such as PCP, heroin, cocaine, methamphetamine, etc., while in the community. He stated he did not like alcohol. He has used alcohol in the past, but he denied ever using it excessively or developing tolerance, withdrawals, blackouts, or having problems controlling his use. He denied a history of DUIs.

## LEGAL HISTORY:

There was a U.S. District Court, Southern District of New York, Pre-Sentence Report dated 07/28/1988 developed and written for his instant offense. He was convicted on all counts regarding RICO conspiracy, armed bank robbery, and bank robbery killings in 1988. This was a conviction by jury trial in front of Honorable Charles S. Hight. His prior criminal history includes the following information:

- 11/07/1968, age 18, grand larceny, second degree, disposition unknown. He was charged as Jeral Wayne Williams. According to King County Clerk's Office, the case was presented to the grand jury on 12/09/1968. The Supreme Court Clerk's Office in King County advised they were unable to locate a disposition for this case.

- 05/01/1970, age 19, possession of a dangerous drug, six degree, dismissed.

- 02/11/1986, age 35, racketeering conspiracy, participating in racketeering enterprise, bank robbery two counts, armed bank robbery two counts, bank robbery murder two counts, conviction.

- Pending charge, 04/07/1986, age 35, armed robbery, carrying a weapon five counts, Superior Court Essex County, New Jersey. Detainer was filed on 04/07/1986. This was an allegation that on 12/19/1978 in Livingston Township, New Jersey, Mr. Shakur and Nathan Burns, Larry Mack, and Marilyn Buck forcibly robbed in excess of $200,000 from James O'Connor. The defendants were in possession of a 0.9 mm weapon when robbing O'Connor. The defendants forcibly robbed in excess of $200,000 from Francisco Jueguen, and they were in possession of a 0.9 mm automatic weapon while perpetrating the robbery. The alleged defendants were in possession of a 0.9 mm automatic weapon on 12/19/1978, and this was a pending case.

On 08/02/1988, Mr. Shakur was sentenced to U.S. District Court, Southern District of New York, to an aggregate term of 60 years. The term was compromised of convictions for racketeering, conspiracy, participating in racketeering enterprise, bank robbery, armed bank robbery, and bank robbery involving a murder.

The pre-sentence report in 1988 indicated that Mr. Shakur had not made himself available to the probation to be interviewed and it was not possible for them to provide an assessment as to any level of the defendant's conduct, despite the comments of the subject's family, which had been recorded and noted.

The pre-sentence report overview of the government's version of the charges indicate that Mutulu Shakur and Marilyn Buck were convicted related to a relationship in a criminal enterprise organized in approximately late 1976 and continued through and beyond October 1981, including robbery and murders at Nyack and Nanuet, New York. It was said that criminal enterprise was initially formed by Mutulu Shakur and co-racketeer Cecil Ferguson as a means of committing crime in support of black revolutionary movements in this country, as well as providing economic support for certain enterprise-affiliated organizations, such as Shakur's acupuncture clinic. The enterprise group included primarily five black men including Mr. Shakur, Odinga, Weens, Smith, Risen, and a cooperating witness who testified at trial for the government, as well as several white women known as a secondary team.

During the period from 1976 to 1982 the enterprise planned and committed a series of crimes, including a prison breakout, armored truck robberies, and bank robberies. The criminal spree resulted in four deaths, including the deaths of two armored car guards and two police officers as well as serious injuries to a number of others. It was said that crimes were carefully planned and executed with precision by Mutulu Shakur and the other heavily armed black males, usually carrying an M16 automatic rifle, shotgun, and 0.9 mm handguns. Those men were supported in the commission of their crimes with Marilyn Buck and the other secondary team members who assigned their jobs, planned escape routes, ran and drove getaway vehicles, and rented safe houses. They were aware where there criminals stored weapons and planned crimes, returning after the crimes and secreted fugitives.

This report indicated summaries of the various offenses, including an attempted robbery of an armored truck parked outside the Mellon National Bank in Pittsburgh on 12/06/1976. That was a foiled robbery attempt with Mr. Shakur apparently being present. He apparently fled from the robbery site on a public bus and returned to NYC. The family then committed a series of crimes including armed robberies in a meat packing plant in the Bronx, two banks in Mount Vernon, and one back in Manhattan, and two armored trucks in New Jersey. Mr. Shakur participated in each of one these robberies, with the exception of the Manhattan Bank. According to information received from the known robbery victims the total amount taken was $300,000 in six robberies.

There was another offense which included an escape from a prison, in which Mr. Shakur and others circled the prison in a van and provided backup security with weapons. Some of these individuals entered the prison, along with two kidnapped prison employees, and drove out of the prison grounds in a commandeered prison van to a nearby school. Therefore, this was a

kidnapping type of offense.   There were getaway cars in which they smuggled Chesimard through to the Caribbean Islands.

There was another Inwood robbery on 04/22/1981, in which the enterprise men successfully stole approximately $521,000 from a Purolato armored truck in Inwood, Long Island.   Mr. Shakur and others were the alleged perpetrators.   They surveyed the area in advance and carefully formulated a plan for both the robbery and the getaway.   Apparently, Mr. Shakur drove a station wagon and they approached an armored truck.   They loaded the money in the station wagon.   They were the Danbury attempted robberies after the Inwood robbery.   Mr. Shakur was charged with and convicted of participating in all three attempts.

There was a Bronx robbery and murder on 06/02/1981 in which Mr. Shakur and others stole about $292,000 from a Brinks truck in a shopping mall.   During that robbery, Tyrone Risen shot and killed Brinks guard William Maroney.   Another Brinks guard was seriously wounded during the gun battle surrounding the robbery.   This robbery was the family's third attempt to rob the armored truck at the Boston Post Road location.

Records indicate that in approximately August 1980, the family began a series of attempts to rob a Brinks truck in Nanuet, New York.   This culminated in the 10/20/1981 robbery and murders of Brinks guard Peter Pagen and police officers Edward O'Grady and Waverly Brown.   It was Mr. Shakur who first spotted the Brinks truck and who told his criminal colleagues that it contained a sack so big that Santa Claus' sled could not take it away.   His original plan was that the money from this job would be split among the individual participants with no money going to the overall business of the family.   More principled and political colleagues intervened, and the group eventually decided the money would be used in usual ways, including part to the individual participants and part for buying weapons, ammunition, and whatever else the enterprise needed to continue to perform its criminal acts and part for whatever projects the group wished to support.

Mr. Shakur stated that he was not guilty of the crimes that comprised the instant offense and that the guilty verdict was not justified by the evidence offered at trial.   He said he was guilty in being involved in a political movement that supported self-determination of black Americans and the instant charges arose from the political warfare being inflicted on him by the U.S. government. The subject insisted that he was not taking part in any offensive force as specified in the instant indictment, although he does work against counterintelligence, which made him a target of the government.   He noted there was no physical evidence that connected with the instant offense and he planned to appeal the verdict.

**INSTITUTIONAL ADJUSTMENT:**

The U.S. Department of Justice U.S. Parole Commission records indicate that information contained in the BOP progress reported dated 07/14/2004 prepared by case manager D. Jones-Dockens, revealed the subject had satisfactory institutional adjustment.   He was working at that time 32 hours per week on laundry detail.   On 02/13/2003, he received a certificate of completion of an elder inmate psychotherapy group.   He maintained clear institutional conduct for the past 36 months.   He completed A&O program, a prerelease program prior to release.   It

should be noted that he was transferred to a number of different BOPs and he did have some incident reports.   He had one BOP incident report of contacting the public without permission in which he was found to be violating the rules of institution.   There was also a charge of phone abuse, and he was found to have violated the rules of institution.

