**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) |
| - against - | ) No.  82 CR 312 (CSH) |
| MUTULU SHAKUR, | ) |
| Defendant. | ) **NOVEMBER 2, 2020** |

_____

### RULING ON DEFENDANT'S MOTION
### FOR COMPASSIONATE RELEASE

**HAIGHT, Senior District Judge:**

Defendant Mutulu Shakur renews a motion before this Court for reduction of his sentence. This Ruling resolves that motion.

I

Shakur is currently serving a 60-year sentence of imprisonment imposed following his conviction in 1988 in this Court for conspiracy to violate RICO, participation in a racketeering enterprise, bank robbery, armed bank robbery, and bank robbery murder.  Shakur was tried together with a co-defendant, Marilyn Jean Buck, who was convicted on the same charges.

 Shakur has filed a motion in this Court for a reduction of his sentence and a "compassionate release" from custody.  He bases that motion upon the First Step Act of 2018, 18 U.S.C. § 3582(c)(1)(A).  In a Preliminary Ruling dated May 27, 2020, 2020 WL 2749686, familiarity with which is assumed, I construed the First Step Act to require that Shakur first address his request for reduction of sentence to the federal Bureau of Prisons ("BOP") before filing a motion for that relief in the District Court.  The Preliminary Ruling also stated that such a request to the BOP "must be

1

acted upon within thirty days of its receipt by the warden," and "If that period of time lapses without response, the Court will proceed to consider the motion's merits (which have been thoroughly briefed already)."  2020 WL  2749686, at *7.

Obedient to that ruling, Shakur promptly filed with the BOP a "Petition for Compassionate Release" dated May 28, 2020.  Shakur contended that the BOP should move immediately for a reduction of  his sentence.  The BOP has taken no action with respect to that petition.  The thirty days specified for the BOP's response elapsed on or about June 30.  Shakur renews his motion before this Court.  The Court now considers the merits of Shakur's motion.

II

I have used the phrase "compassionate release" because that is way courts have come to characterize the reduction of sentence an inmate seeks in such a motion.  The First Step Act, which extended to district courts the authority to reduce sentences which had previously been vested exclusively in the BOP, does not use that term.  The Act provides that the court "may reduce the term of imprisonment" if it finds that "extraordinary and compelling reasons warrant such a reduction." The characterization of a resulting reduction as a "compassionate release" was fashioned by judges, not the Congress: *see, e.g., United States v. Brooker*, No. 19-3218-CR, 2020 WL 5739712 (2d Cir. Sept. 25, 2020), construing the First Step Act ("The statute authorizing compassionate release as it exists today was first enacted as part of the Comprehensive Crime Control Act of 1984. . . . No matter what other changes Congress made to the compassionate release statute over the years, the BOP's absolute control over this mechanism for lenity remained.").  2020 WL 5739712, at *2.

It is striking that judges, not the Congress, coined the phrase "*compassionate* release." "Compassion," the root noun for the adjective "compassionate," is a subjective, broadly defined,

emotional state of mind;[1] the word sits unnaturally in the objective, precise, narrow language of the law.

Shakur's motion presents the question whether, in the circumstances of his case, the Court should grant him a reduction of sentence resulting in what the law has come to call a compassionate release. It is necessary to consider cases which define that concept, and grant or deny the requested relief.

### III

The First Step Act, which conferred Shakur's ability to file a compassionate release motion with the district court, was enacted by Congress "amidst widespread complaints about the failure of the BOP to file motions on prisoners' bring a motion on the behalf," *United States v. Gionfriddo*, No. 3:18-cr-307, 2020 WL 3603754 (D.Conn. July 2, 2020), at *2. The Act, which became effective on December 21, 2018, provides in pertinent part in 18 U.S.C. § 3582(c):

> The court may not modify a term of imprisonment once it has been imposed except that – (1) in any case – (A) the court, upon motion of the Director of the Bureau of Prisons, *or upon motion of the defendant* after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . , after considering the factors set forth in section 3553(a) to the extent they are applicable.

(emphasis added). I have emphasized the phrase that introduces the First Step Act's principal reform: extending to district courts the authority to entertain prisoners' motions for sentence, which

---

[1] The Compact Edition of the Oxford English Dictionary (1971 ed.) at 489 defines "compassion" as: "The feeling or emotion, when a person is moved by the suffering or distress of another, and by the desire to relieve it; pity that inclines one to spare or to succour."

had previously fallen within the exclusive authority of the BOP.