He completed an advanced spinning exercise class, an intermediate spinning class, and was a founding member of the Coleman Penitentiary NAACP chapter.   He was involved with group psychotherapy courses and cultural diversity classes and a suicide prevention course.   He had been found to express remorse for any violence and regrets any loss of blood, whether the blood be from any racial background.

There was a finding of being drug positive on 01/14/1991, and he consistently stated he did not use drugs and this was a false reading.   His request to have his own analysis as to DNA hair sample test was denied.   He was in the program extensively while in the BOP.   He completed basic education and further education in American history, earth science, business education, and completed a wellness program in culture diversity.

An Original Jurisdiction Appeal summary indicated that the age of 57 he received the longest sentence of all the offenders, which was 60 years, and he served 22 years at that time.   There were DHO actions for abusing phone privileges, possessing drug or drug items, refusing program assignments, assault on a staff member, and unauthorized contact with the public.   He received good work reports, completed a changed psychotherapy group program, and participated in the elder inmate psychotherapy program, organized cultural diversity activities, completed course in victim impact, stress and anger management, suicide prevention, drug and alcohol abuse, culture diversity, and a number of education programs.

There was another violation through the BOP as of 02/06/2013, which would have been a phone abuse type of charge.   On 02/06/2013, there was a monitored previously placed phone call by Mr. Shakur.   During this phone call, Mr. Shakur was talking about black liberation struggle, development of strategies and tools to free political figures, giving aid and assistance to comrades in exile, a congress of people in support of his petition for parole, Shakur was authoring a book disguised as a historical fiction about their cause, honoring and paying homage to freedom fighters, teaching young about low intensity warfare, counter intelligence, behavior modification, genocide, and posttraumatic syndrome.   He continued to receive support from the organization he belongs to and his commitments and agenda from behind the walls for the past 15 years.   During this phone call, he solicited feedback and questions from the audience and answered questions posed by the call recipient acting as a moderator.   He requested to speak with Brother Glover (Danny Glover) who was in the audience.   Mr. Shakur was charged with the incident, and he said he was not guilty of the charge.   He was recommended that he lose telephone privileges and email.   It is my understanding that the BOP classified this phone call as use of telephone for abuses other than criminal and engaging in or encouraging group demonstration.   Essentially, they labeled this event and his participating as inciting a rally.

It is my understanding that this event was part of a black history month event in which Danny Glover visited CSUN (California State University Northridge).   This event was in part organized by a professor there named Karin Stanford.   She is a professor at CSUN.   She had connected with Mr. Shakur.   On 02/05/2015, CSUN's department of Panafrican studies, the black student union, and the department of cinema and television arts in the black alumni association cosponsored an event entitled, "Mass Incarceration of Political Prisoners: A Conversation with Danny Glover." Mr. Shakur did call in and was a participant in what Dr. Stanford described as a symposium.   Mr. Shakur called Dr. Stanford on a cell phone and broadcasted the call to the students in the room. The phone call was about 15 minutes, and they were cut off toward the end.   She stated nothing in Mr. Shakur's speech could be considered engaging in or encouraging group demonstration which is the alleged infraction that officers at USP Victorville cited him for.

When I asked Mr. Shakur currently about his involvement in this issue, he had stated to me that he, in fact, was in connection with Dr. Stanford.   He stated that he had shared some of his background history with her.   They did discuss the nature of this symposium before he participated in it and made the phone call.   He stated his goal was to educate some of the audience about his background history and also to continue to work toward eliminating racial disparity and to promote human rights and human equality between races.   He had no goal of inciting violence.

**CURRENT PSYCHOLOGICAL TESTING RESULTS:**

Mr. Shakur was administered the Personality Assessment Inventory (PAI) to assess for psychopathology, personality, and emotional functioning.   The results on the validity scales indicate that he had a tendency to portray himself in a positive light by denying psychological and emotional problems that many people would admit to.   He was defensive on the protocol.   The protocol is being interpreted with caution due to his defensiveness.   Despite his defensiveness, there is evidence of distrust, hostility, and bitterness, potential physical signs of depression, and a lack of social support.   Clinically, Mr. Shakur reported no evidence of mental illness, such as depression, psychosis, bipolar mania, PTSD, conversion or somatic disorders, or chronic anxiety. He reported a stable positive self-image.   He reported having some stress in his life but yet some social support to help him deal with the stress.   There was no evidence of suicidality or anger problems by report.   There was no evidence of any mental disorder on the protocol.   Despite his defensiveness, it is my opinion that his clinical scales would not have been elevated.

Mr. Shakur was administered the Beck Depression Inventory-II (BDI-II) to assess for current symptoms of depression.   He scored an overall 12 on the test, which would be consistent with minimal depression and not enough evidence in my opinion to warrant a diagnosis.   He reported feeling guilty over many things he should have done.   He expects and believes he is being punished.   He is more critical of himself than he used to be.   He cries more than he used to.   He feels more restless or wound up than usual.   He has less energy than he used to have.   He sleeps somewhat less than usual.   He is more irritable than usual.   He craves food all the time.   He denied symptoms related to sadness, pessimism, past failure, loss of pleasure and activities, self-dislike, suicidal thoughts, loss of interest in activities, indecisiveness, worthlessness, concentration difficulties, tiredness and fatigue, and loss of interest in sex.

**DSM 5 DIAGNOSTIC FORMULATION:**

No Diagnosis

**VIOLENCE RISK ASSESSMENT:**

I considered the Hare Psychopathy Checklist-Revised (Hare PCL-R) as an assessment of one's criminal history and personality regarding psychopathic traits.   This is a semi-structured interview and review of his file and history with assessment of a number of psychopathic and antisocial traits/tendencies.   Such personality style includes a lack of consciousness and lack of guilt, empty, egocentricity, pathological lying, repeated violation of social norms, varied and diverse criminal lifestyle, etc.   The purpose of the Hare PCL-R is to assess psychopathic personality traits and the research on the Hare PCL-R correlates psychopathy with criminality and violence.   In essence, elevated psychopathic traits are correlated with general and violent recidivism.

It is my opinion with a reasonable degree of psychological certainty that his score on the Hare PCL-R is about 7, indicating very low and no significant antisocial and psychopathic personality traits.

When reviewing the normative samples, a total score of 7 placed him in the very low psychopathic group with a T-score of 31 and 3rd percentile, which would also indicate a very low and negligible risk of recidivism of any kind.

Mr. Shakur was administered the Inventory of Offender Risk, Needs, and Strengths (IORNS), which is a self-report inventory used to assess risk issues with offenders.   The overall objective of the IORNS would be to have a self-report risk management instrument assessing as many of the variables related to criminal and violent behavior as possible and would reflect change in such variables over time or treatment.   This is a one-time analysis, however, with Mr. Shakur.   The test assesses both static and dynamic risk/need.   Static risk factors are past behavior factors that are static and unchangeable.   Dynamic risk/need factors are changeable factors, such as antisocial cognitions, values, and behaviors.   The static factors would be prior offenses for example.   Other dynamic risk issues would be criminal lifestyle variables or self-regulation problems and impulsivity for example.   Factors such as self-esteem and intimacy problems have also been related to consistent factors of recidivism for general violence and sexual offenses.   Needs issues include treatment and treatment compliance.   This test allows for consideration of protective strengths, as well, such as social supports.