As I previously observed in the Preliminary Ruling: "The combined result of the First Step Act in 2018 and the COVID-19 pandemic in 2020 has been an uncontained increase of motions in district courts by federal inmates seeking to reduce the length of their sentences." 2020 WL 2749686, at *4. The predictable multitude of district court decisions, not all reconcilable, gave rise to uncertainties as to the scope of the reasons a district judge could consider in deciding whether to grant or deny compassionate release. On September 25, 2020, the Second Circuit decided *United States v. Brooker*, 2020 WL 5739712, which answers that question in this Circuit.[2]

Judge Calabresi's opinion begins by observing that although the First Step Act overturned history, "it often did no more than shift discretion from the Bureau of Prisons to the courts." 2020 WL 5739712, at *1. That left open the question posed by the Second Circuit:

> We must today decide whether the First Step Act empowered distirct courts evaluating motions for compassionate release to consider *any* extraordinary and compelling reason for release that a defendant might raise, or whether courts remain bound by U.S. Sentencing Guidelines Manual § 1B1.13 Application Note 1(D), which makes the Bureau of Prisons the sole arbiter of whether most reasons qualify as extraordinary and compelling.

*Id*. The Second Circuit foretold its conclusion:

> Because we hold that Application Note 1(D) does not apply to compassionate release motions brought directly to the court by a defendant under the First Step Act, we vacate and remand the district court's contrary decision.

---

[2] When the Second Circuit decided *Brooker*, on September 25, 2020, Shakur's motion for compassionate release had been filed and fully briefed, and was pending for decision by this Court. Unaccountably, neither counsel for Shakur nor for the government called the *Brooker* decision to this Court's attention. This Court became aware of *Brooker* through its routine efforts, not always successful, to keep apprised of significant legal events.

2020 WL 5739712, at *1, and then concluded that

> the First Step Act freed district courts to consider the full slate of
> extraordinary and compelling reasons that an imprisoned person
> might bring before them in motions for compassionate release.
> Neither Application Note 1(D), nor anything else in the now-outdated
> version of Guideline § 1B1.13, limits the district court's discretion.

*Id*. at *7. The opinion adds, in footnote 5 to *8: "Because Application Note 1(D) does not bind

district courts, they are similarly not bound by BOP's updated guidance on what counts as an

extraordinary and compelling reason."

The Second Circuit arrived at these conclusions in *Brooker* after analyzing the history of

federal sentencing law prior to enactment of the First Step Act in 2018. *Brooker*, decided in 2020,

notes that "the statute authorizing compassionate release as it exists today was first enacted as part of

the Comprehensive Crime Control Act of 1984," a statute that "created the substantive standard that

we still apply: whether 'extraordinary and compelling reasons' exist for compassionate release."

2020 WL 5739712, at *2. "That original statute, unlike the current law, gave BOP exclusive power

over all avenues of compassionate release," an "absolute control over this mechanism for lenity " the

BOP retained during updatings by the U.S. Sentencing Commission of Application Note 1(D) to §

1B1.13 of the Sentencing Guidelines. *Id*.

Given that history, the enactment of the First Step Act gave rise to a question which *Brooker*

notes "has split district courts across the country." 2020 WL 5739712, at *5. The Second Circuit

summarized the dispute:

> A majority has concluded that, despite Application Note 1(D), the
> First Step Act freed district courts to exercise their discretion in
> determining what are extraordinary circumstances. A sizable
> minority, including the district court below, has reached the opposite
> conclusion, holding that Application Note 1(D)'s language continues

5

to preclude court action, absent a motion by the BOP.

(citations omitted). The Second Circuit resolved the dispute in *Brooker*: "We agree with the majority position, and so vacate and remand the district court's decision." *Id.* One can understand Judge Calabresi's comment in *Brooker* that the decision "freed" district judges to use their discretion in deciding motions for compassionate release.

"Nor can we say, as a matter of law," the Second Circuit continued in *Brooker*, "that a court would abuse its discretion by granting someone compassionate release on this record. It bears remembering that compassionate release is a misnomer." The First Step Act, the Second Circuit observed, "in fact speaks of sentence reductions,"[3] which may be accomplished in a variety of ways, and the court of appeals reminds us that "a district court's discretion in this area – as in all sentencing matters  – is broad."*Id.* at *8.

The district court in *Brooker* took a constricted view of its authority under the First Step Act. The Second Circuit reversed, listed possible reasons for granting compassionate release to the defendant, held that consideration of such factors, "whether in isolation or combination, is best left to the sound discretion of the trial court in the first instance," and vacated and remanded the case "to allow the district court to consider the possible relevance of these and any other factors, and then to exercise the discretion that the First Step Act gives to it." *Id.* at *9.