The IORNS includes study samples with sample selection developed as a measure of offender recidivism risk, treatment and management needs, protective strengths, and normative comparisons to offender populations which are considered essential and of the highest relevance. Five separate offender samples were obtained for normative purposes from the New Jersey Correctional System, the Texas Department of Criminal Justice, and the Reception Unit at the Washington Correction Center for Women.   It should be noted that the instrument was not looking specifically at federal offenders who have, at times, significantly different types of

14

offenses. Therefore, the protocol will be considered with caution as, in my opinion, the risk/protective/needs factors are very similar amongst state and federal offenders, but the normative samples obviously focused on state offenders.

Mr. Shakur did not have any elevations on any of the scales. He was ultimately low in risk and high in protective strengths. There was no evidence that he was answering the questions inconsistently. There was some evidence that he was perceiving himself positively, free of serious personality flaws, which is consistent with his PAI.

The Overall Risk Index reflects three domains related to risk including static risk, dynamic risk/need, and protective strength factors. His overall score was below the 1st percentile and very low.

His Static Risk Index assessing prior criminal offenses and issues related to recidivism was not clinically significant in elevation. Under the Static Risk Index, the only area of elevation was for irresponsibility regarding prior criminal behaviors. He was not elevated for pro-criminal attitudes. There was no elevation for psychopathy or severe criminal personality. There was no clinically significant elevation for intra/interpersonal problems, alcohol/drug problems, aggression or negative social influences.

The Dynamic Need Index assessing criminal orientation and attitudes, esteem and interpersonal function problems, substance, hostility and physical aggression, as well as being influenced negative by friends or family was not clinically significant in elevation. He did report significant environmental resources. He denied negative influences by friends or family, but rather support. He did portray himself in a positive light.

When considering the overall findings on the IORNS, there was no significant evidence of elevated risk issues that are static or dynamic in nature.

Mr. Shakur's background history was also rated via the Level of Service Inventory-Revised (LSI-R), which assesses recidivism as a way of systematically bringing together risk and needs information, defender treatment planning, and for assigning levels of freedom in supervision. The LSI-R has samples of many of the major and minor risk factors in order to provide a comprehensive risk/needs assessment relevant to criminal history, companions, and attitudes/orientation which are indicators of the major risk factors identified by theory and research. It should also be noted that the full assessment of the LSI-R is challenged in this case because Mr. Shakur has been incarcerated for about 30 years. Some of the factors regarding his lifestyle once released are unknown at this time.

Overall, Mr. Shakur's score on the LSI-R was 9. When considering the profile form for male inmates, a score of 9 includes an 11.7% chance of recidivism when recidivism is designed as re-incarceration with one year following release. He presents as a low-risk/needs group. His cumulative frequency for prison inmates was 6.6%, meaning that 93-94% of the inmates would have higher scores than him.

I also considered other risk factors related to offending that the IORNS and LSI-R also consider. As part of my evaluation, I considered items in a qualitative fashion on the Federal Post-Conviction Risk Assessment. This is a scientifically based instrument developed by the administrative office of the United States Courts. The purpose is to improve the effectiveness and efficiency of post-conviction supervision. The tool is used to assess evidence-based practices as the use of a risk and needs assessment tool to identify which persons to target for correctional interventions, what characteristics and needs to address, and how to deliver supervision and treatment in a way that optimizes positive outcomes.

I considered some of the factors on this instrument. There is no evidence that he had a community supervision violation. His past criminal history included no evidence of juvenile offending. He also did not have a very variable offending pattern. His institutional adjustment has been, for the most part, positive. He did have violent offending within his current offense. He was usually employed in the community. He usually had a good work outlook. There was no evidence of alcohol or drug problems. Prior to his arrest and currently, he has good social support and a lack of family problems. He will not be of single marital status and will live with his wife and daughter. He has exhibited a motivation to change, especially regarding his prior more radical militant attitudes about racial change and human rights versus the current more peaceful means to demonstrate reconciliation between races. His arrest history is not significant. His age is definitely a mitigating factor as to older age. He has maintained good educational attainment prior to his arrest with a doctorate in acupuncture, as well as consistent educational attainment within the BOP. There is no evidence of mental health problems, gambling addiction, or current criminal associates by my understanding. He has not engaged in gang activity or weapons concerns while in prison. He will have a good outlook as far as financial condition, and there is no significant evidence of life skill deficiencies, mental impairment, or low cognitive functioning.

Finally, when considering risk of violence in general criminality, I want to consider two factors, including the issue of age and social supports. One of the most significant risk factors and protective factors relevant to recidivism of any kind includes older age. Age at release from prison and older age in general has been significantly related to a diminishing and mitigating factor in risk assessment and recidivism in general. Age in crime is especially related due to differences biologically relevant to testosterone, levels of impulsivity and brain development, social and lifestyle variables, intimacy in relationships, with all findings being consistent in that youthful offenders are much higher risk of criminality than older adults. Most of the research has indicated there is a significant drop off of criminality and violence at about 40 years of age.

Other factors related to age and violence include greater access to legitimate sources of material goods and excitement, alcohol, sex, drugs; patterns of illegitimate opportunities with the assumption of adults roles and opportunity is increased for crimes, negative peer associations and lifestyles and reduced orientation to same-age and same-sex peers, and increased orientation to persons of the opposite sex or persons who are older or more mature; cognitive and analytical skills and brain development leading to a gradual decline in egocentrism and invisibility, poor decision making, and risk taking; increased legal and social costs for deviant behavior; age-graded norms, increase in maturity and responsivity; anticipation of assuming adult roles, coupled with

16

reduced subjective acceptance of deviant roles and the threat those pose in entering adult status. As individuals and offenders advance into middle and then older age, crime and violence diminish.

Importantly to this case, there is evidence of diminishing physical capabilities as one gets older, and Mr. Shakur is about 64 years of age with a history of stroke and some medical problems. Furthermore, Mr. Shakur has definite prosocial connections and relationships including his wife figure and his daughter and sons.   He plans on living with Afeni and their daughter, Sekyiwa.   He wants to teach a class in human rights at a local community college or university.   He would also like to continue with his acupuncture work.   It is my understanding that from Afeni's estate he will also be given a certain amount of money (allowance) each month.   He has reported significant family support systems.

Importantly, there is also a significant risk factor that should be mentioned, which is the target of violence and crime.   Mr. Shakur's offenses centered around some radical and even potentially militant and violent movements by the family and his group who had conspired to fight racial inequality and oppression through illegal and even violent means.   Mr. Shakur's offenses included conspiracy, ultimate robbery, and bloodshed as a consequence of robbery.   Importantly, he has stated that these circumstances pertaining to Black Panther political movements, for example, have been tempered and diminished over time.

Mr. Shakur has noted his attitudes and toleration for violence have also diminished over time. The circumstances from the 1960s and 1970s have certainly changed, and the former tactics of militant response have tempered to more peaceful demonstrations that support racial equality.   It is my understanding that Mr. Shakur has not had communications with anyone about racial unrest, violence, conspiracy, etc.   He is more an advocate of equal human rights through peaceful means. He has not been involved with gang-related behaviors or the Black Guerilla family, for example. Rather, he has been considered as a mentor and a peacekeeper within the prison system.   He is also reflecting upon his life and wants to be considered as a peaceful activist rather than as a convicted felon.   He wants to be a good example for the younger blacks in prison and is promoting reconciliation rather than violence.