IV

Thus, the granting or denial of Mutulu Shakur's motion for a compassionate release falls within the Court's discretion. In approaching the case, I am "freed" by the *Brooker* decision "to

---

[3] "*Compassionate* release" is a misnomer because the adjective invokes the full range of the human spirit. A "sentence reduction" is derived from the language of the law.

consider the full slate of extraordinary and compelling reasons" Shakur might urge; nothing in the Sentencing Guidelines Application Notes "limits the district court's discretion."

However, my discretion is not entirely unfettered.  The First Step Act itself provides in § 3582(c)(1)(A) that this Court may reduce the term of Shakur's imprisonment, "*after considering the factors set forth in section 3553(a) to the extent they are applicable,* if it finds that (i) extraordinary and compelling reasons warrant such reduction."  (emphasis added).  § 3553(a), captioned "Factors to be considered in imposing a sentence," lists several specific factors, preceded by: "The court, in determining the particular sentence to be imposed, shall consider - - " The First Step Act protocol governing compassionate releases mandates my consideration of the § 3553(a) factors, insofar as they are applicable to Shakur's case.  The Court's reduction of Shakur's sentence, without considering the § 3553(a) factors, would be an abuse of discretion.[4]

District courts proceeding under the First Step Act routinely evaluate a defendant's assertion of § 3582(c)(1)(A)(i) "extraordinary and compelling reasons" for a sentence reduction in the light of the § 3553(a) factors.  In *United States v. Gionfriddo*, No. 3:18-cr-307, 2020 WL 3603754 (D.Conn. July 2, 2020), Judge Meyer said that "Beyond a court's determination as to whether there exists 'extraordinary and compelling reasons' for a sentence reduction, a court must also 'consider the factors set forth in 18 U.S.C. section 3553(a) to the extent they are applicable," which requires  the court to "examine the same factors it did when it initially sentenced the defendant, including the nature and circumstances of the crime, the defendant's history and characteristics, and the multiple

---

[4]   The First Step Act also provides, in § 3582 (c)(1)(A), that a court, in order to reduce a sentence under that section, must also find that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."  The case at bar does not present a decisive issue arising out of a Commission policy statement.

7

purposes of sentencing, such as providing just punishment, deterring crime, protecting the public from further crimes by the defendant, and providing the defendant with rehabilitation." 2020 WL 3603754, at *3. *See also United States v. Brunstorff*, No. 3:12-cr-00004, 2020 WL 6110961, at *2 (D.Conn. Oct. 16, 2020) (O'Shea, *J.*) (construing the First Step Act, "I may reduce Brunstorff's term of imprisonment if (1) he has fully exhausted his administrative remedies or 30 days have passed from receipt of his request by the Warden, and (2) I find, *after considering the Section 3553(a) factors*, that 'extraordinary and compelling reasons warrant' a reduction of his term of imprisonment.") (emphasis added); *United States v. Rodriguez*, No. 00 Cr. 761-2, 2020 WL 5810161, at *5 (S.D.N.Y. Sept. 30, 2020) (Rakoff, *J.*) ("Having found extraordinary and compelling reasons for a sentence reduction, the Court must now determine whether, and if so how much of, a sentence reduction is warranted by those reasons *and is appropriate based on the Section 3553(a) factors* and applicable policy statement.") (emphasis added); *United States v. Ebbers*, 432 F.Supp.3d 421, 429 (S.D.N.Y. 2020) (Caprioni, *J.*) ("After finding 'extraordinary and compelling reasons,' a court must then 'consider[] the factors set forth in section 3553(a).").

It is generally held that a district judge's consideration of the § 3553(a) factors may preclude the reduction of a particular defendant's sentence, even though other circumstances would have constituted extraordinary and compelling reasons for doing so. *See, e.g., Simon v. United States*, No. 07 Crim. 474, 2020 WL 5764322, at *3 (S.D.N.Y. Sept. 28, 2020) (Ramos, *J.*) (construing the First Step Act and citing *Brooker*; "Assuming arguendo that Simon's medical conditions constitiute extraordinary and compelling circumstances, which the Government concedes, any reduction in Simon's sentence would be inconsistent with the factors enumerated in § 3553(a)."); *United States v. Agostini*, No. 00 CR 237, 2020 WL 6047362, at *2 (S.D.N.Y. Oct. 13, 2020) (Marrero, *J.*) (citing

8

*Brooker*; "However, even assuming Agostini has demonstrated 'extraordinary and compelling reasons' under Section 3582, the Section 3553(a) factors would still weigh against his release on balance.").