**FORENSIC OPINION:**

Mr. Peter Schey, Attorney for the Center for Human Rights and Constitutional Law, is representing Mr. Shakur in his parole board hearing in April 2016.   Mr. Schey had requested I examine his client for a current forensic psychological evaluation aimed at informing the parole board as to his client's psychological status and as to a risk and violence risk assessment.

Mr. Shakur has been convicted of RICO conspiracy, federal armed bank robbery, and federal bank robbery killings in a course of criminal conduct.   He was convicted on 05/11/1988 and sentenced to 60 years in federal prison.

Under Section 2.19, information considered in making a parole/re-parole determination, the Commission can consider, under (a)(5) reports of physical, mental, or psychiatric examination of the offender.   This forensic psychological evaluation addresses Mr. Shakur's overall

psychological status and risk.

Mr. Shakur does not present with any evidence of mental illness.  The federal BOP records indicate no diagnosis as to mental illness or personality disorder.  I have never seen him diagnosed with antisocial personality disorder.   The nature of his offending was an activist type of offense, which is a unique type of criminal offending.  Despite his racially based noble causes about 40 years ago, there was blood that was shed.  There was also indication that he was engaging in criminal enterprises and conspiracies to better his financial lifestyle.  Mr. Shakur has continue to state that his criminal offenses were as a result of being an activist rather than a criminal.  Nonetheless, he has taken responsibility for some of the offending behaviors and has exhibited remorse regarding the blood that was shed as a result of the criminal endeavors.

Mr. Shakur presents as an individual who has made many reforms and changes in his life and his way of thinking and primarily his beliefs that have been modified from radical and militant perceptions of oppression and needs for equality even if through violent means to a tempered and peaceful reunification and reconciliation between races.

The factors indicating lower risk, in my opinion, include the following:

1. No significant evidence of antisocial personality disorder
2. Low psychopathic traits with a very low score of 7 on the Hare Psychopathy Checklist-Revised (PCL-R)
3. Low recidivism scores on the Level of Service Inventory, Revised (LSI-R)
4. Low recidivism scores on the Inventory of Offender Risk, Needs, and Strengths (IORNS)
5. A lack of recent violence and criminality within the BOP and good prison adjustment overall
6. Completion of various self-help programs, such as the BOP DAP program and consistent further education with college classes attended and achieved
7. A lack of prior significant criminal history and violent history prior to this instant offense
8. A lack of juvenile criminal history
9. Definite social and family supports
10. Definite positive financial situation upon leaving prison
11. Older age as a mitigating risk factor
12. Positive work outlet
13. No significant alcohol and drug issues
14. Motivation to change and a changed attitude from radical to peaceful
15. No significant mental health problems
16. A likely lack of criminal associates at his parole domicile
17. No use of weapons while in prison
18. Positive attitude toward intervention
19. Intact and high level of intelligence as a form of resilience
20. No significant life skill deficiency
21. Community and cultural situational circumstances have changed regarding past violence
22. There are significant risk management factors in place regarding his re-entry including federal probation supervision

Finally, it is my opinion with a reasonable degree of psychological certainty that Mr. Shakur poses as a low risk of future general and violent criminality once released into the community.

Respectfully submitted,

**John Matthew Fabian**

_/s/ **John Matthew Fabian**

**e signature**
John Matthew Fabian, PSY.D., J.D., ABPP
Board Certified Forensic & Clinical Psychologist
Forensic & Clinical Neuropsychologist

19

119

# EXHIBIT P

Judge Charles S. Haight, Jr.
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

April 12,  2020

Dear Judge Haight,

My name is Deondre Williams, I was a 5 time convicted felon. That was who I was before I met Dr. Mutulu Shakur. I am not that person anymore.  I am 32 years old, I grew up in California and since being released, I reside in Las Vegas, NV. My mother was sentenced to life without parole, when I was only 10 and soon after that I was placed in the foster care system. I grew up with no father figure and so I quickly turned to street life. I moved to Las Vegas and was committing crime after crime, I spent most of my twenties incarcerated.

I met Dr. Shakur in 2015, I was freshly into my own prison sentence. I was very inquisitive and searching for something that just felt real and could give me a sense of purpose in this life. Although I was walking my own path it wasn't until one day Dr. Shakur and I were in the infirmary when he asked me a few questions, and at the conclusion of the conversation he asked for me to come to a class he was teaching which was titled, "Human Rights and International Law." During that class I learned so much in so little time, but I wanted more. I knew instantly he and I connected. I watched as he captivated the hearts of all his students, and it was interesting because we all came from many different walks of life, from the poor to the rich, Black, Brown, Asian, Natives, and Whites! We all love and respect this man.

He personally awakened me to a different way of thinking. I was developing a classic thought pattern he had watched so many people develop, but he was able to help me see that was not the right way to go. That universal change happens within the mind. We have to change the way we think in order to change the way we grow. I would watch during his birthday how everyone would make him food, and he would light up everytime someone made him something sweet. His face was like that of a seven year old in a candy house.

We started talking everyday, walking the yard and even working out together. The things I was told he was incarcerated for had me confused. He carried himself like an old man who wanted nothing more but just to go home and to live in peace. He would ask me personal questions about my family and what my intentions were when I went home. I can remember one instance where he looked me dead in the eye and said "family is love, and if you love your family you wouldn't come back." I cried my last day there, I have never cried my whole time there until then because I knew I was leaving someone who has changed my entire way of thinking.

I've been released and home with my loved ones for 1 year and 2 months now and I have not committed any crime let alone thought of one. I am a full time dad to my two sons, and I have

121

one on the way. I am in the IATSE local 720 union and I make $30-$36 per hour. I continue to embrace everything he has ever taught me and as I look upon my family every night I remember the words he spoke to me, but it has become painful to me because I miss him as well because after it all he is considered family too. I am proud to be a positive member of my community today. If it wasn't for Dr. Shakur, I wouldn't be the man I am for myself or my family.

Sincerely,

*Deondre Williams*

Deondre Williams

# EXHIBIT Q



## Summary Reentry Plan - Progress Report
Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: SHAKUR, MUTULU 83205-012

SEQUENCE: 00143403
Report Date: 11-16-2019



| | |
|---|---|
| Facility: | LEX LEXINGTON FMC |
| Name: | SHAKUR, MUTULU |
| Register No.: | 83205-012 |
| Quarters: | F01-110L |
| Age: | 69 |
| Date of Birth: | 08-08-1950 |

| | |
|---|---|
| Custody Level: | MAX |
| Security Level: | HIGH |
| Proj. Rel Date: | 12-15-2024 |
| Release Method: | MAND REL |
| DNA Status: | FLP01516 / 01-18-2011 |

## Contact Information

**Release contact & address**

Sekyiwa  Shakur, ADULT DAUGHTER
1A west Kappas Maruna Pier, Sausalito, CA 94945
US
phone (home) : (415) 299-3408

## Offenses and Sentences Imposed

| Charge | Terms In Effect |
|---|---|
| CT 1 - RICO CONSP - T18:1961 & 1962(D); CT 2 - RICO SUBSTANTIVE - T18:1961, 1962(C) & 2; CTS 3 & 6 - BANK ROBBERY - T18: 2113(D) & 2; CTS 4 & 7 - ARMED BANK ROBBERY - T18:2113(D) & 2; CTS 5 & 8 - BANK ROBBERY KILLINGS - T18:2113(E) & 2 | 60 YEARS |

Date Sentence Computation Began:     08-02-1988

Sentencing District:     NEW YORK, SOUTHERN DISTRICT

| Days FSGT / WSGT / DGCT | Days GCT or EGT / SGT | Time Served | + Jail Credit  - InOp Time |
|---|---|---|---|
| 128 /   0 /    0 | 655 /  128 | Years: 33 Months: 11 Days: | + 903      JC  - 0      InOp |

## Detainers

| Detaining Agency | Remarks |
|---|---|
| NO DETAINER | |

## Program Plans

Inmate Shakur arrived to FMC Lexington from FCC Victorville on December 17, 2019.  He is participating and continues to be involved in numerous educational programs and this facility.  He has maintained clear conduct since 2013. Inmate goals were established to aid in transition into society.