V

These principles govern Shakur's present motion for a compassionate release.

The most recent record includes the briefs of counsel, affidavits from physicians, and letters to the Court from the family of Shakur and the families of the three murder victims in the underlying crimes.

Shakur's current medical condition is a cause of grave concern. He is 69 years of age. The BOP denied Shakur's first request for a compassionate release in a memorandum dated December 5, 2019, which recited Shakur's diagnosis of multiple myeloma (a cancer of plasma cells), stated that "thus far, Mr. Shakur has tolerated chemotherapy with no adverse effects," "his life expectancy is currently considered to be indeterminate and as long as seven years," and "could possibly be further extended with a stem cell transplant." The BOP concluded at that time that Shakur's condition did not fall within its First Step Act regulations' definition of "terminal medical condition" (life expectancy of 18 months or less). In late December 2019, Shakur was moved from a prison in Victorville, California to the Federal Medical Center in Lexington, Kentucky for cancer treatment). Counsel for Shakur say that in October 2019, "a private Victorville oncologist" opined that Shakur had "advanced stage cancer and had about two years to live." Main Brief [Doc. 195] at 2. Medical tests indicate that Shakur's cancer has spread to his skull, his jaw, and his shoulders. Multiple myeloma has no cure. Treatment can slow its progress. Shakur has also been diagnosed in prison as hypertensive and diabetic. He has survived a stroke.

9

Shakur's prospects are adversely affected by the COVID-19 virus. Shakur submits the opinions of medical experts that confinement in a prison setting where the virus is present increases the likelihood of spreading the infection: a conclusion fully in accord with common sense. Counsel for Shakur say in their most recent submission, a letter brief dated June 28, 2020 [Doc. 203], that "as of June 28, 2020, BOP reports 254 infections of people incarcerated at FMC Lexington (an infection rate of 19%)" and "six of those people have died." The United States Attorney does not dispute those figures, which are said to be furnished by the BOP itself.

Sometimes, in a compassionate release case, the government concedes that a prisoner's medical condition, if standing alone, would constitute "extraordinary and compelling reasons" for sentence reduction under the First Step Act, but resists that remedy when the § 3553(a) factors are added to the analysis (as they must be). In the case at bar, the government does not offer that concession. Rather, the United States Attorney's Letter Brief [Doc. 198] at 7 (dated May 1, 2020) opposes Shakur's release by arguing that (1) as of that date, Shakur's condition did not qualify as an "extraordinary and compelling reason" as defined by the Sentencing Guidelines Application Notes; and (2) COVID-19 does not pose an unacceptable risk, since "Shakur is housed at FMC Lexington, a BOP medical center, which is closed to visitors and has only five confirmed cases among nearly 1500 inmates." Those two contentions are not presently persuasive. First, the government's parsing of the Application Notes does not survive the Second Circuit's subsequent opinion in *Brooker*. Second, the number of confirmed COVID-19 cases at FMC Lexington has grown markedly since the government submitted its brief.

Of course, the more recent 19% infection rate at FMC Lexington, stressed by Shakur, means that 81% of the 1500 inmates are *not* infected, a calculation that cuts across Shakur's perception of

10

his own infection as near-inevitable.  However, Shakur's age of 69, and medical conditions including cancer whose treatment reduces his immune systems, render him more vulnerable to the virus.

I will assume *arguendo* that Shakur's medical conditions, when combined with the presence of COVID-19 in FMC Lexington, would combine to constitute an extraordinary and compelling reason for Shakur's release.  But those circumstances do not stand alone.  I must now consider the effect of the factors listed in 18 U.S.C. § 3553(a).

VI

18 U.S.C. § 3553(a) provides: "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." Subsection (a) then provides that the court, "in determining the particular sentence to be imposed, shall consider – (1) the nature and circumstances of the offense and the history and characteristics of the defendant."  The "purposes" set forth in subparagraph (2), which the sentence is intended to achieve, include "the need for the sentence imposed – (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."