## Current Work Assignments

| Facl | Assignment | Description | Start | |
|---|---|---|---|---|
| LEX | PEND MED | INMATES WAITING JOB CLEARANCE | 02-03-2020 | |

### Work Assignment Summary

Shakur has been consist with work assignments through his incarceration.  He is not currently working due to his medical treatment.

## Current Education Information

| Facl | Assignment | Description | Start | |
|---|---|---|---|---|
| LEX | ESL HAS | ENGLISH PROFICIENT | 06-30-1991 | |
| LEX | GED HAS | COMPLETED GED OR HS DIPLOMA | 09-14-1994 | |

### Education Courses

| SubFacl | Action | Description | Start | Stop |
|---|---|---|---|---|
| LEX MS M | C | HEALTH CORE TOPIC RPP1 | 01-07-2020 | 01-07-2020 |
| VIP | C | HUMAN RIGHTS ACE CLASS | 04-23-2019 | 08-16-2019 |
| VIP | C | MOTHER'S DAY HISTORY | 05-09-2019 | 05-09-2019 |
| VIP | C | CREATIVE WRITING | 01-07-2019 | 04-15-2019 |
| VIP | C | WORLD CULTURE ACE CLASS | 02-21-2019 | 03-25-2019 |
| VIP | C | CREATIVE WRITING | 07-30-2018 | 12-04-2018 |
| VIP | C | POETRY | 08-02-2018 | 12-04-2018 |
| VIP | C | ADVANCED TUTOR TRAINING CLASS | 07-16-2018 | 08-07-2018 |

124

## Summary Reentry Plan - Progress Report

Dept. of Justice / Federal Bureau of Prisons

Plan is for inmate: SHAKUR, MUTULU  83205-012

SEQUENCE: 00143403
Report Date: 11-16-2019

| SubFacl | Action | Description | Start | Stop |
|---------|--------|-------------|-------|------|
| ATL | C | PHYSICAL FITNESS ASSESSMENT | 08-17-1998 | 08-18-1998 |
| ATL | C | BLOOD PRESSURE | 07-27-1998 | 08-04-1998 |
| ATL | C | ANATOMY/KINESIOLOGY | 07-09-1998 | 07-16-1998 |
| ATL | C | MEDICAL SCREENING | 06-29-1998 | 07-02-1998 |
| ATL | C | CORONARY RISK FACTORS | 06-10-1998 | 06-22-1998 |
| ATL | C | FITNESS | 05-31-1998 | 06-07-1998 |
| ATL | C | CPR TRAINING | 05-17-1998 | 05-24-1998 |
| ATL | C | CULTURAL DIVERSITY WED 6-8 PM | 04-06-1998 | 05-13-1998 |
| ATL | C | CULTURAL DIVERSITY WED 6-8 PM | 02-27-1998 | 03-25-1998 |
| FLM | C | BUSINESS EDUCATION | 06-23-1995 | 10-03-1995 |
| FLM | C | EARTH SCIENCE | 06-26-1995 | 08-01-1995 |
| FLM | C | TWENTIETH CENTURY AMER HIST | 03-21-1995 | 04-24-1995 |
| LOM | C | WEIGHT SAFETY | 09-27-1989 | 10-27-1989 |
| LOM | C | ADULT BASIC ED PM | 12-05-1988 | 01-09-1989 |

### Education Information Summary

Inmate Shakur has continued to program during his incarceration.  He has completed numerous self-help and Adult Continuing Education class.  He has taught numerous classes while in the Federal Bureau of Prisons.

### Discipline Reports

| Hearing Date | Prohibited Acts | | |
|--------------|-----------------|--|--|
| 03-13-2013 | 297 : PHONE ABUSE-DISRUPT MONITORING | | |
| 05-31-2007 | 327 : CONTACTING PUBLIC WITHOUT AUTH | | |
| | 408 : CONDUCTING A BUSINESS W/O AUTH | | |
| | 410A : USING MAIL W/O AUTH | | |
| 05-31-2007 | 297 : PHONE ABUSE-DISRUPT MONITORING | | |
| 05-09-2001 | 297 : PHONE ABUSE-DISRUPT MONITORING | | |
| 01-14-1991 | 109 : POSSESSING DRUGS OR DRUG ITEMS | | |

### Discipline Summary

Inmate Shakur has maintained clear conduct since 2-6-2013.

### ARS Assignments

| Facl | Assignment | Reason | Start | Stop |
|------|-----------|--------|-------|------|
| LEX MS M | A-DES | OTHER AUTH ABSENCE RETURN | 02-03-2020 | CURRENT |
| LEX MS M | A-DES | OTHER AUTH ABSENCE RETURN | 01-27-2020 | 02-03-2020 |
| LEX MS M | A-DES | OTHER AUTH ABSENCE RETURN | 01-20-2020 | 01-27-2020 |
| LEX MS M | A-DES | OTHER AUTH ABSENCE RETURN | 01-15-2020 | 01-20-2020 |
| LEX MS M | A-DES | OTHER AUTH ABSENCE RETURN | 01-13-2020 | 01-15-2020 |
| LEX MS M | A-DES | OTHER AUTH ABSENCE RETURN | 01-06-2020 | 01-13-2020 |
| LEX MS M | A-DES | OTHER AUTH ABSENCE RETURN | 12-30-2019 | 01-06-2020 |
| LEX MS M | A-DES | TRANSFER RECEIVED | 12-17-2019 | 12-30-2019 |
| VIP | A-DES | OTHER AUTH ABSENCE RETURN | 10-16-2019 | 11-11-2019 |
| VIP | A-DES | OTHER AUTH ABSENCE RETURN | 10-08-2019 | 10-16-2019 |
| VIP | A-DES | OTHER AUTH ABSENCE RETURN | 08-30-2019 | 10-08-2019 |
| VIP | A-DES | OTHER AUTH ABSENCE RETURN | 08-29-2019 | 08-30-2019 |
| VIP | A-DES | OTHER AUTH ABSENCE RETURN | 08-23-2019 | 08-29-2019 |
| VIP | A-DES | OTHER AUTH ABSENCE RETURN | 06-20-2019 | 08-23-2019 |
| VIP | A-DES | OTHER AUTH ABSENCE RETURN | 01-30-2018 | 06-20-2019 |
| VIP | A-DES | OTHER AUTH ABSENCE RETURN | 03-29-2017 | 01-30-2018 |
| VIP | A-DES | OTHER AUTH ABSENCE RETURN | 02-08-2017 | 03-29-2017 |
| VIP | A-DES | OTHER AUTH ABSENCE RETURN | 11-18-2015 | 02-08-2017 |
| VIP | A-DES | OTHER AUTH ABSENCE RETURN | 08-20-2015 | 11-18-2015 |
| VIP | A-DES | OTHER AUTH ABSENCE RETURN | 07-02-2015 | 08-20-2015 |
| VIP | A-DES | OTHER AUTH ABSENCE RETURN | 06-08-2015 | 07-02-2015 |
| VIP | A-DES | OTHER AUTH ABSENCE RETURN | 04-27-2015 | 06-08-2015 |