In the case at bar, the "nature and circumstances" of the underlying offense are horrendous and its seriousness is extreme.  One may refer to and quote the Second Circuit's opinion rejecting the joint direct appeal of Shakur and his co-defendant, Buck: 888 F.2d 234 (2d Cir. 1989).  "Shakur and Buck were participants in a group known as the 'family'" whose political goal was to "further its conception of the Black struggle in America" but whose "means of attaining those goals were violently criminal."  From 1976 to October 1981, the group "committed a succession of robberies and attempted robberies of armored trucks in the Northeast.  Shakur was one of the leaders of a small group of men who planned and executed the robberies, while Buck was a member of the so-called

11

'secondary team,' a group consisting mostly of women who assisted in the robberies by driving get-away cars, planning escape routes, and renting 'safe houses.'" 888 F.2d at 236. The group's "final and most notorious crime, the 'Brinks robbery' of October 20, 1981, resulted in the shooting deaths of a Brinks guard and two police officers in Nanuet and Nyack, New York." *Id*.

The trial of the resulting consolidated indictments, which commenced on November 8, 1987 and concluded on May 11, 1988 with jury verdicts of guilty against both defendants on all counts, included testimony from informer and non-informer witnesses and exhibits, from which the jury was enitled to find that on October 20, 1981, Shakur planned and participated with others in an armed robbery of a Brinks armored truck in Nanuet. During the robbery Peter Paige, a Brinks armored truck guard, was shot and killed. Attempting to flee the scene, Shakur and others were stopped at a road block by Nyack police officers. A shoot-out ensued, during which two police officers, Sergeant Edward O'Grady and Officer Waverly Brown, were killed. Shakur was a fugitive until February 1986, when the FBI arrested him in Los Angeles. He was returned to this District for trial.

Following his conviction, this Court sentenced Shakur to 60 years' imprisonment, with a recommendation that the BOP deny parole (which at that time was still available under federal sentencing law). The Parole Commission has from time to time denied Shakur's requests for parole. The government advises in its Letter Brief at 2 that Shakur is scheduled to be released from custody on Decmber 15, 2024.

The government contends that "Shakur's crimes are simply too reprehensible for compassionate release." Letter Brief at 7. Citing § 3553(a), the government urges that "the Court should require Shakur to serve his full sentence in order to reflect the seriousness of the offense, promote resepct for the law, provide just punishment, and afford adequate deterrence," *id.* at 8, and

12

adds that such a conclusion would be "consistent with the Court's recommendation at sentencing that

Shakur not be eligible for parole."

Counsel's briefs for Shakur on this motion sensibly do not suggest that Shakur's crimes are

anything but serious.  Their contention is that Shakur "has now served 34 years in prison, which is

nearly half his life.  Granting him compassionate release at this point 'will not prevent him from

being adequately punished nor will it discount the seriousness of his offense or diminish the message

that his crimes were unacceptable."  Shakur's Main Brief at 23 (citing and quoting *United States v.*

*Ebbers*, 432 F.Supp.3d at 432).  Judge Caprioni granted the defendant in *Ebbers* compassionate

release.  Her opinion is persuasive, but perhaps not in the way Shakur had in mind.

A jury convicted Ebbers of securities fraud, for deceiving the investing public and the SEC

concerning WorldCom, Inc's true financial condition.  The district court sentenced Ebbers to 25

years' imprisonment.   After serving 13 years, Ebbers moved under the First Step Act for

compassionate release.  The court found that freeing Ebbers would not imperil the public.  By that

time, Ebbers's physical and mental condition had deteriorated to a such a degree that Judge Caprioni

described it thus:

> He is sick, weak, disoriented, and bedridden.  His ability to care for
> himself is nearly gone, his cognitive functions are impaired, and his
> body is wasting away.  His remaining time on earth will be spent in
> end-of-life care, not fashioning fraudulent securities schemes.

Judge Caprioni concluded:

> Thirteen years of incarceration  – up to the point of approaching death
> – is not a slap on the wrist; it seems likely that no one who might be
> considering commiting accounting fraud would view his sentence as
> lenient.  Far from it  – Ebbers has essentially served the life sentence
> that the sentencing court predicted it had imposed.

13

432 F.Supp.3d at 432-433.[5]

The differences between *Ebbers* and the case at bar are manifest.  Ebbers's underlying crime of securities fraud deprived investors of money.  Shakur's crimes of murder during armed robbery deprived a Brinks employee and two serving police officers of their lives.  When Ebbers applied for and received compassionate release, he was approaching death; his conceptual life sentence had been "essentially served."  Shakur's cancer may eventually prove fatal, but his death is not imminent, and his COVID-19 infection in the prison population is not certain.