## Summary Reentry Plan - Progress Report
Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: SHAKUR, MUTULU  83205-012

**SEQUENCE: 00143403**
**Report Date: 11-16-2019**

| Facl | Assignment | Reason | Start | Stop |
|------|-----------|--------|-------|------|
| VIP | A-DES | OTHER AUTH ABSENCE RETURN | 03-16-2015 | 04-27-2015 |
| VIP | A-DES | OTHER AUTH ABSENCE RETURN | 07-15-2014 | 02-28-2015 |
| VIP | A-DES | OTHER AUTH ABSENCE RETURN | 07-01-2014 | 07-15-2014 |
| VIP | A-DES | OTHER AUTH ABSENCE RETURN | 05-22-2014 | 07-01-2014 |
| VIP | A-DES | OTHER AUTH ABSENCE RETURN | 11-22-2013 | 05-22-2014 |
| VIP | A-DES | OTHER AUTH ABSENCE RETURN | 03-21-2013 | 11-22-2013 |
| VIP | A-DES | TRANSFER RECEIVED | 09-01-2011 | 03-18-2013 |
| FLP CHG | A-DES | TRANSFER RECEIVED | 08-19-2011 | 08-26-2011 |
| FLP STPD | A-DES | TRANSFER RECEIVED | 07-08-2010 | 08-19-2011 |
| FLM | A-DES | TRANSFER RECEIVED | 06-21-2007 | 07-08-2010 |
| ATL | A-DES | TRANSFER RECEIVED | 04-18-2007 | 04-19-2007 |
| POL | A-DES | TRANSFER RECEIVED | 03-17-2007 | 04-18-2007 |
| CLP | A-DES | OTHER AUTH ABSENCE RETURN | 04-20-2006 | 03-15-2007 |
| CLP | A-DES | TRANSFER RECEIVED | 01-31-2006 | 04-20-2006 |
| ATL | A-DES | TRANSFER RECEIVED | 08-11-1997 | 01-31-2006 |
| SPG MS | A-DES | TRANSFER RECEIVED | 07-01-1997 | 08-06-1997 |
| ATL | A-DES | TRANSFER RECEIVED | 09-23-1996 | 07-01-1997 |
| FLM | A-DES | TRANSFER RECEIVED | 02-14-1995 | 09-20-1996 |
| MAR | A-DES | TRANSFER RECEIVED | 03-24-1994 | 02-14-1995 |
| LEW | A-DES | TRANSFER RECEIVED | 08-02-1993 | 03-24-1994 |
| null | A-DES | MOVEMENT NOT TRACKED | 11-03-1988 | 07-29-1993 |

### Current Care Assignments

| Assignment | Description | Start | |
|-----------|-------------|-------|---|
| CARE1-MH | CARE1-MENTAL HEALTH | 07-23-2010 | |
| CARE4 | MRC CARE REQUIRED | 11-04-2019 | |

### Current Medical Duty Status Assignments

| Assignment | Description | Start | |
|-----------|-------------|-------|---|
| LOS | LENGTH OF STAY | 01-09-2020 | |
| LOWER BUNK | LOWER BUNK REQUIRED | 12-31-2019 | |
| MED HOLD | MEDICAL HOLD - DO NOT TRANSFER | 01-07-2020 | |
| NO DUTY | NO DUTY DUE TO MEDICAL COND | 12-31-2019 | |
| NO PAPER | NO PAPER MEDICAL RECORD | 12-18-2019 | |
| REG DUTY | NO MEDICAL RESTR--REGULAR DUTY | 12-18-2019 | |
| SOFT SHOES | SOFT SHOES ONLY | 12-31-2019 | |
| YES F/S | CLEARED FOR FOOD SERVICE | 12-18-2019 | |

### Current PTP Assignments

| Assignment | Description | Start | |
|-----------|-------------|-------|---|
| *NO ASSIGNMENTS* | | | |

### Current Drug Assignments

| Assignment | Description | Start | |
|-----------|-------------|-------|---|
| DRG E COMP | DRUG EDUCATION COMPLETED | 06-02-1995 | |

### Physical and Mental Health Summary

He is currently a care level 4; medical care required.  He is undergoing treatment for Cancer at this time.

He completed the Drug Education program in 1995.

### FRP Details

Most Recent Payment Plan

** NO FRP DETAILS **

### Financial Responsibility Summary

No court imposed obligation.

---

Sentry Data as of 02-03-2020          Summary Reentry Plan - Progress Report          Page 4 of 6

| | Summary Reentry Plan - Progress Report | SEQUENCE: 00143403 |
|---|---|---|
| | Dept. of Justice / Federal Bureau of Prisons | Report Date: 11-16-2019 |
| | Plan is for inmate: SHAKUR, MUTULU  83205-012 | |

**Release Planning**

This information is being submitted for relocation purposes.  He was previously approved to relocate from the Southern District of New York to the Northern District of California.  Since then this address is no longer available due to the individual passing away.  In September 2019, he provided a new address within Central District of California in Los Angeles, CA.

**General Comments**

Inmate Shakur has been incarcerated for 34 years.  He will release to his daughter's residence if granted Parole.

127

# EXHIBIT R

# INMATE COPY

**INMATE SKILLS DEVELOPMENT PLAN**   Current Program Review: 04-13-2015

| | |
|---|---|
| Name: | SHAKUR, MUTULU |
| Register Number: | 83205-012 |
| Security/Custody: | HIGH/MAX |
| Projected Release: | 02-10-2016 / TWO THIRDS |

Institution: VICTORVILLE USP, P.O. BOX 5400, ADELANTO, CA 92301, Telephone: (760) 530-5000

| | |
|---|---|
| Next Review Date: | 07-03-2015 |
| Next Custody Review Date: | 07-03-2015 |
| Age/DOB/Sex: | 64 / 08-08-1950 / M |
| CIM Status: | Y |
| | If yes, reconciled: Y |

Driver's License/State: /
FBI Number: 337630H
DCDC Number:
INS Number:
PDID Number:
Other IDs:

**Release Residence:** Aleni Shakur Davis, Mother of Children, 41 KAPPAS WEST PIER, SAUSALITO, CA 94965
Telephone: (832) 592-3312

**Release Employer:** [Name] [Address] [POC]
Contact:
Telephone:

**Primary Emergency Contact:** Watani Tyehimba, Friend, 4316 Buckingham Circle, Decatur, GA 30035
Telephone: (404) 288-6075

**Secondary Emergency Contact:** Sekyina Shakur, Daughter, 885 Raye Road, St. Martin, GA 30068
Telephone: (818) 207-6355

**Mentor Information:**

**Controlling Sentence Information:**

| Offense(s)/Violator Offenses | Sentence | Sentencing Procedure | Supervision Term |
|---|---|---|---|
| | 60 YEARS | 4205(A) REG ADULT-ORIG TERM GRTR THAN 1YR | NOT APPLICABLE |

| Controlling Sentence Began | Time Served/Jail Credit/Inoperative Time | Days GCT/EGT/SGT | Days FSGT/WSGT/DGCT | Parole Status |
|---|---|---|---|---|
| 08-02-1988 | 29 YEARS 2 MONTHS 1 DAYS / 903 / 0 | 0 / 655 / 3372 | 188 / 0 / 0 | Hearing Date: 12-15-2024 / Hearing Type: STATUTORY INTERIM HEARING / Last USPC Action: 10-02-2002 |