Shakur's motion relies upon § 3553(a)(6), which requires a sentencing court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  Shakur's Main Brief recites at 24 a list of nine individuals described as Shakur's "co-conspirators." The list includes Marilyn Buck, who was tried with Shakur in the instant case, and eight other persons, who were convicted one way or another in other cases. Shakur's brief recites the "time sentenced" and "time served" for each individual, and makes the argument: "Granting compassionate release would not create any unfair sentence disparity.  Mr. Shakur remains the last of his co-conspirators in prison."  If this argument is intended to suggest that Shakur's release is necessary to *avoid* an "unwarranted sentence disparity" with the time served by other individuals, there is no substance to it.  The record in this case does not reveal the circumstances of these other individuals' complicity, sentencing, or release.  The closest comparator to Shakur is his trial co-defendant, Buck, who received a lengthy sentence, contracted uterine cancer while in prison, obtained a compassionate release from the BOP on July 15, 2010, and died at her

---

[5]   Judge Caprioni's perception came to pass.  The court granted Ebbers's motion for compassionate release on December 18, 2019.  Ebbers died at his home in Mississippi on February 2, 2020.

home on August 3, 2010, at the age of 62.  At the time of her compassionate release, Marilyn Buck's situation more closely resembles that of Bernard Ebbers than the present circumstances confronted by Shakur.

Before the trial began, Shakur moved to dismiss the indictment against him.  I denied that motion in an opinion reported at 690 F.Supp. 1291 (S.D.N.Y. 1291 (1988), which at 1292 describes Shakur's argument: "He contends that the acts charged in the indictment are political acts which are not properly the subject of criminal prosecution.  He further contends that under applicable treaties and international law he is a prisoner of war, and thus immune from prosecution for the acts charged in the indictment."  While Shakur did not appeal from the denial of that jurisdictional motion, his view is echoed today in the website "mutulushakur.com" (visited October 29, 2020), where Shakur refers to himself as a "political prisoner" because "the crimes of which he was convicted were politically motivated, not motivated  by greed or revenge."

That distinction is lost on the families of the three murder victims.  The sons of Paige and Brown and the widow of O'Grady have written to the Court, describing their and their families' losses and continuing anguish, and opposing Shakur's release in the strongest possible terms.

VII

The First Step Act requires me to consider "the factors set forth" in 18 U.S.C. § 3553(a) before the Court is in a position to find whether Shakur has shown that "extraordinary and compelling reasons warrant" a reduction of sentence under § 3582(c)(1)(A)(i).

The first § 3553(a) factors the court must consider are "the nature and circumstances of the offense  and the characteristics of the defendant."  § 3553(a)(1).  § 3553(a) also commands the court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth

in paragraph (2) of this subsection."   § 3553(a)(2) directs the court to consider "the need for the sentence imposed – (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct;" . . . .

At one level of consideration, Shakur's years of age and incarceration, medical condition and the COVID-19 virus combine to make a *sympathetic* reason for reducing his sentence and releasing him to the care of his family in Los Angeles.  The decisions a sentencing judge must make can be difficult, as when a defendant and his family appeal to the judge's sense of compassion.

In this case, the § 3553(a) factors make it impossible for the Court to find that Shakur demonstrates "extraordinary and compelling reasons" for a *compassionate* release.  Shakur's criminal conduct, indefensibly undertaken for political reasons, resulted in the murder of a law-abiding private security guard and two serving law enforcement officers, losses of life which caused endless grief to three families.  It is difficult to imagine how "the nature and circumstances of the offense" and the "history and characteristics" of Shakur when he committed it could argue more strongly against a reduction of the sentence the Court imposed: a sentence that reflected then, and reflects now, "the seriousness of the offense" and the need "to provide just punishment for the offense."

It follows that Shakur's motion under the First Step Act for a reduction of his sentence fails. Shakur will continue the term of his imprisonment at the Lexington facility, undergoing medical treatment, until December 2024, when he will have served the full amount of time imposed.

Should it develop that Shakur's condition deteriorates further, to the point of approaching death, he may apply again to the Court, for a release that in those circumstances could be justified as

"compassionate."  That is what occurred in the cases of Shakur's co-defendant, Marilyn Buck, and Bernard Ebbers.

VIII

For the foregoing reasons, Mutulu Shakur's motion under the First Step Act for a reduction of his sentence is DENIIED.

It is SO ORDERED.

Dated:   New Haven, Connecticut
             November 2, 2020


                                  s/ <u>CHARLES S. HAIGHT, JR.</u>
                                     CHARLES S. HAIGHT, JR.
                                  Senior United States District Judge

17