**Detainers:** N
**Special Parole Term:** NOT ENTERED
**Pending Charges:** None known
**Cim Status:** Y
**Cim Reconciled:** Y

| Financial Responsibility | Imposed | Balance | Case No./Court of Jurisdiction | Assgn/Schedule Payment |
|---|---|---|---|---|
| | | | | FINANC RESP-NO OBLIGATION |

**Financial Plan** Active: N  Financial Plan Date: [Date]
Comm Dep-6 mos:  Commissary Balance:

**Payments**
Commensurate: Y
Missed: N

**Judicial Recommendations:** none / None / None
**Special Conditions of** None

---

**INMATE SKILLS DEVELOPMENT PLAN**   PROGRAM REVIEW: 04-13-2015

**Supervision:**

| | | | |
|---|---|---|---|
| USPO Sentencing: | Michael Fitzpatrick, Chief, New York Southern Probation Office, Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street Room, New York, NY 10007-1312 | USPO Relocation: | [POC] [District] [Street Address/Suite] [City], [State] [Zip] |
| Phone/Fax: | 212-805-0040 / 212-805-0047 | Phone/Fax: | [Phone] / [Fax] |

Subject to 18 U.S.C. 4042(B) Notification: Y
- Current conviction for a crime of violence (state and federal)
DNA Required: Y - 01-18-2011
Treaty Transfer Case: N

**Profile Comments:**

**EDUCATION DATA**

| Facility | Assignment | Description | Start Date | Stop Date |
|---|---|---|---|---|
| VIP | GED HAS | COMPLETED GED OR HS DIPLOMA | 09-14-1994 | CURRENT |
| VIP | ESL HAS | ENGLISH PROFICIENT | 06-30-1991 | CURRENT |

**COMPLETED EDUCATION COURSES**

| Course Description | Completion Date | Course Hours |
|---|---|---|
| POLITICAL SCIENCE ACE CLASS | 04-22-2014 | 10 |
| HOUSE OF HEALING ACE CLASS | 04-22-2014 | 10 |
| BEGINNERS VOICE/VOCAL MUSIC | 01-15-2014 | 6 |
| AFRICAN HISTORY CLASS | 09-30-2013 | 10 |
| BREAKING BARRIERS | 09-30-2013 | 10 |
| ACE CREATIVE WRITING | 06-30-2013 | 10 |
| BEGINNER CROCHET COURSE | 06-29-2013 | 6 |
| AFRICAN HISTORY CLASS | 03-01-2013 | 10 |
| AFRICAN HISTORY CLASS | 12-18-2012 | 10 |
| AFRICAN HISTORY CLASS | 09-14-2012 | 10 |
| BEGINNER CROCHET COURSE | 09-22-2012 | 6 |
| HUMAN RIGHTS, PART3 | 05-25-2012 | 10 |
| MULTICULTURAL POETRY | 05-25-2012 | 10 |
| BEGINNERS MUSIC THEORY CLASS | 03-29-2012 | 9 |
| HUMAN RIGHTS PART 2 | 03-16-2012 | 10 |
| HUMAN RIGHTS | 12-02-2011 | 10 |
| BEGINNING CROCHET | 07-18-2011 | 80 |
| BEGINNING BEADING | 07-18-2011 | 80 |
| INTERMEDIATE ART | 07-18-2011 | 80 |
| DB FILM CRITIC | 04-23-2011 | 10 |

Name: SHAKUR, MUTULU                                                RegNo: 83205-012

| | | |
|---|---|---|
| BEGINNING WELLNESS | 12-21-2010 | 80 |
| DELTA B BASIC GUITAR CLASS | 12-21-2010 | 80 |
| BEGINNING ART | 12-21-2010 | 80 |
| HISTORY OF SCIENCE - PART 1 | 10-28-2009 | 27 |
| ENGINEERING AN EMPIRE | 10-13-2009 | 36 |
| WAR OF 1812 & LIFE OF HITLER | 10-01-2008 | 30 |
| TEN DAYS THAT CHANGED AMERICA | 04-29-2008 | 30 |
| BIOG: EXPLORERS & EARLY AMERIC | 02-19-2008 | 42 |
| JAZZ - PART 2 | 11-13-2007 | 30 |
| CULTURAL DIVERSITY (ACE) | 03-08-2007 | 20 |
| SPINNING | 03-16-2007 | 5 |
| SPIN | 11-30-2006 | 12 |
| INTERMEDEATE SPIN CLASS | 07-30-2006 | 11 |
| ELL ORIENTATION ACE | 02-03-2006 | 2 |
| TYPING BEG/ADVANCE | 03-12-2004 | 300 |
| UNDERSTANDING OF WORLD ACTING | 10-10-2003 | 12 |
| CULTURAL DIVERSITY WED 6-8 PM | 09-02-2003 | 84 |
| CULTURAL DIVERSITY WED 6-8 PM | 12-19-2000 | 45 |
| CARDIOVASCULAR ENDURANCE | 10-23-1998 | 2 |
| NUTRITION | 10-06-1998 | 2 |
| FLEXIBILITY | 09-21-1998 | 2 |
| EXERCISE PHYSIOLOGY | 08-27-1998 | 2 |
| PHYSICAL FITNESS ASSESSMENT | 08-18-1998 | 2 |
| BLOOB PRESSURE | 08-04-1998 | 2 |
| ANATOMY/KINESIOLOGY | 07-16-1998 | 2 |
| MEDICAL SCREENING | 07-02-1998 | 2 |
| CORONARY RISK FACTORS | 06-22-1998 | 2 |
| FITNESS | 06-07-1998 | 2 |
| CPR TRAINING | 05-24-1998 | 2 |
| CULTURAL DIVERSITY WED 6-8 PM | 05-13-1998 | 16 |
| CULTURAL DIVERSITY WED 6-8 PM | 03-25-1998 | 2 |
| BUSINESS EDUCATION | 10-03-1995 | 42 |
| EARTH SCIENCE | 08-01-1995 | 25 |
| TWENTIETH CENTURY AMER HIST | 04-24-1995 | 50 |

Department of Justice                                          Federal Bureau of Prisons
## INMATE SKILLS DEVELOPMENT PLAN          PROGRAM REVIEW: 04-13-2015

| | | |
|---|---|---|
| WEIGHT SAFETY | 10-27-1989 | 35 |
| ADULT BASIC ED PM | 01-09-1989 | 60 |

### HIGH TEST SCORES

| Test | Subtest | Score | Test Date | Test Facil | Form | State |
|---|---|---|---|---|---|---|
| Inmate has no score history items in this area | | | | | | |

### WORK DATA

| Facility | Assignment | Description | Start Date | Stop Date |
|---|---|---|---|---|
| VIP | UNT 6A ORD | UNIT 6A ORDERLY | 03-16-2015 | CURRENT |

### WORK HISTORY

| Facility | Assignment | Work Assignment Description | Start Date | Stop Date |
|---|---|---|---|---|
| VIP | UNT 6A ORD | UNIT 6A ORDERLY | 10-07-2014 | 02-28-2015 |

### DISCIPLINE HISTORY

| UDC / DHO | Hearing Date | Report No. | Prohibited Act / Description | Sanction |
|---|---|---|---|---|
| Inmate has no disciplinary history items in this area. | | | | |

### MOVEMENT DATA

| Facility | Assignment | Description | Start Date | Stop Date |
|---|---|---|---|---|
| VIP | A-DES | DESIGNATED, AT ASSIGNED FACIL | 03-16-2015 | CURRENT |

### MOVEMENT HISTORY

| Facility | Assignment | Start Date | Stop Date |
|---|---|---|---|
| VIP | DESIGNATED, AT ASSIGNED FACIL | 07-15-2014 | 02-28-2015 |

### CASE MANAGEMENT ASSIGNMENTS

| Facility | Assignment | Description | Start Date | Stop Date |
|---|---|---|---|---|
| VIP | RPP PART | RELEASE PREP PGM PARTICIPATES | 09-17-2012 | CURRENT |
| VIP | CMU REF D | CMU REFERRAL DENIED | 10-12-2011 | CURRENT |
| VIP | CFSR | CERT FOOD SINCERITY REMOVAL | 06-25-2007 | CURRENT |
| VIP | V94 CVB913 | V94 CURR VIOL BEFORE 91394 | 02-08-1996 | CURRENT |

### MEDICAL DUTY STATUS ASSIGNMENTS

| Facility | Assignment | Description | Start Date | Stop Date |
|---|---|---|---|---|
| VIP | YES F/S | CLEARED FOR FOOD SERVICE | 07-06-2010 | CURRENT |
| VIP | REG DUTY | NO MEDICAL RESTR–REGULAR DUTY | 07-08-2010 | CURRENT |

# EXHIBIT S

March 20, 2018

To Whom It May Concern:

This is to let you know that Mutulu Shakur, Reg. No. 83205-012,
a federal inmate in the Federal Bureau of Prisons, has worked
for me as an adult continuing education tutor in the USP
Victorville, California, Education Department since May 2013.
He teaches a human rights class to other inmates.  He maintains
a good attitude and motivates other inmates to participate in
education programs.  If you have any questions for me, please
call (760) 530-5091.

Sincerely,

Matthew J. Schuldt
Assistant Supervisor of Education
USP Victorville

# EXHIBIT T

December 28, 2017

To Whom It May Concern;

This letter is being written, at the request of Inmate SHAKUR, MUTULU Reg #83205-012, to document his participation in the Suicide Watch Inmate Companion program. Inmate SHAKUR was trained as a Suicide Watch Inmate Companion at USP Atlanta on 02/07/2005. He was successful in completing 8 hours of specialized training in suicide prevention and working with individuals suffering from mental illness. His inmate companion duties included the following:

- Attend all training and supervision sessions.
- Maintain constant visual observation of the inmate on watch.
- Write entries in the suicide watch log book at least every 15 minutes.
- Log in all other important information and changes related to the suicide watch during his suicide watch shift.
- Notify staff of all emergencies and important developments during the suicide watch. If there is no staff in the area, the companion will immediately call control center using the phone in the suicide watch area.
- Maintain clear and accurate communication with staff during periodic staff checks.
- Demonstrate effective listening and appropriate verbal communication, with the inmate on watch. The companions will not use profane, disrespectful or offensive language towards the inmate on suicide watch under any circumstances.
- Maintain confidentiality of any information received about the inmate on suicide watch by not sharing any information regarding the inmate on watch with any other inmates.

Sincerely,

Dr. S. Peprah, Deputy Chief Psychologist
Federal Bureau of Prisons
FCC Victorville
PO Box 5400
Adelanto, CA 92301

# EXHIBIT U

I, EDGAR MOSQUERA GAMBOA, REG. No. 60512-079, BORN IN COLOMBIA, ATTEST TO THE FOLLOWING ON THE DAY OF _____ TO BE TRUE TO THE BEST OF MY RECOLLECTION.

I, EDGAR MOSQUERA GAMBOA HEREBY PROVIDE THIS TESTIMONY ON BEHALF OF DR. MUTULU SHAKUR, REG. No. 83205-012, WHO IS CURRENTLY IMPRISONED AT THE UNITED STATES PENITENTIARY - VICTORVILLE.

I, EDGAR MOSQUERA GAMBOA, NEVER MET DR. MUTULU SHAKUR BEFORE THE EVENT OF REFERENCE TOOK PLACE, AND ALTHOUGH WE ARE IN THE SAME FACILITY, THE NATURE OF THE ENVIRONMENT DOES NOT ENCOURAGE CROSS CULTURE INTERACTION, WHICH MAKES DR. MUTULU SHAKUR'S ACTIONS THAT DAY MUCH MORE REFLECTIVE OF HIS INNATE NATURE AND CHARACTER.

ON NOVEMBER 15, 2011 I, EDGAR MOSQUERA GAMBOA, WHILE INVOLVED IN A HANDBALL GAME AT THE USP-VICTORVILLE REC YARD, AN EVENT I RARELY PARTICIPATE IN, SUFFERED A MASSIVE HEART ATTACK (THE SPECIFIC DIAGNOSIS OF WHICH I WAS NOT AWARE AT THE TIME) WHICH MADE ME FEEL AN INTENSE PAIN IN MY CHEST AREA THAT THREW ME TO THE GROUND, AND ALTHOUGH I WAS CONSCIOUS, THE PAIN WAS SO SEVERE AND DEBILITATING THAT I COULD BARELY BREATH AND MY VISION WAS BLURRED. THROUGH THE PAIN AND SEMICONSCIOUSNESS I SAW DR. SHAKUR RACE THROUGH VARIOUS AREAS SEGREGATED BY DIFFERENT CULTURES, GANGS AND RACES, IN ORDER TO ASSIST ME.

136

2/

His actions were very surprising to me because of the invisible but rigid barriers applied by all organisations in this environment.

Dr. Shakur began to perform numerous techniques I was not familiar with. He asked me questions concerning the nature of what I was experiencing. He probed my body with his fingers applying pressure on various locations. He instructed me to calm down and to concentrate on my breathing, all of which I tried my best to do, with some effort indeed. It alleviated my distress, but clearly I was still in crisis. After a period of time which to me seemed as forever, the medical staff did arrive and I was rushed away in an emergency.

I was taken to Saint Mary Medical Center, were an open chest surgery was performed on me to conduct a triple bypass operation on my heart. I remained in the hospital for 12 days, and still today I'm not fully recovered.

Although I am now aware of the political status of Dr. Shakur, who many here call "Doc", I have never had a political or social conversation with him prior to that day. The only interaction after I was returned to the U.S.P. has been the daily greetings and encouragement for rehabilitation from my surgery.

I would like to state that, now that I understand

137

3/

Dr. Shakur's political status, it's clear to me that we have two different world views. Therefore my respect and admiration is based on what I believe is the humane character of his gesture and actions.

The techniques Dr. Shakur performed on me could have delayed the effect of the attack I was suffering. In other words, it could have given me some precious time to reach the operation room where my life was saved, and therefore I am very grateful for what he did.

Edgar Mossuera Gamboa
Reg. No. 60512-079

01-12-12
DATE

✱ See Attached Cd. acln ✱



JACOBA WILSON
Commission # 1890452
Notary Public - California
San Bernardino County
My Comm. Expires May 21, 2014

138

# ACKNOWLEDGMENT

State of California County of San Bernardino

On ___January 12th 2012___ before me, Jacoba Wilson Notary Public

personally appeared
___Edgar M Gamboa___, who
proved to me on the basis of satisfactory evidence to be the person whose name is
subscribed to the within instrument and acknowledged to me that he executed the same
in his authorized capacity, and that by his signature on the instrument the person, or the
entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that
the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

JACOBA WILSON
Commission # 1890452
Notary Public - California
San Bernardino County
My Comm. Expires May 21, 2014